**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION**

| | |
|---|---|
| TAMMY BARKER, TIMOTHY ROBERT BARKER, AND MELISA MERRYMAN, on behalf of themselves and on behalf of those similarly situated, ) ) ) | |
| ) | No.        08-cv-50015 |
| Plaintiffs, ) | |
| ) | Hon. Judge Philip G. Reinhard |
| v. ) | |
| ) | Magistrate Judge P. Michael Mahoney |
| LOCAL 150, INTERNATIONAL UNION OF OPERATING ENGINEERS, AFL-CIO, ) ) | Trial By Jury Demanded |
| ) | |
| Defendant. ) | |

**FIRST AMENDED COMPLAINT**

Now come the Plaintiffs, TAMMY BARKER (hereinafter referred to as "Mrs. Barker"),

TIMOTHY BARKER (hereinafter referred to as "Mr. Barker") AND MELISA MERRYMAN, by and

through their attorneys, Robert T. Hanlon, of The Law Offices of ROBERT T. HANLON AND

ASSOCIATES, P.C., and Dean J. Polales, of UNGARETTI & HARRIS LLP, complaining of the

Defendant, LOCAL 150, INTERNATIONAL UNION OF OPERATING ENGINEERS, AFL-

CIO (hereinafter at times referred to as "Local 150"), and state as follows:

**NATURE OF ACTIONS**

1.        This Complaint contains four counts.  Count One is an action arising under the

Drivers Privacy Protection Act of 1994, 18 U.S.C. § 2721 *et seq*., ("DPPA") and seeks a

monetary remedy against Local 150 for unlawfully obtaining, disclosing and using motor vehicle

records in the amount of statutory minimum damages of $2,500 for each unlawfully obtained,

disclosed or used motor vehicle record, other damages for compensable injuries to plaintiffs and

members of a class or persons, injunctive relief under this Court's equitable powers to remedy

Defendant Local 150's, violations of the Drivers Privacy Protection Act, 18 U.S.C. § 2721 *et seq*., as it relates to the class and to the named Plaintiffs, and reasonable attorney fees, costs and expenses.  In Count II Mrs. Barker is the only plaintiff and seeks a Declaration by this Court that the actions of Local 150, in stalking, following, intimidating and harassing Mrs. Barker as set forth therein, are unlawful and not privileged as well as damages relating to said conduct.  In Count III Mrs. Barker is the only plaintiff and seeks injunctive relief and damages pursuant to a state pendent claim of Intentional Infliction of Emotional Distress.  In Count IV, Mr. Barker & Mrs. Barker seek injunctive relief and damages against Local 150 for Intrusion Upon the Seclusion of Mrs. Barker and Mr. Barker.

### JURISDICTION, VENUE & PARTIES

2.      This Court has jurisdiction to hear Count I because the claim arises under a federal statute and this Court has jurisdiction pursuant to the DPPA, 18 U.S.C. § 2724(a) (conferring jurisdiction on the United States District Courts for actions under the DPPA, 18 U.S.C. § 2721 *et seq*.) and 28 U.S.C. §1331 (Federal question jurisdiction). Count II is presented herein under both federal question jurisdiction and ancillary and pendent jurisdiction; Counts III and IV are presented herein pursuant to federal question jurisdiction and principles of ancillary and pendent jurisdiction.

3.      Venue is proper in the Northern District of Illinois because, amongst other things, a substantial part of the events or omissions giving rise to the claims occurred, and acts of Defendant Local 150 relating to each cause of action set forth herein took place in this District and the Defendant maintains its principal office in this District and regularly conducts its activities in this district.

4.      Plaintiffs, Mr. and Mrs. Barker, reside in Cary, Illinois in the Northern District of Illinois.

5.      Plaintiff Melisa Merryman resides in Woodstock, Illinois in the Northern District of Illinois.

6.      Defendant Local 150 is a labor organization with its principal office located in Countryside, Illinois that conducts activities within the Northern District of Illinois.  Defendant Local 150 by and through its officers, agents and employees regularly engages in and transacts its activities in the counties comprising the Northern District of Illinois.

7.      A substantial portion of the events giving rise to these claims occurred in the Northern District of Illinois. Venue is, therefore, properly placed in this Court pursuant to 28 U.S.C. § 1391.

8.      Definitions.  As used herein, the following terms have the following meanings:

a.      "Pursuit Agent" shall mean any officer, employee or agent of Local 150 following, conducting surveillance of, and/or harassing Mrs. Barker and includes but is not limited to the following individuals:  Mike Aprile, Joe Farrell, Jim Schweihs, Nicholas Cline, Thomas Rottman, and Ryan Drew.

b.      "Pursuit Vehicles" are automobiles owned by, leased by, used by or operated by Local 150 and its officers, employees and agents as Pursuit Agents (as defined hereinabove); some of which are black Ford Crown Victoria automobiles with video cameras mounted on the vehicle dashboard; often having strobe lights clipped to the interior visors immediately behind the blue tinting at the top of the vehicle's windshield.

**COUNT I**
**Violation of the Drivers Privacy Protection Act, 18 U.S.C. § 2721 *et seq***

9.      Plaintiffs, restate and re-allege the allegations of paragraphs 1-8 as if fully set out herein in this Count I.

10.      This action arises under a federal statute and this Court has jurisdiction pursuant to the DPPA, 18 U.S.C. § 2724(a) (conferring jurisdiction on the United States District Courts for actions under the DPPA) and 28 U.S.C. §1331 (Federal question jurisdiction). This is a class action pursuant to the Driver Privacy Protection Act, 18 U.S.C. § 2721 et seq. (the "DPPA"). Plaintiffs bring this action on their own behalf and on behalf of all similarly situated individuals whose "personal information" is contained in any "motor vehicle record" maintained by the State of Illinois within the meaning of the DPPA, 18 U.S.C. § 2725 (1) and (3), who have not provided "express consent" within the meaning of the DPPA, 18 U.S.C. § 2725 (5) to the State of Illinois for the distribution of their "personal information" for purposes not enumerated in the DPPA, 18 U.S.C. § 2721(b), and whose "personal information" has been knowingly obtained by Defendant Local 150 within the meaning of the DPPA, 18 U.S.C. § 2724, for purposes not authorized by the DPPA, including "to check plates on construction sites only."

11.      The DPPA was enacted as part of omnibus crime legislation passed by Congress in 1993, known as the Violent Crime Control and Law Enforcement Act of 1993, in part to provide privacy protections to individuals' personal information and highly restricted personal information as a result, in part, of several well publicized incidents in which criminals had used publicly available motor vehicle records to identify and stalk their victims.  Those incidents included:

a.  the murder of actress Rebecca Schaeffer in California by a man who had obtained

Schaeffer's address from California's Department of Motor Vehicles;

b.  home invasion robberies by a gang of Iowa teenagers who identified their victims

by copying the license plate numbers of expensive automobiles and used those

license plate numbers to obtain the addresses of the vehicle owners from the Iowa

Department of Transportation; and the Arizona murder of a woman whose home

address identified the Arizona Department of Motor Vehicles.

12.     As originally enacted in 1993, the DPPA made it unlawful for any person or

*organization* to disclose or *obtain* personal information derived from any motor vehicle record,

unless the subject of the information had authorized such disclosure or the request/disclosure

qualified under a recognized exception, including use by a federal or state agency, use in

connection with motor vehicle and driver safety, use in court proceedings, use in certain research

activities relating to certain insurance matters and use for verification of personal information

submitted by the subject of such information.  Use of personal information for marketing

activities was permitted, so long as the States had provided individuals identified in motor

vehicle records with the opportunity to prohibit such disclosures.  This "opt out" provision

effectively gave individuals the right to prohibit such disclosures.  This "opt out" provision

effectively gave the individuals the right to prohibit the States from disclosing personal

information for marketing purposes.  18 U.S.C. §2721 (1993).

13.     Congress significantly amended the DPPA in 1999 by eliminating the "opt out"

provision for marketing activities.  Use or obtaining of personal information contained in motor

vehicle records for surveys, marketing or solicitations was thereafter permitted only if the State

obtained the express consent of the person to whom such information pertained.  Similarly, a

requester of personal information was allowed to obtain such information for any purpose, "if the

requestor demonstrate[d] it ha[d] obtained the express consent of the person to whom such

personal information pertain[ed]." 18 U.S.C. 2721 (b)(13), (14) (1999).  By changing the "opt

out" exceptions of the 1993 to an "opt in" requirement in the 1999 DPPA amendments, Congress

significantly reduced the categories of persons whose personal information may be lawfully

obtained under the Act. The effective date of the 1999 amendments to the DPPA was June 1,

2000.


14.     Under the DPPA a "person" who knowingly obtains, uses *or* discloses "personal

information" concerning another from a motor vehicle record for a purpose not permitted by the

DPPA shall be liable to the individual to whom the information pertains. 18 U.S.C. § 2724.  The

DPPA provides for liquidated damages in the amount of $2,500.00 for each violation of the

DPPA, in addition to Punitive damages upon a showing of a willful or reckless disregard of the

law, reasonable attorney fees and costs and other relief including preliminary and equitable

relief.  18 U.S.C. §2724(b).  A "person" under the DPPA is defined as "an individual,

organization or entity, but does not include a state or agency thereof." 18 U.S.C. §2721(2).


15.     Under the DPPA it is unlawful for a "person" to make false representations to

obtain any personal information from an individual's motor vehicle record. 18 U.S.C. §2722(b).

16.     The Drivers Privacy Protection Act, 18 U.S.C. § 2721, defines the term "personal information" as:

> Information that identifies an individual, including an individual's photograph, social security number, driver identification number, name, address (but not the 5-digit zip code), telephone number, and medical or disability information, but does not include information on vehicular accidents, driving violations, and driver's status.

17.     Upon information and belief, the Plaintiffs allege all of the following facts and circumstances through the end of the Complaint, which facts and circumstances give rise to the claims made in this Complaint.

18.     Beginning on a date unknown, but not later than June 2003, and continuing thereafter to at least 2008, Defendant, Local 150 has obtained, disclosed and used personal information contained in motor vehicle records relating to Tammy Barker, Timothy Robert Barker, Melisa Merryman and millions of other persons, for purposes not permitted under the DPPA, including but not limited to the following:

a.     Local 150, obtained license plate data containing "personal information" for vehicles registered in Illinois in violation of the Drivers Privacy Protection Act, 18 U.S.C. § 2721 et seq, including, but not limited to, information related to registered vehicles in the State of Illinois containing not only the license plate number, but the expiration, an Illinois reference number, the make, year, Vehicle Identification Number, Owner's Name, Address, Zip code, and Driver's License Number (which contains a code for dates of birth and other identifying information) from the Illinois Secretary of State.

b.     In 2004 and 2005, Defendant Local 150 obtained from the Illinois Secretary of State sets of computer disks containing millions of separate and distinct motor

vehicle records which in turn contained Personal Information for millions of Illinois citizens, residents, motor vehicle owners and motor vehicle operators associated with each record it received via either overnight courier services or the United States Mail.

c.    Defendant obtained and stored motor vehicle data on electronic storage mediums or on storage devices including, but not limited to, compact discs and its computers and has loaded software allowing it to search for specific records on at least one of its computers.

d.    After obtaining the named Plaintiffs' "personal information", as defined in the Act, from motor vehicle records, Defendant Local 150's, Pursuit Agents have appeared outside Mr. Barker's home, accosted, assaulted, stalked, or otherwise engaged in reckless conduct directed toward Mrs. Barker.

e.    Prior to Mrs. Barker, providing any information as to her identity and her home address to Local 150, Defendant Local 150's Pursuit Agents addressed Mrs. Barker by name and appeared at her home.

f.    Mrs. Barker has not expressly consented to the release of her motor vehicle records as required by the DPPA.

g.    Mr. Barker has not expressly consented to the release of his motor vehicle records as required by the DPPA.

h.    Melisa Merryman has not expressly consented to the release of his motor vehicle records as required by the DPPA.

19.    Defendant Local 150 has obtained personal information, as defined in the Act, related to plaintiffs and millions of other people, without obtaining their written consent and without their express consent having been given to the State of Illinois from which Defendant Local 150 obtained their records. More specifically, public records available from the Illinois

Secretary of State demonstrate that on June 4, 2003 or thereabouts, Local 150 executed an

Agreement for purchase of vehicle registration microfiche plate number and sequence,

representing that the purpose of obtaining the records was "TO CHECK PLATES ON

CONSTRUCTION SITES ONLY."   Such a purpose is not authorized under the DPPA.


20.     Local 150 paid for the complete Motor Vehicle Database with checks drawn on its

bank account by sending a certified letter containing its checks to the Illinois Secretary of State.


21.     In October 2004, or thereabouts, Defendant Local 150 obtained two CD's

embedded with motor vehicle data containing personal information from the Illinois Secretary of

State.


22.     In 2005, the Defendant again obtained additional CD's containing motor vehicle

data containing personal information from the Illinois Secretary of State.


23.     From and before 2003 to the date of the filing of this Complaint, Plaintiffs have

been residents of the Northern District of Illinois and owners of vehicles registered in the State of

Illinois and holders of Illinois Drivers licenses, each constituting a "motor vehicle operators

permit," referenced in the DPPA, 18 U.S.C. § 2725(1).  Plaintiffs are and have also been the

owners and operators of automobiles registered in Illinois, for which there is a "motor vehicle

title" and Motor vehicle registration," as defined in the DPPA, 18 U.S.C. § 2725(1).  Plaintiffs

Illinois Drivers License, motor vehicle title and motor vehicle registration all contain "personal

information" concerning Plaintiffs, within the meaning of the DPPA, 18 U.S.C. §2725(3). These

records disclose, among other things, Plaintiff's name, address and drivers license numbers.

24.     After the effective date of the 1999 amendment to the DPPA (June 1, 2000), Defendant Local 150 unlawfully obtained "personal information" of individuals, including the named plaintiffs, from the Illinois Secretary of State's "motor vehicle records" in violation of the DPPA, including computer searchable disks as well as microfiche for Illinois vehicles.

25.     Defendant obtained lists of motor vehicle records containing "personal information" from Illinois "motor vehicle records" in violation of the DPPA.

26.     Defendant Local 150's violations of the DPPA have been committed "knowingly" within the meaning of the DPPA 18 U.S.C. §2724(b). In the context of the DPPA, to act knowingly is to act with the knowledge of the facts that constitute the offense. See *Bryan v. United States*, 524 U.S. 184, 193, 118 S.Ct. 1939, 1946 (1998) ("Unless the text of the statute dictates a different result, the term knowingly merely requires proof of knowledge of the facts that constitute the offense.") Defendant, Local 150, knows that it obtained personal information pertaining to individuals from the Illinois Secretary of States' records for purposes not authorized by the DPPA.

27.     The information obtained by the Defendant from "motor vehicle records" contains "personal information" within the meaning of the DPPA, 18 U.S.C. §2725(3).  Local 150 obtained, disclosed and/or used such information for purposes not authorized by the DPPA, including the purposes of "check[ing] plates on construction sites only."  Each record of "personal information" knowingly obtained, disclosed and used for unauthorized purposes from

motor vehicle records is a separate and distinct violation of the DPPA, remediable under DPPA, 18 USC §2724.

28.     The defendant continues to use "motor vehicle records" it previously obtained in violation of the DPPA to identify members of the proposed class.

CLASS ACTION ALLEGATIONS

29.     Pursuant to *Fed. R. Civ. P. 23(b)(3)* plaintiffs bring this action on behalf of themselves , and all others similarly situated, as representatives of the following class (the "Class"):

> Each and every individual whose name, address, driver identification number (driver's license number), are contained in motor vehicle records obtained by the Defendant from the office of the Illinois Secretary of State, without the express consent of such individuals, commencing 4 years prior to the date of the filing of this action and through the date of judgment herein, but excludes all Federal Judges and their family members within the first degree of consanguinity and persons who have expressly authorized the Illinois Secretary of State's office to provide third parties with their "personal information" for any purpose..

30.     The Requirements of *Fed R. Civ. P 23* are met in this case.  The class, as defined, is so numerous that joinder of all members is impracticable.  It is estimated that the class contains in excess of 5,000,000 members.

31.     There are questions of fact and law common to the Class as defined, which common questions predominate over any questions affecting only individual members.  The common questions include:

> a.   whether Local 150 obtained, disclosed and/or used "personal information" from motor vehicle records of members of the class, within the meaning of the DPPA, for the unauthorized purpose of checking plates on construction sites only, and all other unauthorized purposes;

> b.   whether Local 150 obtained, disclosed and/or used personal information" from the "motor vehicle records" of members of the class knowingly and unlawfully, within the meaning of the DPPA, 18 U.S.C. §2724(a).

32.     Plaintiffs can and will fairly and adequately represent and protect the interests of the Class as defined hereinabove and have no interests that conflict with the interests of the Class.  This is because:

    a.  all questions of fact regarding liability of the Defendant are common to the class and predominate over any individual issues that may exist, such that by prevailing on each of their own claims, Plaintiffs will necessarily establish the liability of the Defendant to all class members;

    b.  without the representation provided by the Plaintiff, it is unlikely that any class member would receive legal representation to obtain the remedies specified by the DPPA;

    c.  a remedy available under the DPPA is the liquidated sum of $2,500, which plaintiff intends to seek for each and every members of the Class;

    d.  a remedy available under the DPPA is for injunctive relief, which plaintiff intends to seek for each and every member of the class; and

    e.  Plaintiffs have retained competent counsel, who are experienced in litigation, labor matters and class action litigation.  Plaintiffs and their counsel have the necessary resources to adequately and vigorously litigate this class action, and Plaintiffs and their counsel are aware of their fiduciary responsibility to the class members and are determined to diligently discharge those duties to obtain the best possible recovery for the Class.  Namely, the Law Firm of Ungaretti & Harris has litigated other class action suits and labor matters and has sufficient resources to advance this cause of action.

33.     All Class members have the same legal rights under the DPPA.  Defendant

Local 150's violations of the DPPA have affected the privacy rights of millions of owners and

lessees of motor vehicles in a similar way.  The class action is superior to any other method for

remedying Defendant Local 150's violations of the DPPA given that common questions of fact

and law predominate and the liquidated damage provision of the DPPA provide an identical

minimum monetary remedy to each and every member of the class.  Class treatment is likewise

indicated to ensure optimal compensation for the class and limiting the expense and judicial

resources associated with legions of potential claims.


34.     Local 150 knowingly obtained "personal information", pertaining to the

Plaintiffs and the members of the Class from "motor vehicle records" maintained by the Illinois

Secretary of State in violation of the DPPA.  18 U.S.C. §2721 *et seq*. Local 150's obtaining,

disclosing and using this information for millions of persons was not for a purpose authorized by

the DPPA.


35.     Pursuant to the DPPA, 18 U.S.C. §2724 (a), Local 150 is liable for knowingly

obtaining "personal information" pertaining to Plaintiffs and the members of the Class from

"motor vehicle records," in violation of the DPPA.


36.     Plaintiffs and each of the members of the Class are entitled to liquidated

damages in the amount of $2,500 for each instance in which the Defendant violated the DPPA.


37.     **Authorization and Instigation:**  The aforementioned unlawful conduct consisting

of the obtaining, disclosing and using motor vehicle records containing personal information as

defined in the DPPA, has occurred with and at the authorization, sanction, advice, encouragement, and/or instigation of Defendant Local 150 and its officers.

38.     **Damages, Irreparable Injury and Need for Injunctive Relief**:  If Defendant Local 150, and its agents and employees are not restrained from its continued possession, retrieving, disclosing and/or using any personal information contained in any motor vehicle record in its possession or control obtained in violation of the DPPA, including the named plaintiffs and the members of the class plaintiffs seek to represent, they collectively will suffer additional irreparable harm in that each will be deprived on a continuing basis of the very privacy and safety protections afforded by the DPPA to all persons whose motor vehicle records continue to remain in the possession, custody and control of Local 150 and its officers, agents and employees.

39.     **Injunction is in the Public Interest**:  An injunction is in the public interest because Local 150's unlawful conduct and continuing possession of the motor vehicle records of millions of persons poses a continuing threat to the privacy and personal safety of millions of Illinois residents and motorists.  Additionally, by the enactment of the DPPA Congress established the policy objectives associated with protecting motorists from unwarranted dissemination of personal and motor vehicle record information including establishing that it is in the public interest to protect the safety and privacy of the class from Local 150's unlawful possession, obtaining, disseminating, and use of personal information from Motor Vehicle Records.

40.     **No Adequate Remedy at Law**:  The named Plaintiffs, and the class which plaintiffs seek to represent have no adequate remedy at law.  Although the statute provides a statutory damage amount of $2,500, such an amount cannot make the class whole without prohibiting Local 150 from its continued unlawful possession and use of the ill gotten motor

vehicle records in its possession.  This is because the named plaintiffs have suffered, continue to

suffer, and will continue to suffer an injury to their rights to privacy afforded each of them under

the DPPA.   Further, because the unlawful conduct complained of herein is of an ongoing and

continuing nature, it is impossible to ascertain when the Defendant Local 150's unlawful conduct

will end.

41.        **Balancing of the Rights Interests and Injuries:**  The balancing of the interests

of the parties is entirely in favor of Plaintiffs.  This is because the activities which the Plaintiffs

seek to restrain are unlawful acts to begin with, and that the denial of injunctive relief would

serve to require plaintiffs and the proposed class members to suffer additional injury.

42.        **Prior Application:**  There has been no prior application for the injunctive

relief sought herein to this Court or any other court for violations of the DPPA.

43.        **Need for Temporary Relief:**  Plaintiffs have suffered and will continue to

suffer irreparable harm and irreparable injury, as described herein above, unless a restraining

order is issued restraining Defendant Local 150, from possessing, retrieving, disclosing and/or

using any personal information contained in any unlawfully obtained motor vehicle record in its

possession or control, including those members of the class plaintiffs seek to represent.

Wherefore, Plaintiffs demand judgment on their behalf and on behalf of all of the

members of the class to the following effect:

A.        Declaring that this action may be maintained as a class action;

B.        Enter a Preliminary Injunction restraining Defendant, Local 150, and its
employees or agents, from possessing, retrieving, disclosing and/or using any
personal information contained in any unlawfully obtained motor vehicle record

in its possession or control, including those members of the class plaintiffs seek to represent.

C.    Issue a Permanent Injunction restraining Defendant Local 150, and its employees or agents from possessing, retrieving, disclosing and/or or using any personal information contained in any unlawfully obtained motor vehicle record in its possession or control, including those members of the class plaintiffs seek to represent.

D.    Granting judgment in favor of Plaintiffs and other members of the Class against Defendant Local 150 in the amount of $2,500 for each instance in which the defendant unlawfully obtained, disclosed or used personal information concerning the Plaintiff or any of the members of the Class for purposes not authorized by the DPPA, including but not limited to checking plates on construction sites only;

E.    Punitive damages should the Court find that the defendant acted in willful and reckless disregard of the DPPA;

F.    All reasonable attorney's fees and costs incurred;

G.    Exercise the courts general equitable powers to require Defendant to tender all motor vehicle records unlawfully obtained and/or possessed, and all copies thereof, to the Clerk of the United States District Court.

H.    Such other relief as the court deems appropriate.


## FACTS COMMON TO COUNTS II, III AND IV


44.    Plaintiffs restate and re-allege the allegations of paragraphs 1-8 and 17 as if fully set out herein in Counts II through IV.

45.    Although Mrs. Barker does not seek relief based on the Illinois Criminal Code, Local 150's Pursuit Agents have engaged in a variety of unlawful activities designed and intended to do wrongful harm and violence to the mind and health of Mrs. Barker including:

a.    Assaulting Mrs. Barker as prohibited by the Illinois Criminal Code, at 720 ILCS 5/12-1;

b.    Engaging in criminally reckless conduct as prohibited by the Illinois Criminal Code, at 720 ILCS 5/12-5;

c.    Performing acts of criminal intimidation against Mrs. Barker as prohibited by the Illinois Criminal Code, at 720 ILCS 5/12-6;

d.    Stalking Mrs. Barker as prohibited by the Illinois Criminal Code, at 720 ILCS 5/12-7.3, which has risen to the level of aggravated stalking as defined by the Illinois Criminal Code, at 720 ILCS 5/12-7.4 based on the physical harm that Mrs. Barker has suffered;

e.    Driving in a manner that violates the Illinois Vehicle Code and in particular:

(i)    Following too closely behind Mrs. Barker's vehicle to the extent that Mrs. Barker could not see the license plates or headlights of the Pursuit Vehicles of Local 150 in her rear-view mirror, 625 ILCS 5/11-710 (a); disobeying traffic control devices (running red lights) 625 ILCS 5/11-305-06; recklessly swerving between lanes on Illinois streets and highways, 625 ILCS 5/11-503; performing illegal u-turns on an exit ramp, 625 ILCS 5/11-802; moving in front of Mrs. Barker's automobile and slamming on the brakes, 625 ILCS 5/11-1416; and otherwise engaging in reckless driving that, on at least one occasion required, another vehicle to swerve off the road to avoid an accident and, on another occasion, forced drivers to slam on their brakes to avoid accidents, 625 ILCS 5/11-503.

      f.      Local 150 procured and utilized Illinois license plate information in violation of the Illinois Vehicle Code 625 ILCS 5/2-123;

      g.      Defendant Local 150 has interfered with Mrs. Barker's contractual relationship with her employer by causing her personal anxiety and stress and financial harm by requiring that she take time off work.

46.     Defendant Local 150, has specifically been ordered to refrain from attempting to cause automobile accidents, swerving automobiles in front of delivery vehicles and slamming on the brakes.  See *NLRB v. International Union of Operating Engineers, Local 150*, Case No. 98-4123 (7th Cir. January 2000).

47.     Defendant Local 150 has falsely and fraudulently stated, represented and asserted to local law enforcement on several occasions that the above described conduct directed at Mrs. Barker constituted conduct related to ambulatory picketing arising out of a labor dispute, in spite of the fact that Defendant Local 150 has stated that it is not attempting to organize Mrs. Barker's employer, PSI, and that on none of the occasions outlined below in paragraph 42 subparagraphs (a) through (ppp) have the Pursuit Agents of Local 150 engaged in any informational or other picketing of Mrs. Barker.  Such conduct constitutes a false pretense and false pretext for conduct aimed at inducing Mrs. Barker to quit her job and seek employment elsewhere and does not constitute legitimate activity of Local 150 arising out of a labor dispute. From and after in or about February 2005, Defendant Local 150's conduct as alleged below in paragraph 42 subparagraphs (a) through (ppp) was intended to intimidate Mrs. Barker and constitutes misleading conduct with intent to influence the testimony of Mrs. Barker in an official proceeding, namely Midwest Engineering Services, et al v Local 150, International Union of

<u>Operating Engineers, AFL-CIO</u>, in violation of Title 18, United States Code, §1512, and as such, is not permitted conduct of a Labor Organization.

48.　　In May of 2004 or thereabouts, Mrs. Barker, a 34 year old (now 38), mother of two and wife arrived at the offices of her employer, PSI, where she observed three people and two Ford Crown Victoria automobiles in the parking lot.  The Ford Crown Victoria automobiles had video cameras prominently displayed or mounted on the dashboards of each automobile.

49.　　Defendant Local 150, thereafter commenced a campaign of wrongful intimidation against Mrs. Barker by undertaking an elaborate and constant surveillance of Mrs. Barker and at times taking actions that placed her in fear for her safety, including driving on the roadways and interstate highway system in an erratic, reckless, violent, and dangerous fashion.  More specifically:

　　　a.　　The Defendant's Pursuit Agent, Joe Farrell, followed Mrs. Barker, at points between Elgin and West Dundee as well as on various roadways. While Joe Farrell was pursuing Mrs. Barker, he maneuvered his Ford Crown Victoria immediately behind Mrs. Barker's vehicle, so that his headlights could not be seen by Mrs. Barker.  At one point during Joe Farrell's pursuit of Mrs. Barker, she entered an intersection just as the light began to change to yellow.  In order to continue his pursuit of Mrs. Barker, Joe Farrell swerved around a third automobile and into another lane and then traversed the intersection despite the then existing red light.  Mrs. Barker, in fear for her safety, then went to the West Dundee Police Department for help.  Joe Farrell followed Mrs. Barker right up to the West Dundee Police Department.

b.      While present at the West Dundee Police Department, Mrs. Barker was in
tears.   The West Dundee Police detained Joe Farrell, but did not issue any
report or file any charges.

c.      On January 14, 2005, the Defendant's Pursuit Agent, Jim Schweihs,
followed Mrs. Barker.  At that time Mrs. Barker did not know of Mr.
Schweihs' identity, but latter learned of his identity.   Like the other Crown
Victoria automobiles that had previously been outside the offices of her
employer, Mrs. Barker, observed that this Crown Victoria had a dash
mounted video camera prominently displayed.  As before, Jim Schweihs
followed Mrs. Barker very closely, and at many times during his pursuit of
Mrs. Barker, Jim Schweihs maneuvered his Pursuit Vehicle immediately
behind Mrs. Barker's vehicle so that the Ford Crown Victoria headlights
could not bee seen.

d.      On January 14, 2005 when Mrs. Barker arrived at the St. Charles waste
treatment facility, Mrs. Barker approached the Defendant's Pursuit Vehicle
and asked the Pursuit Agent why he was following her.  The Defendant's
Pursuit Agent, Jim Schweihs, then told Mrs. Barker that he just wanted to
talk with her and asked her to get into the Pursuit Vehicle.  Mrs. Barker
refused.   Jim Schweihs then told Mrs. Barker that he would stop following
her, if she would talk with him and then he gave her his phone number
708-927-6060.   Thereafter, Jim Schweihs pulled out of the St. Charles
waste treatment facility and waited near the entrance to the plant.

e. On January 17, 2005  the Defendant's Pursuit Agent, Mike Aprile, telephoned Mrs. Barker and left a telephone message that indicated that he knew she had been at work for just a few hours and that he was watching her every move.  That based upon the message, Mrs. Barker became alarmed and disturbed, feared for her safety and the safety of her family.

f. On January 18, 2006, Mrs. Barker was to report to Crest Hill, Illinois, to make concrete cylinders and possibly do compaction testing.

g. When Mrs. Barker, left to travel to Crest Hill, she noticed that she was again being followed by a person she later identified as the Defendant's Pursuit Agent, Jim Schweihs.  While on US Highway 20, heading towards Route 59.  Mrs. Barker exited US Highway 20 at Bluff City Road.  In order to maintain the chase of Mrs. Barker, Jim Schweihs had to erratically and with willful disregard to the safety of all citizens on the roadways, including Mrs. Barker, maneuver around a third party car in the lane next to him as well overcome a truck in the off ramp.  Jim Schweihs sped up and cut off the car in front of him.  Then when it became apparent that Jim Schweihs could not squeeze between Mrs. Barker's company vehicle and the truck on the exit ramp, he sped up even faster to get in front of Mrs. Barker on the exit ramp.  Jim Schweihs then slammed on his brakes and stopped.  Mrs. Barker and the truck behind her both had to slam on their brakes to avoid an accident with Jim Schweihs.  Since Mrs. Barker could re-enter traffic on US Highway 20 safely, Mrs. Barker did so.  Upon discovering that Mrs. Barker was not on the exit ramp, Jim Schweihs, while on the exit ramp, performed an illegal u-turn traversing the

separation between the exit ramp and an adjoining entrance ramp to re-engage his pursuit of Mrs. Barker.

h.    The Defendant's Pursuit Agent, Jim Schweihs, then continued to follow Mrs. Barker and continued to cut-off other drivers to stay behind her. Whenever, Mrs. Barker would change lanes, so too would Jim Schweihs. Overcome by fear for her safety, Mrs. Barker called the Elgin Police Department, seeking assistance.

i.    Later that same day, January 18, 2005, while Mrs. Barker was headed south on Route 59, where Route 59 veers off onto Route 30 (Will County) with a single lane in each direction, the Defendant's Pursuit Agent, Jim Schweihs, attempted to pass a truck using the opposing lane of traffic. At this time, Jim Schweihs again accelerated to pass both the truck and Mrs. Barker's car, and then slammed on his brakes directly in front of Mrs. Barker, thereby causing her to slam on her brakes. The truck behind Mrs. Barker also slammed on its brakes and swerved off the road to avoid hitting Mrs. Barker. Again, Mrs. Barker was in fear for her safety, crying and experiencing chest pains. Once again, Mrs. Barker reported the conduct of the Pursuit Agent, Jim Schweihs, to the police. The responding police officer told Mrs. Barker she needed a civil attorney.

j.    Thereafter, on January 18, 2005 Mrs. Barker continued to her scheduled job site with a police escort for approximately 6-8 miles more or less. After completing her work at the job site, Mrs. Barker, left the job site and observed a Pursuit Vehicle traveling in the opposite direction. The Pursuit

Vehicle immediately turned around and began following Mrs. Barker. Mrs. Barker recognized the driver as the same person who had been following her that day, January 18, 2005, and noticed the car's license plate ML 9119. She also saw that he had a video camera with him.

k.      On January 18, 2005 Mrs. Barker told the Defendant's Pursuit Agent, Jim Schweihs, to stop following her and that she believed that someone would get hurt if he continued to follow her.

l.      On January 18, 2005 Mrs. Barker returned to her car and the Defendant's Pursuit Agent, Jim Schweihs, again followed her to Elgin where she drove to the Elgin Police Station.

m.      On the evening of January 18, 2005 Mrs. Barker returned home, without being followed, and was emotionally distraught and so upset that she became physically ill, throwing up on several occasions that evening and into the next morning.

n.      On Wednesday, January 19, 2005, Mrs. Barker asked her employer to lay her off because she could not stand being followed. She remained physically ill for the balance of the week and was emotionally unable to work as a result of the conduct of the Defendant's Pursuit Agents.

o.      On Friday, February 25, 2005, at 11:00 a.m. or thereabouts, the Defendant's Pursuit Agent, Mike Aprile, called Mrs. Barker's cell phone

and offered to get her a job with State Testing, a different company than her employer PSI and a competitor of PSI.

p.      On Thursday, March 24, 2005, or thereabouts, the Defendant's Pursuit Agent, Nicholas Cline, followed Mrs. Barker to Portillo's restaurant in Batavia, Illinois, where she was meeting her husband for lunch.  Nicholas Cline parked in close proximity to Mrs. Barker's vehicle.[1]  Mrs. Barker's husband yelled at Nicholas Cline to ask him to leave Mrs. Barker alone. Concerned for her husband's safety and welfare, Mrs. Barker pleaded with Nicholas Cline to leave her alone.

q.      On Monday, March 28, 2005, or thereabouts, the Defendant's Pursuit Agent, Nicholas Cline, followed Mrs. Barker in a Pursuit Vehicle with license plate 255 1800.  During that pursuit, Nicholas Cline followed Mrs. Barker closely and had to swerve away from Mrs. Barker to avoid hitting her vehicle.  While being pursued by Local 150's Pursuit Agent, Nicholas Cline, Mrs. Barker felt threatened, experienced fear, became emotionally upset and commenced crying.  Again Mrs. Barker asked Nicholas Cline to stop following her and asked him why was he doing this to her?  In response thereto he stated, "We only want to make your life better." Thereafter, Nicholas Cline held his business card in one hand and with the other hand held his thumb and pinky finger to the side of his face and mouthed the words "call me."

---

[1] The vehicle described herein as "Mrs. Barker's vehicle" was a vehicle owned by Mrs. Barker's employer and assigned to Mrs. Barker.

r.     On April 1, 2005 or thereabouts, the Defendant's Pursuit Agent, Mike
       Aprile, called Mrs. Barker and asked Mrs. Barker if she had called State
       Testing.   Thereafter, at 8:15 a.m. or thereabouts Mike Aprile, started
       following Mrs. Barker.

s.     On Tuesday, May 2, 2005, at 8:45 a.m. or thereabouts, the Defendant's
       Pursuit Agent, Mike Aprile, called Mrs. Barker on her cell phone.  Upon
       answering the phone, Mrs. Barker recognized the voice on the phone to be
       that of Mike Aprile when he stated, "We're squared away with State
       Testing that they joined Friday."  He then asked her, "Did you know that?"
       Finally, Local 150 Pursuit Agent, Mike Aprile, asked Mrs. Barker "Do you
       need me to call Jay for you?"

t.     On May 5, 2005 or thereabouts at 6:15 a.m. a Pursuit Vehicle was parked
       in view of Mrs. Barker's home at 572 West Main Street, Cary, McHenry
       County, and State of Illinois.  Prior to that time, no Pursuit Vehicle
       followed Mrs. Barker home.

u.     Upon seeing the Pursuit Vehicle, Mrs. Barker became sick to her stomach,
       vomited and feared that the Defendant's Pursuit Agents were going to
       follow her children to school.  Mrs. Barker contacted the Cary Police
       Department.  At approximately 6:30 a.m. or thereabouts, Cary Police
       responded to Mrs. Barker's home and identified the driver of the black
       Crown Victoria as Thomas Rottman.

v.      On May 11, 2005 or thereabouts, Mrs. Barker was followed by another Pursuit Vehicle, license plate PXC-137.

w.      On Friday, May 13, 2005, or thereabouts Local 150 Pursuit Agent, Jim Schweihs, driving a Pursuit Vehicle with the license plate ML 9119, followed Mrs. Barker from the PSI office in Elgin, Illinois, to the Fulton Street parking garage between the hours of 6:30 a.m. and 8:00 a.m. or thereabouts.

x.      On Tuesday, May 17, 2005, or thereabouts the Defendant's Pursuit Agent, Jim Schweihs, followed Mrs. Barker commencing at 6:40 a.m. or thereabouts and followed her from PSI's offices home to the Fulton Street parking garage located in Elgin, Illinois.

y.      While Defendant's Pursuit Agent, Jim Schweihs, was following Mrs. Barker on May 17, 2005, he drove recklessly and at times tailgated Mrs. Barker's car.

z.      On Tuesday, May 17, 2005, or thereabouts, Mrs. Barker concerned for her safety, while in route to Elgin, called 911 to report that she was being followed.  Thereafter, Mrs. Barker arrived at the Elgin Police Department crying and emotionally distraught.

aa.     On Friday, May 20, 2005, or thereabouts, the Defendant's Pursuit Agent, Mike Aprile started following Mrs. Barker from a job location in Elgin, and followed Mrs. Barker to a job site in Streamwood, Illinois.

bb.    On June 14, 2005 Mrs. Barker was followed from Elgin to a job location at Route 59 and Route 19.

cc.    On Friday, June 17, 2005, a Pursuit Vehicle started to follow Mrs. Barker from the PSI office.  Being alarmed and emotionally disturbed about being followed, she returned to her office.  Mrs. Barker started feeling anxious and had feelings of despair.

dd.    On Tuesday, April 25, 2006, or thereabouts, was followed by two separate Pursuit Vehicles on her return to PSI's office.  Mrs. Barker exited her vehicle and approached one of the cars which was being driven by the Defendant's Pursuit Agent, Michael Aprile.  Mrs. Barker begged Defendant's Pursuit Agents, Mike Aprile and Ryan Drew, not to follow her as she was going home.  Pursuit Agent, Mike Aprile, replied, "You're a liar and untrustworthy so we're going to follow you anywhere."[2]  Thereafter, Mrs. Barker drove to the Cary Police Department and the Cary Police temporarily detained Mike Aprile and Ryan Drew.

ee.    On Tuesday, April 25, 2006, or thereabouts, after leaving the Cary Police Department, Mrs. Barker went to her home and thereafter observed the Defendant's Pursuit Agents, Mike Aprile and Ryan Drew, drive past her home on several occasions that same day.

---

[2] Keeping Local 150's promise to follow Mrs. Barker anywhere, Pursuit Agents have followed Mrs. Barker all the way to Janesville Wisconsin.

ff.    On Monday, May 1, 2006, or thereabouts, the Defendant's Pursuit Agent, Ryan Drew, followed Mrs. Barker in her personal vehicle.

gg.    On Thursday, May 25, 2006, or thereabouts, the Defendant's Pursuit Agent, Ryan Drew, commenced following Mrs. Barker at Route 31 and Route 62 in McHenry County.

hh.    On Wednesday, May 31, 2006, at 9:30 a.m. or thereabouts, after Mrs. Barker left her son's 4th grade farewell breakfast at Maplewood School and was followed home, she left her residence heading east on West Main.  The Defendant's Pursuit Agent, Ryan Drew, was monitoring Mrs. Barker's home from 2 blocks away taking video's of Mrs. Barker and her home.

ii.    Mrs. Barker then took a circuitous route to evade the Defendant's Pursuit Vehicle out of fear that the Pursuit Agent would harm her child if she remained at home and the Pursuit Agent, Ryan Drew, lurking around Mrs. Barker's home.  Mrs. Barker fears for her son's safety knowing that Local 150 "strangers" can be hiding around her home anytime.

jj.    On Thursday, June 22, 2006, or thereabouts Mrs. Barker left work at approximately 1:00 p.m. to go home and was immediately followed by the Defendant's Pursuit Agent, Ryan Drew.  While Mrs. Barker was being followed by Ryan Drew, she stopped at the West Dundee Police Station. While at the police station, the Defendant's Pursuit Agent, Ryan Drew, loudly and agitatedly, told the officer, "It's my legal right to follow her and you (the police) can't stop me."  After Ryan Drew made his statement to

the police officer, the officer returned to Mrs. Barker and told her to leave and that Ryan Drew was not going anywhere.  As Mrs. Barker left the police station, Ryan Drew tried to jump back into his vehicle to resume his pursuit of her.  However, the officer (with his back to Mrs. Barker, between her vehicle and Ryan Drew's vehicle) shook his head "no" and that chase terminated.

kk.     On Thursday, July 13, 2006, at 9:45 or thereabouts while Mrs. Barker was parked talking on her cellular phone, a Pursuit Vehicle pulled in, circled the parking lot where Mrs. Barker was parked and stopped perpendicular to Mrs. Barker.  As before, with other Local 150 Pursuit Vehicles, there was a video camera on the dashboard.  This vehicle had license plate GV 1806 and was driven by the Defendant's Pursuit Agent, Mike Aprile.  Mrs. Barker was shaking, lost her breath, and felt her chest tighten.  She called the Elgin Police on her way to the police station.  The police immediately pulled the Defendant's Pursuit Agent, Mike Aprile, over when he arrived. By this time Mrs. Barker was so distressed that she couldn't even catch her breath to speak with the officer.  Although Mrs. Barker has repeatedly made it clear how this harassment devastates her, Defendant Local 150, via its Pursuit Agents continues to engage in this behavior.

ll.     On Friday, July 28, 2006, or thereabouts Mrs. Barker was headed north on Route 25 and suddenly noticed a Pursuit Vehicle, license plate number TVZ 693, behind her.  Shortness of breath once again came over Mrs. Barker.

mm.    On Wednesday, August 2, 2006, Mrs. Barker was on her way home at about 5:15 p.m. heading north on Cary-Algonquin Road.  Two blocks from her home, Mrs. Barker observed another Local 150 Pursuit Vehicle with license plate TVZ 693 heading south.  At that time, the Pursuit Vehicle's presence made Mrs. Barker sick to her stomach and created fear in her for the safety of her children, as a result of the Local 150 "strangers" lurking about her home.

nn.    On Tuesday, August 8, 2006, at approximately 8:30 a.m. or thereabouts Mrs. Barker was leaving her home for work.  As Mrs. Barker was getting into her truck, she  looked up and saw a Local 150 Pursuit Vehicle with the license plate TVZ 693 slowly creeping down the street while staring at her, while in front of Mrs. Barkers home heading west.  Panic, anxiety, fear, and feelings of helplessness overwhelmed Mrs. Barker.

oo.    On Thursday, August 10, 2006, or thereabouts Mrs. Barker was driving to work at approximately 8:20 a.m. traveling south on Cary-Algonquin Road (two blocks from her residence) when she spotted a Local 150 Pursuit Vehicle with the license plate TVZ 693 heading north on Cary-Algonquin Road.  The Pursuit Vehicle immediately pulled off the road and turned around in pursuit of Mrs. Barker.  Mrs. Barker became sick and managed to lose her pursuer because of other vehicles on the roadway.  Mrs. Barker experienced frustration and anxiety and became sick.

pp.    On Monday, August 28, 2006, or thereabouts Mrs. Barker departed from her home around 6:00 a.m. and observed the Defendant's Pursuit Agent,

Ryan Drew, driving a Pursuit Vehicle with license plate TVZ 693 sitting on Seebert Street, Cary, Illinois, facing north, perpendicular to the street Mrs. Barker resides upon. The Pursuit Vehicle commenced moving towards Mrs. Barker, but a third party car pulled out in front of the Pursuit Vehicle and he could no longer pursue Mrs. Barker. Again Mrs. Barker experienced fear, anxiety and frustration with Defendant Local 150.

qq.    On Tuesday, September 5, 2006, or thereabouts Mrs. Barker left her home around 6:00 a.m. and was immediately pursued by Defendant's Pursuit Agent, Ryan Drew, in a Pursuit Vehicle with license plate TVZ 693. At that time, the Pursuit Vehicle was idling on School Street, which is perpendicular to West Main Street in Cary, Illinois. Ryan Drew was facing north in view of Mrs. Barker's home. Mrs. Barker flagged down a Cary Police Officer, briefed him and then went to the Cary Police Station. A police officer guided Mrs. Barker through the station to the back door to allow her to leave in peace.

rr.    On or about November 9, 2006 Mrs. Barker filed suit in the Circuit Court of McHenry County against Defendant Local 150, and thereafter voluntarily dismissed the action to pursue this remedy in this Federal Court. Thereafter the preceding harassment subsided until August 30, 2007.

ss.    On Thursday, August 30, 2007, at 6:30 a.m. or thereabouts the Defendant's Pursuit Vehicle, a black Ford Crown Victoria with the license plate T80

5449, parked in front of Mrs. Barker's home.  A photograph of the Pursuit Vehicle is attached hereto as Exhibit B.

tt.    On Tuesday, September 4, 2007, at 6:45 a.m. or thereabouts the Defendant's Pursuit Vehicle, a black Ford Crown Victoria with the license plate T80 5449, parked in front of Mrs. Barker's home.

uu.    On Wednesday, September 5, 2007, at 6:45 a.m. or thereabouts the Defendant's Pursuit Vehicle, a black Ford Crown Victoria with the license plate T80 5449, parked in front of Mrs. Barker's home.  A photograph of the Pursuit Vehicle is attached hereto as Exhibit C.

vv.    On Thursday, September 6, 2007, or thereabouts the Defendant's Pursuit Vehicle, a black Ford Crown Victoria with the license plate T80 5449, parked in front of Mrs. Barker's home and followed Mrs. Barker from her home in Cary to the offices of her employer, PSI, in Elgin.

ww.    On Tuesday, September 11, 2007, at 6:45 a.m. or thereabouts the Defendant's Pursuit Vehicle, a black Ford Crown Victoria with the license plate T80 5449, parked in front of Mrs. Barker's home. Approximately one hour later, at 7:45 a.m., Mrs. Barker walked over and asked the Defendant's Pursuit Agent to stop sitting in front of her home because it upset her, her family and her neighbors.  Mrs. Barker thereafter told Defendant's Pursuit Agent not to follow her when she dropped her son off at school.

xx.     On Thursday, September 13, 2007, at 6:40 or thereabouts the Defendant's Pursuit Vehicle, a black Ford Crown Victoria with the license plate T80 5449, parked in front of Mrs. Barker's home.

yy.     On Monday September 17, 2007, at 6:45 a.m. or thereabouts the Defendant's Pursuit Vehicle, a black Ford Crown Victoria with the license plate T80 5449, parked in front of Mrs. Barker's home.

zz.     On Tuesday, September 18, 2007, at 6:45 a.m. or thereabouts the Defendant's Pursuit Vehicle, a black Ford Crown Victoria with the license plate T80 5449, parked in front of Mrs. Barker's home.

aaa.    On Wednesday, September 19, 2007, or thereabouts the Defendant's Pursuit Vehicle, a black Ford Crown Victoria with the license plate T80 5449, parked in front of Mrs. Barker's home and followed Mrs. Barker to Route 47 in Woodstock.

bbb.    On Monday, September 24, 2007, at 6:30 a.m. or thereabouts, two of the Defendant's Pursuit Vehicles, a black Ford Crown Victoria with the license plate T80 5449 and a grey Ford Crown Victoria with License Plate ZX1918, parked outside Mrs. Barker's home.  Two of the Defendant's Pursuit Agents in their vehicles watched Mrs. Barker and her son get into Mrs. Barker's personal vehicle at about 8:30 a.m.  They followed Mrs. Barker and her son right into the Prairie Hill School Parking Lot.  Mrs. Barker became very upset.

ccc.　　On Tuesday, September 25, 2007, at 8:30 a.m. or thereabouts the Defendant's Pursuit Vehicle, a black Ford Crown Victoria with the license plate T80 5449, was parked in front of Mrs. Barker's home.  The Defendant's Pursuit Agent watched Mrs. Barker and her son get into her personal vehicle and then followed them to school again. Emotionally upset again Mrs. Barker called 911.   By the time police arrived, the Pursuit Agent had left.  However, after Mrs. Barker turned onto US Route. 14 from Second Street, she observed the same Pursuit Agent following her again. A picture of the Defendant's Pursuit Vehicle is attached hereto as Exhibit D.

ddd.　　On Wednesday, September 26, 2007, at 7:00 a.m. or thereabouts the Defendant's Pursuit Vehicle, a black Ford Crown Victoria with the license plate T80 5449, parked in front of Mrs. Barker's home. An officer pulled behind the Pursuit Vehicle with license plate T80-5449 at 9:38am, but left. A photograph of the Defendant's Pursuit Vehicle is attached hereto as Exhibit E.  The Defendant's Pursuit Agent followed Mrs. Barker until 2:40 p.m. or thereabouts.

eee.　　On Thursday, September 27, 2007, at 7:00 a.m. or thereabouts the Defendant's Pursuit Vehicle, a black Ford Crown Victoria with the license plate T80 5449, was parked in front of Mrs. Barker's home. The Defendant's Pursuit Agent watched Mrs. Barker and her son get into her personal vehicle at about 8:30 a.m. and proceeded to follow Mrs. Barker and her son to school.

fff.    On Friday, September 28, 2007, at 6:50 a.m. or thereabouts the
Defendant's Pursuit Vehicle, a black Ford Crown Victoria with the license
plate T80 5449, was parked in front of Mrs. Barker's home. At about 7:05
a.m. a second Pursuit Vehicle, a grey Crown Victoria with license plate ZX
1918, joined in the surveillance of Mrs. Barker.

ggg.    On Tuesday, October 2, 2007, the Defendant's Pursuit Vehicle, a black
Ford Crown Victoria, was parked in front of Mrs. Barker's home for most
of the morning.

hhh.    On Monday, October 8, 2007, at 6:45 a.m. or thereabouts three of the
Defendant's Pursuit Vehicles were parked outside Mrs. Barker's home – 2
black and 1 gold.  All three remained at Mrs. Barker's home until after
3:00 p.m.

iii.    On Tuesday, October 9, 2007, at 5:45 a.m. or thereabouts at least one of
the Defendant's Pursuit Vehicles was parked outside Mrs. Barker's home.
After leaving her home, the Pursuit Vehicle commenced following Mrs.
Barker.  During this pursuit, another Pursuit Vehicle joined the pursuit of
Mrs. Barker.

jjj.    On Thursday, October 18, 2007, at 7:30 a.m. or thereabouts at least one of
the Defendant's Pursuit Vehicles was parked outside Mrs. Barker's home.

kkk.    On Friday, October 19, 2007, or thereabouts not one but two of the
Defendant's Pursuit Vehicles were parked around Mrs. Barker's home.

The Pursuit Vehicles followed Mrs. Barker.  During this pursuit, Mrs. Barker was almost rear ended by the Pursuit Vehicle displaying license plate 984 6452, on Randall Road going south just before U.S. Highway 20. During the pursuit of Mrs. Barker, the Defendant's Pursuit Agent driving the Pursuit Vehicle having the license plate 984 6452 remained very close to Mrs. Barker and was very aggressive in his driving.  Both Pursuit Agents followed Mrs. Barker from Cary to DeKalb, Illinois.  The two Pursuit Agents remained outside when Mrs. Barker entered Wal-mart. When Mrs. Barker exited Wal-mart, she was approached by an adult male claiming to be "Rabbi Theo S. Fins".  He claimed he knew Mrs. Barker from somewhere and inquired about hiring PSI, that he has his own construction business. The man gave Mrs. Barker his "business card" and asked for Mrs. Barker's.   The man claiming to be Rabbi Theo S. Fins asked Mrs. Barker, "Aren't you going to ask me what I'm building?  How big is it?  And what will it be used for?"  Fins then commented that he was building a 280,000 square foot hazardous waste warehouse.  Mrs. Barker pointed out the Local 150 Pursuit Agents in the parking lot that were following her and who were then videotaping both Fins and Mrs. Barker. Fins didn't seem bothered and said that he was at one time Sweeney's (Executive at AFL-CIO) personal labor attorney and that he could make a phone call to Washington and they wouldn't be a problem.   Both of the aforementioned Pursuit Vehicles followed Mrs. Barker to Interstate 80 west then to Interstate 39 north. On Interstate 39 north, one of the Pursuit Vehicles, black in color, disengaged the chase.  The grey Pursuit Vehicle with license plate 984 6452 closely followed Mrs. Barker to Janesville, Wisconsin, allowing no one to get between them.

lll.    On October 25, 2007 or thereabouts, two of the Defendant's Pursuit Vehicles, bearing the license plate numbers HBD 732 and 984 6452, were positioned around Mrs. Barker's home with one along the street in front of her home and the other parked nearby.  Police were dispatched to Mrs. Barker's home and took no action.

mmm. On October 26, 2007, at 4:50 a.m. or thereabouts the Defendant's Pursuit Vehicle bearing the license plate number 984 6452 parked outside Mrs. Barker's residence.  The Defendant's Pursuit Agent driving the Pursuit Vehicle quickly pulled up behind Mrs. Barker's work truck with his bright lights focused on the back and side of her work vehicle.

nnn.    On October 29, 2007 at 7:00 a.m. or thereabouts one of the Defendant's Pursuit Vehicles parked outside Mrs. Barker's residence.  Police were dispatched to Mrs. Barker's home and took no action other than to document that the Pursuit Vehicle was positioned outside her home.

ooo.    On October 30, 2007 at 2:40 p.m. or thereabouts one of the Defendant's Pursuit Vehicles followed Mrs. Barker from Elgin to one of her attorney's offices.

ppp.    That Defendant continues its pattern of harassment of Mrs. Barker up to the time of the filing of this case.

50.     Mrs. Barker has contacted Defendant, Local 150, and asked that she not be followed and to be left alone.

51.     That although the US District Court issued a restraining order against the Defendant, Local 150, prohibiting it from violating the traffic laws of the State of Illinois, Local 150 continues to injure and do violence to the mind, health and wellbeing of Mrs. Barker.

52.     That substantial and irreparable injury to Mrs. Barker will follow unless the Defendant, Local 150, and its officers, agents and employees are restrained as requested in each count herein.

53.     That as to each item of relief granted, greater injury will be inflicted upon Mrs. Barker by the denial of relief than will be inflicted upon Defendant Local 150 by the granting of relief requested in each count herein.

54.     That Mrs. Barker has no adequate remedy at law.

55.     That Mrs. Barker is in fear that her person and her property will be damaged as a result of Local 150's conduct as set forth herein in this complaint.

56.     Defendant Local 150, refuses to desist or refrain from its conduct of harassing and pursuing Mrs. Barker.

57.     Section 18 U.S.C. 2724. Civil action – provides:

   (a)   **Cause of action**.--A person, who knowingly obtains, discloses or uses personal information, from a motor vehicle record, for a purpose not permitted under this

chapter shall be liable to the individual to whom the information pertains, who may bring a civil action in a United States district court.

**(b)**    **Remedies.**--The court may award--

    **(1)**    actual damages, but not less than liquidated damages in the amount of $2,500;

    **(2)**    punitive damages upon proof of willful or reckless disregard of the law;

    **(3)**    reasonable attorneys' fees and other litigation costs reasonably incurred; and

    **(4)**    such other preliminary and equitable relief as the court determines to be appropriate.

58.    The Plaintiff, Mrs. Barker, has not provided any consent to Local 150 to obtain any information about her from the Illinois Secretary of State or from any motor vehicle records of any State.

59.    Defendant Local 150 obtained and used her personal information obtained from the Secretary of State's Illinois Motor Vehicle records.

60.    Pursuant to 18 U.S.C. 2724 (b) (4), Mrs. Barker asks this Court to fashion the only just remedy for having obtained information from Mrs. Barker's license plates and about Mrs. Barker without her consent, which is to deprive Defendant Local 150, from the benefit it has received from its ill gotten gain and restrain Local 150 as set forth below.

61.    **Authorization and Instigation:**  The aforementioned unlawful conduct consisting of the obtaining and using motor vehicle records containing personal information, has occurred with and at the authorization, sanction, advice, encouragement, and or instigation of Defendant Local 150.

62.    **Emotional Distress and Physical Injury**:  Mrs. Barker, has suffered and continues to suffer emotional distress which includes uncontrollable vomiting, crying, and mental injury for which she cannot be adequately compensated at law.

63.    **Damages, Irreparable Injury and Need for Injunctive Relief**:  If Defendant Local 150, and its agents and employees are not restrained from following, harassing, intimidating, and pursuing Mrs. Barker, she will suffer additional irreparable harm in that she will suffer continued deterioration of her mental and physical state; will have lost the right to be free from harassment, intimidation and coercion; will have lost the right to perform her job without fear for her safety; and will have lost the right to be gainfully employed with the employer of her choosing without tortius interference from Local 150.

64.    **Injunction is in the Public Interest**:  An injunction is in the public interest because Local 150's unlawful and tortious conduct creates a threat to the personal safety of Illinois residents and motorists.  Additionally, the policy objectives associated with protecting Illinois motorists from unwarranted dissemination of personal information has been adopted by Congress establishing that it is in the public interest to protect the privacy of all citizens from the release or use of personal identifying information.

65.    **No Adequate Remedy at Law**:  Mrs. Barker, has no adequate remedy at law. No amount of money can make Mrs. Barker whole.  This is because she has suffered, continues to suffer, and will continue to suffer an injury to her person by way of harm to her mental and physical health and wellbeing, unless the illegal and or tortious acts of the Defendant Local 150, are not enjoined, and said injuries are difficult of definite ascertainment as required by law; because delays incident to obtaining relief in this action for damages would result in the continuation of serious and irreparable damage to Mrs. Barker's physical and emotional state,

and deterioration in her job performance risking damage to the contractual relationship between Mrs. Barker and her employer, PSI.  Further, because the unlawful conduct complained herein is of an ongoing and continuing nature, it is impossible to ascertain when the Defendant Local 150's unlawful conduct will end.

66.    **Balancing of the Rights Interests and Injuries:**  The balancing of the interests of the parties is entirely in favor of Mrs. Barker.  This is because the activities which Barker seeks to restrain are unlawful acts to begin with, and that the denial of injunctive relief would serve to require Mrs. Barker to suffer additional injury.  In fact, the Defendant Local 150 will suffer no injury if restrained from following Mrs. Barker.

67.    **Prior Application:**  Mrs. Barker has not made prior application for injunctive relief to this Court or any other court based upon the same set of facts as alleged herein. However, Mrs. Barker did seek temporary injunctive relief in the Circuit Court of McHenry County which was denied based on jurisdictional grounds and, therefore, the merits of Mrs. Barker's claims have not yet been considered by this Court or any other court.[3]

68.    **Need for Temporary Relief:**  Mrs. Barker has suffered and will continue to suffer irreparable harm and irreparable injury, as described herein, unless a restraining order is issued restraining Defendant Local 150, from following Mrs. Barker or coming within sight of Mrs. Barker, her home or her children's schools.

---

[3] Mrs. Barker's state court claims did not include all of the facts set forth in this Complaint and did not seek a remedy under the Federal DPPA and her request for a TRO was denied based on preemption by Federal Courts and lapse of time since the conduct complained of had occurred.

COUNT II

<u>DECLARATORY ACTION</u>

69.     Mrs. Barker restates and re-alleges the factual allegations of paragraphs 44- 68 as if fully set out herein in this Count II.

70.     Local 150, by and thru its agents, have systematically claimed a legal right to engage in conduct outlined above at paragraph 49 in sub-paragraphs (a) through (ppp).

71.     Mrs. Barker has asked, begged, and pleaded with Local 150 to stop following her or appearing outside her home.

72.     The Defendant's claims conflict with the right of Mrs. Barker to be free from Local 150's harassment as set forth in paragraph 49 and its sub-paragraphs (a) through (ppp), in that it has followed Mrs. Barker, parked outside Mrs. Barker's home, acted recklessly towards Mrs. Barker, accosted Mrs. Barker, and created fear and anxiety in Mrs. Barker.

73.     An actual controversy exists between the Defendant and  Mrs. Barker.

**WHEREFORE**, Mrs. Barker respectfully prays that this Honorable Court grant the following relief:

a.     Declare that the acts of Defendant Local 150, in stalking, following, intimidating and harassing Mrs. Barker as set forth herein, are unlawful, and not privileged.

b.     Enter a Preliminary Injunction restraining Defendant, Local 150, and its
employees or agents, from following Mrs. Barker or from coming within
sight of Mrs. Barker, or from coming within sight of Mrs. Barker's home
or the school of either of Mrs. Barker's children.

c.     Issue a Permanent Injunction restraining Defendant Local 150, and its
employees or agents from following Mrs. Barker or from coming within
sight of Mrs. Barker or from coming within sight of Mrs. Barker's home or
the school of either of Mrs. Barker's children.

d.     Award Mrs. Barker monetary damages in an amount to be determined at
trial.

e.     Award to Mrs. Barker her costs and attorney fees.

f.     Order such other and further relief in this matter as this Court deems proper
just, equitable or necessary.

## COUNT III

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

74.     Mrs. Barker, plaintiff in this Count, restates and re-alleges the allegations of
paragraphs 44-68 as if fully set out herein in this Count III.

75.     Defendant Local 150's actions against Mrs. Barker as described herein in this
Complaint, have been reckless, intimidating, threatening, and coercive.

76.     The Defendant Local 150 was aware that the actions taken by them did in fact cause manifestations of emotional distress to be present in Mrs. Barker.

77.     The Defendant Local 150 intended to cause Mrs. Barker, emotional distress.

78.     The Defendant Local 150 was aware that its repeated conduct was likely to cause emotional distress in Mrs. Barker.

79.     The actions described herein are truly extreme and outrageous.

80.     The actions of the Defendant Local 150 described in paragraph 49 and its sub-paragraphs, did in fact cause emotional distress in Mrs. Barker.

81.     The emotional distress suffered by Mrs. Barker culminated in physical illness and serious damage to her ability to perform her work.

**WHEREFORE**, Mrs. Barker respectfully prays for this Honorable Court to grant the following relief:

a.      Enter a temporary restraining order against Defendant Local 150, and its employees or agents, restraining it, and its employees or agents from following Mrs. Barker or from coming within one mile of Mrs. Barker, or from coming within sight of Mrs. Barker's home, or the school of either of Mrs. Barker's children.

b.      Issue a Permanent Injunction restraining order against Defendant Local

150, and its employees or agents restraining it and its employees or agents

from following Mrs. Barker or from coming within one mile of Mrs.

Barker or from coming within sight of Mrs. Barker's home or the school of

either of Mrs. Barker's children.

c.      Award Mrs. Barker monetary damages in an amount to be determined at

trial.

d.      Award to Mrs. Barker's her costs and attorney fees.

e.      That Mrs. Barker has such other and further relief in this matter as this

Court deems just, equitable or necessary.


## COUNT IV
### INVASION OF PRIVACY – INTRUSION UPON THE SECLUSION

82.     Mrs. Barker, restates and re-alleges the allegations of paragraphs 44-68 as if fully
set out herein in this Count IV.


83.     The Defendant's Pursuit Agents have intruded without authorization into the

affairs of Mrs. Barker and have intruded upon the seclusion of Mrs. Barker's home, Mrs.

Barker's affairs, Mrs. Barker's travels, Mrs. Barker's motor vehicle records, and Mrs. Barker's

mind.


84.     The intrusion described hereinabove in paragraph forty-nine (49), and its subparts,

are offensive or objectionable to any reasonable man or woman.

85.     The actions of Local 150 have intruded into the private records of the Plaintiff and have intruded into the sanctity and solitude of the Plaintiff's home.

86.     The intrusion by Local 150 set forth herein above in paragraph forty-nine (49), and its subparts, has caused and continues to cause anguish and suffering on Mrs. Barker.

87.     The emotional distress suffered by Mrs. Barker culminated in physical illness, chest pains, loss of sleep, tears, and overall anxiety as well as periodic inability to perform her work.

88.     Mrs. Barker has been deprived of the seclusion and sanctity of her home knowing that Pursuit Agents of Local 150 may be lurking outside her home.

**WHEREFORE**, Mrs. Barker respectfully prays for this Honorable Court to grant the following relief:

a.      Enter a preliminary injunction against Defendant Local 150, and its employees or agents, restraining it, and its employees or agents from following Mrs. Barker or from coming within one mile of Mrs. Barker, or from coming within sight of Mrs. Barker's home, or the school of either of Mrs. Barker's children.

b.      Issue a Permanent Injunction restraining order against Defendant Local 150, and its employees or agents restraining it and its employees or agents from following Mrs. Barker or from coming within sight of Mrs. Barker

or from coming within one mile of Mrs. Barker's home or the school of

either of Mrs. Barker's children.

c.      Award Mrs. Barker monetary damages in an amount to be determined at

trial.

d.      Award to Mrs. Barker's her costs and attorney fees.

e.      That Mrs. Barker has such other and further relief in this matter as this

Court deems just, equitable or necessary.

### **Trial By Jury Demanded**

Plaintiffs demand trial by jury of all claims herein.

Respectfully Submitted,


By:   s/Robert T. Hanlon
              Robert T. Hanlon, Plaintiff's Attorney


Attorneys for the Plaintiffs

THE LAW OFFICES OF ROBERT T. HANLON & ASSOC., P.C.
Robert T. Hanlon (ARDC # 6286331)
14212 Washington Street
Woodstock, IL  60098
(815) 206-2200
ARDC Attorney No. 6286331

UNGARETTI & HARRIS, LLP
Dean J. Polales (ARDC # 3125505)
3500 Three First National Plaza
Chicago, IL 60602
(312) 977-4248

## SERVICE OF DOCUMENTS BY ELECTRONIC MEANS

I, Robert T. Hanlon, an attorney, certify service of this document was accomplished pursuant to ECF on all Electronic Filing Users of record, this 22nd day of February 2008.


/s/ Robert T. Hanlon