# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| MIDWEST ENGINEERING SERVICES, INC.,) PROFESSIONAL SERVICE INDUSTRIES INC., GME CONSULTANTS, INC., and GME CONSULTANTS OF ILLINOIS, INC., ) ) ) ) | FEB 1 0 2005 |
| Plaintiffs, ) ) | |
| v. ) ) | Case No.: |
| INTERNATIONAL UNION OF OPERATING ) ENGINEERS, LOCAL 150, AFL-CIO, ) ) | 05 C 50 0 23 |
| and ) ) | JURY TRIAL REQUESTED |
| MIDWEST CONSTRUCTION INDUSTRIES ) ADVANCEMENT FUND, ) ) | |
| and ) ) | |
| ILLINOIS VALLEY CONSTRUCTION ) INDUSTRY ADVANCEMENT FUND, ) ) | |
| Unnamed Signatory 150 Contractors, ) In the Relevant Market and Unnamed ) Co-conspirator Developers, Owners, ) And Construction Managers, ) ) | |
| Defendants. ) ) | |

PLAINTIFFS' VERIFIED COMPLAINT FOR TEMPORARY
RESTRAINING ORDER, PRELIMINARY AND PERMANENT INJUNCTIVE
RELIEF, AND DAMAGES

Plaintiffs, Midwest Engineering Services, Inc., Professional Service Industries, Inc., GME

Consultants, Inc., and GME Consultants of Illinois, Inc. (hereinafter"Plaintiffs"), complain of the

Defendants as follows:

## INTRODUCTION

1.      This case is filed by four (4) open shop (non-union signatory) geo-technical

engineering, construction monitoring, material environmental testing, and soil and concrete

testing companies to seek redress for an illegal, on-going conspiracy among the Defendants and

their co-conspirators in violation of the federal Sherman Antitrust Act, federal Labor

Management Relations Act ("Labor Act"), and other federal and state laws, including the Illinois

Antitrust Act.  The object of the Defendants' conspiracy is the abuse and acquisition of

monopoly market power in the relevant industry in Northern Illinois by using illegal predatory

tactics including agreements prohibited by the federal labor laws, a purpose of which is to

exclude Plaintiffs from the marketplace and to monopolize the relevant market.  The Defendants'

illegal actions have had the intent and effect of reducing and eliminating competition between

Plaintiffs and Defendants and their signatory contractors.

2.      Plaintiffs also seek preliminary and permanent injunctive relief to reconstitute

competition and seek a temporary restraining order to prevent daily threats to their employees in

furtherance of the illegal restraint of trade and monopolization objectives.

## THE PARTIES

3.      Plaintiff Midwest Engineering Services, Inc. (hereinafter referred to as "MES"), is

a corporation organized and existing under the laws of the State of Wisconsin with an office and

place of business at 4243 West 166th Street, Oak Forest, Illinois 60452.  At all relevant times

Plaintiff MES has been engaged in the business of geotechnical engineering, construction

monitoring and materials environmental testing including soils testing services and related

services in the relevant market.

4.    Plaintiff Professional Service Industries, Inc. (hereinafter "PSI"), is an Illinois corporation with its corporate offices at 1901 S. Meyers Road, Suite 400, Oakbrook Terrace, Illinois 60181, servicing Northern Illinois from its offices at 665 Toll Gate Road, Unit H, Elgin, Illinois 60123, is in the business of geotechnical engineering services, including soils and concrete testing services, structural steel testing and, geotechnical consulting on privately and government funded commercial low rise and high rise structures.  PSI is presently performing work on the new County Courthouse in Rockford, Illinois.

5.    GME Consultants, Inc. (hereinafter referred to as "GME"), is a Minnesota corporation with offices at 14000 21st Avenue No., Minneapolis, Minnesota 55447 and GME Consultants of Illinois, Inc. an Illinois corporation with offices at 4242 Harrison Avenue, Suite F in Rockford, Illinois 61108 has been a leader in soils and concrete testing and related services in the Downtown Chicago and Northeastern Illinois area, and has recently lost a major long time customer in Rockford, Illinois, due restraint and coercion by Defendant Operating Engineers Local 150.

6.    Upon information and belief Defendant International Union Operating Engineers, Local 150, AFL-CIO is a labor organization within the meaning of the National Labor Relations Act (29 U.S.C. § 151, *et seq.*).  Defendant and its agents at all relevant times transact business in this jurisdiction with its principal place of business at 6140 Joliet Road, Countryside, Illinois 60525.

7.    Upon information and belief Defendant Midwest Construction Industries Advancement Fund (MCIAF) and its Labor Management Trustees are respectively bound to administer such Fund pursuant to an Agreement and Declaration of Trust establishing this "Industry Fund" with principal offices c/o International Union of Operating Engineers Local 150,

-3-

6200 Joliet Road, Countryside, Illinois 28874, and an office in Rockford, Illinois. Upon information and belief the Midwest Construction Industry Advancement Fund (MCIAF) a "target fund" is an entity created under and within the collective bargaining agreement between Operating Engineers Local 150 AFL-CIO and the Mid-America Regional Bargaining Association. The Industry Fund through the terms of the Trust Indenture Agreement administered by its respective labor and management trustees has collected funds of signatory employers in the relevant market in order to issue payments to contractors with whom Operating Engineers Local 150 has collective bargaining agreements or to whom Operating Engineers Local 150 makes payments.

8. Upon information and belief the Illinois Valley Construction Industry Advancement Fund located at P.O. Box 411, LaSalle, Illinois 61401 together with the Illinois Valley Construction Industry Labor/Management Fund at the same location through its respective labor and management trustees bound to administer funds by the Agreement and Declaration of Trust to which signatory employers to the Operating Engineers Local 150 Collective Bargaining Agreement agreed to be bound. They and have collected money from the employees of signatory employers in the relevant market in order to issue payments to contractors with whom Operating Engineers Local 150 has collective bargaining agreements in the geographic area and to whom Operating Engineers Local 150 agrees to make payments.

9. Upon information and belief, Defendants Operating Engineers Local 150 employers and their trustees signatory to the Midwest Construction Industry Advancement Fund (MCIAF), administered as a "target fund" by the Management Trustees and Labor Trustees of said Fund pursuant to an Agreement and Trust Indenture Document and their respective geographic jurisdiction and the Illinois Valley Construction Industry Advancement Fund and

-4-

respective Labor and Management Trustees acting on behalf of their representative employers and Operating Engineers Local 150 in their geographic area have operated a 'target fund" in conspiracy, combination, and concert with unnamed co-conspirators, including persons with whom Operating Engineers Local 150 has collective bargaining agreements in the relevant market and unnamed co-conspirators, developers, owners and construction managers identified herein, entered into agreements in restraint of trade to limit the relevant market to Operating Engineers Local 150 contractors, to erect barriers to entry, and to continue; or expand to maintain and complete the monopoly Operating Engineers Local 150 contractors in the relevant market.

## JURISDICTION AND VENUE

10.    Original jurisdiction as to the matters alleged herein is based on 28 U.S.C. §1331 (federal question), 28 U.S.C. § 1337 (civil action arising under an act of Congress regulating commerce or protecting commerce against restraints or monopolies) 28 U.S.C. §§2201 through 2202 (federal declaratory judgment act); 15 U.S.C. § 15 (antitrust) and 15 U.S.C. § 26 (injunctive relief)original jurisdiction also lies with this Court based on 29 U.S.C. § 187(a) of the Labor Management Relations Act (as amended) which provides for a damage remedy for unfair labor practices in the nature of secondary boycotts and illegal primary activity which include threats to enter into agreements prohibited by Section 8(e) of the Labor Management Relations Act which is an analog to the agreements in restraint of trade prohibited under the Sherman Act Supplemental jurisdiction is alleged under 28 U.S.C. § 1367 under which Plaintiffs claim a violation of the Illinois Anti-Trust Law (740 ILCS 10/3) common law claims under which they seek preliminary injunctive relief, declaratory relief and damages and tortious interference with contract and  arising under the laws of the State of Illinois.

11.    Venue is proper in this District pursuant to 28 U.S.C. §1391 and 15 U.S.C. §22

insofar as a substantial portion of the Plaintiffs and Defendants reside and/or conduct business

within the District.

## ALLEGATIONS COMMON TO MORE THAN ONE CLAIM

12.    The claims set forth herein arise under 15 U.S.C. §1 and §2, commonly known as

the Sherman Act and 15 U.S.C. §§ 15 and 26, commonly known as the Clayton Act. Plaintiffs

seek to obtain injunctive relief, damages and costs, including reasonable attorneys' fees and

expert witness fees, under Sections I and II of the Sherman Act and Declaratory Judgment by

reason of Defendants' violation of 15 U.S.C. Secs. 15 and 20 of the Clayton Act. Plaintiffs also

seek damages and costs pursuant to 29 U. S. C. §187(a) commonly known as the Labor

Management Relations Act (as amended) (hereinafter "Labor Act") and seek costs and damages

and an appropriate remedy as part of supplementary jurisdiction under the laws of the State of

Illinois for tortious interference with contract and prospective contractual advantage, and in

addition,

## ILLINOIS ANTI-TRUST LAW
### (740 ILCS 10/3)

13.    Plaintiffs seek preliminary injunctive relief, declaratory relief and damages for

violation of the Illinois Anti-Trust Law pursuant to Section 740 ILCS 10/3(3) of the Illinois Anti

Trust Act which provides that every person shall be deemed to have committed a violation of this

Act who shall:

        a.      (2) by contract, combination, or conspiracy with one
                   or more other persons unreasonably restrain trade or
                   commerce; or acquire monopoly power over any
                   substantial part of trade or commerce of this State
                   for the purpose of excluding competition . . .

And under Section 10/3(4) the definition of trade or commerce:

      b.    Includes all economic activity involving or relating to any commodity or service and service is defined as " . . . any activity, not covered by the definition of commodity, which performed in whole or in part for the purpose of financial gain.

14.    The activities of Defendants are not directed solely to labor objectives which are legitimate under the laws of the United States. Defendants' activities are unlawful under Sherman Act Sections 1 and 2 and Section 8(b)(4)A to obtain agreements prohibited by Section 8(e) of Labor Act.

15.    Plaintiffs do not have a contractual relationship with the Defendant Operating Engineers Local 150. Plaintiffs and other similarly situated geotechnical and materials engineers, consultants and engineering companies performing soils and concrete testing have requested the opportunity to perform work within the relevant market and have in fact had agreements within the relevant markets; however, Defendant Local Union 150 has entered into conspiracies and agreements in restraint of trade and in violation of the Illinois Anti Trust Law (740 ILCS 10/3), Sherman Act §1 and §2 and §8(b)(4)(A), §8(b)(4)(B) and §8(e) of the Labor Act. Operating Engineers Local 150 has entered into agreements with various unnamed co-conspirators, and other employers, including developers, building owners, building management, and general contractors in order to eliminate Plaintiffs and other similarly situated geotechnical engineering service companies and soils and concrete testing companies who are not signatories to a collective bargaining agreement with Local 150 (defined herein as "Non-Local 150 Contractors") from access to the relevant market by engaging in the following conduct since approximately January 2000:

**DEFENDANT OPERATING ENGINEERS CONSPIRED IN COMBINATION WITH UNNAMED CO-CONSPIRATORS WITH EMPLOYERS WHO HAVE NO EMPLOYEES CAPABLE OF BEING ORGANIZED and, DEVELOPERS OR SUPPLIERS AND/OR OTHER DEFENDANTS IN VIOLATION OF SHERMAN ACT SECTIONS 1 AND 2 AND SECTION 8(b)(4)(A), SECTION 8(b)(4)(B) AND SECTION 8(e) OF THE LABOR ACT AND IN VIOLATION OF THE ILLINOIS ANTI TRUST LAW 740 ILCS 10/3 TO DRIVE NON-SIGNATORY CONTRACTORS OUT OF THE RELEVANT MARKET**

16.    The following conduct was engaged in by Defendant, Operating Engineers Local 150 in contract, combination or concert with Unnamed Co-Conspirators to conspire with employers who have no employees capable of being organized, developers or suppliers and/or the other Defendants in isolation of Sherman Act Sections 1 and 2; and Section 8(b)(4)(A), Section 8(b)(4)(B) and Section 8(e) of the Labor Act and in violation of The Illinois Anti Trust Law 740 ILCS 10/3 by foreclosure of Plaintiffs from the relevant market since approximately March 2001 for the purpose of and with the effect of monopolization by a series of illegal, unprotected tactics and actions predicated on Local 150's attempts and success in obtaining monopolistic control of the relevant geographic market and causing injury to competition as follows:

a.    Local 150 has engaged in a pattern of trickery and sham efforts seeking recognition for purposes of collective bargaining through "top down" organizing by improperly and contrary to labor law engaging in sham bargaining and coercion to engage in bargaining and/or obtain recognition for Operating Engineers Local 150 through "top down" organizing for the purpose initially of obtaining a significant position in the relevant market for itself and its favored contractors by using threats, coercion, and "Target Agreements" and engaged in a pattern of conduct found to be unlawful by the United States Court of Appeals for the Seventh Circuit in International Union of Operating Engineers Local 150, AFL-CIO v. National Labor Relations

Board and Terracon, Inc. 361 F 3d 395 (7th Cir. 2004), in forcing Plaintiff GME Consultants, Inc. out of the relevant market.

      b.     Efforts by Defendant Operating Engineers Local 150 described in paragraph a. above as were found unlawful in a case involving Terracon and affirmed by the U.S. Court of Appeals, International Union of Operating Engineers, Local 150, AFL-CIO v. NLRB and Terracon, Inc., Intervenor 361 F.3d 395 (7th Cir. 2004), affirming Terracon Inc. & International Union of Operating Engineers Local 150, 339 N.L.R.B. No. 35 (June 6, 2003), were also visited upon Plaintiff GME Consultants, Inc., resulting in substantial economic harm to Plaintiff GME Consultants, Inc. and Defendant Operating Engineers Local 150 causing the constructive coerced withdrawal of GME Consultants, Inc. from the Chicago area relevant market in which it had enjoyed an outstanding reputation and had a substantial segment of the soils and concrete testing and related drilling relevant market.

      c.     Local 150 has engaged in a pattern and practice of interference with the business of contractors it targets as potential signatories to its collective bargaining agreement, by engaging in pressures, picketing, threats and coercion prohibited by Section 8(b)(4)(A) and 8(b)(4)(B), and 8(e) of the Labor Act for the purpose of obtaining agreements in restraint of trade. This pattern of conduct is demonstrated by the facts recited in Judge Plunkett's Decision on Summary Judgment in ECS v. Local 150 173 L.R.R.M. (BNA) 2965 (October 30, 2003).

      d.     The pattern of secondary activity set forth above with respect to ECS in ECS v. Local 150 was utilized in obtaining agreements through "top down" organizing and secondary activity.

      e.     In the case of STS Consultants Ltd. v. International Union of Operating Engineers Local 150, 174 L.R.R.M. (BNA) 2403, 2003 WL 229 37926 (N.D. Ill.) (December 9, 2003), a

pattern of coercion to obtain restraint of trade agreements were sought and obtained by Local

150; through the threat of boycott of persons who did not agree to change the way they did

business with or refrain from doing business with STS, obtained an agreement with STS as

demonstrated by the Decision of Magistrate Judge Bobrick in STS v. Local 150 as well as the

prior Decision rendered against Local 150 by Judge Plunket ECS v. Local 150, 173 L.R.R.M.

(BNA) 2695 (N.D. Ill. 2003).

      f.     The relevant market includes soil and concrete testing and related geotechnical

engineering consulting services utilized in non-residential building construction and multi family

housing construction in geographic known as the Chicago-Naperville-Joliet, IL, IN, WI

Metropolitan statistical area, excluding Kenosha County WI, but including in addition,

Stephenson, Winnebago, Ogle, and Boone Counties in Illinois in a circumference of 150 miles

radiating out from the heart of the relevant market in Chicago, Illinois, and on soils and concrete

testing and related geotechnical engineering consulting.

      g.     On or about the fall of 2000 at a time Plaintiff PSI had performed various

geotechnical consulting services and was negotiating for additional geotechnical consulting

services necessary in the planning and preparation of the proposed addition and reconstruction of

Soldier Field along the lakefront in Chicago, Illinois. PSI was retained by Hoffman Management

as agent for the Owner and Architect on the project. STS was also retained to perform certain

geotechnical services on the foundations for the new Stadium at Soldier Field.

      h.     At or about the time of the commencement of preliminary work on the Soldier

Field project Operating Engineers Local 150 (hereinafter "Local 150") and unnamed employer

co-conspirators who were signatories to the Operating Engineers Local 150 Collective

Bargaining Agreement received money from a Fund jointly administered by representatives of

Labor and Management used to subsidize and aid signatory contractors to destroy competition in competing more effectively against non-signatory contractors and obtained a shared monopoly. Such monies are commonly known as "target funds," arguably not unlawful under the Labor Act when used for defensive purposes on private projects, but unlawful when used as part of an overall conspiracy in restraint of trade to acquire new markets and on government funded projects. In this instance in connection with the Soldier Field job, Flood Testing Laboratories of Chicago, Illinois, on information and belief received "Target Funds" with the aid of Operating Engineers Local 150 and its agents James Sweeney and Stan Simrayh. These same individuals who coerced and threatened agents of the architect, owners and developers for the Soldier Field project particularly representatives of Hoffman, Management Agents for the architect and owner, causing them to replace PSI a "non-signatory" contractor, with Flood Testing Laboratories, Inc., a recent Operating Engineers Local 150 signatory contractor.

On information and belief Flood Testing Laboratories formally entered into a written agreement with Operating Engineers Local 150 in early 2002.

j.      Also on information and belief at or about the same time in late 2001 or early 2002, Holmes a previously non-signatory contractor was awarded "target" monies with aid of Defendant Operating Engineers Local 150 to enable Holmes to capture projects that had been the work of STS and ECS, at the time non-signatory contractors.

k.      When STS and ECS would not succumb to voluntarily become signatories to Operating Engineers Local 150 agreements they found all their jobs picketed and additional restraint and coercion was visited upon Owners and owner representatives with whom they did business by Defendant Operating Engineers Local 150 by secondary and/or primary boycott pressures in violation of Section 8(b)(4)(B) and 8(b)(4)(A) of the Labor Act to obtain agreements

prohibited by Section 8(e) of the Labor Act. Such neutral Owners, Developers and Contractors who had previously done business with STS and ECS were coerced into changing the nature of their relationship from using STS and ECS and instead using signatory contractors such as Flood and Holmes. As a result of the secondary boycott pressure, such neutrals were coerced into entering into agreements in restraint of trade which furthered the monopolization of the Relevant Market by Defendant Local 150. These developers, contractors and suppliers that had business relationships with STS and ECS became parties to agreements in violation of Section 8(e) which is the analog to the Anti-Trust Laws and thus engaged in agreements in restraint of trade as a result of threats and coercion by Defendant Operating Engineers Local 150. (Consolidated Express, Inc. v. New York Shipping Assn., 602 F.2d 494, 513 (3d Cir. 1979)).

I.      STS and ECS were subjected to secondary boycott pressures found to be unlawful in the litigation they each brought against the International Union of Operating Engineers Local 150 recited above, in decisions by the United States District Court, Northern District of Illinois in each of the cases, finding secondary boycott violations under 8(b)(4)(B) resulting in loss of business and prospective loss of future business by STS and ECS in the Relevant Market in Chicago for soils testing and geotechnical services. ECS and STS continued to be subjected to illegal pressure under Section 8(b)(4)(B), but they and their contractors, suppliers, owners, and developers were also subjected to illegal pressure under Section 8(b)(4)(A) to obtain agreements in (restraint of trade) prohibited by Section 8(e) of the Labor Act; at the same time on information and belief Flood and Holmes were threatened to become signatory contractors Operating Engineers Local 150,  in a conspiracy in restraint of trade that resulted in Local 150 contractors obtaining a 705 share of the market within a 2 year period as they each become signatory contractors with Local 150, giving Local 150 a 70% monopoly in the geotechnical

engineering soils testing and related service engineering Relevant Market in the geographic area described in subparagraph j above  this paragraph.

m.      or about this time in January 2001 another national engineering consulting firm with operations throughout the United States similar to PSI by the name of Terracon which engaged in soils testing and drilling out of its Naperville, Illinois facility became the target of sham collective bargaining efforts through the device of union business agents Operating Engineers Local 150, *i.e.*, Business Agent Simrayh, a union organizer attempting to obtain recognition for purposes of collective bargaining by misleading local management officials at a remote facility in Naperville for Terracon to engage in discussion of questions concerning terms and conditions of employment for persons the union claimed to represent through having obtained signed authorization cards from Terracon employees.  he Decision rendered by Chief Judge Flaum of the United States Court of Appeals for the Seventh Circuit , affirming a Decision of the National Labor Relations Board, 361 F 3d 395.  Judge Flaum found that the employer Terracon through its local management had been "mislead" into engaging in conversations with the representatives of Operating Engineers Local 150 that substantial evidence supported the finding by the National Labor Relations Board that the employer (Terracon) did not "implicitly" voluntarily recognize the union as the exclusive bargaining agent of its employees and thus did not violate the National Labor Relations Act by withdrawing recognition from the union and refusing to bargain with the union.

n.      The Seventh Circuit in <u>Terracon</u> held the employer had no duty to bargain with Operating Engineers Local 150 (see <u>Terracon Inc. And International Union of Operating Engineers, Local 150, AFL-CIO</u> (decided June 6, 2003) 339 NLRB No. 35, <u>aff'd</u>, 361 F 3d 395 (7th Cir. 2004) because <u>Terracon</u> had not manifested the necessary intent to recognize the Union.

The Seventh Circuit also held that the employer who wished an NLRB election had a right to an NLRB election and did not waive its right to seek an election absent a "clear agreement" to engage in bargaining which the Seventh Circuit affirmed and the Board found had not occurred.

o.    In early 2001, Plaintiff GME Consultants, Inc. was major competitor for geotechnical services and material soils testing in the Northern Illinois market including the City of Chicago.

p.    GME Consultants, Inc. likewise was confronted with an effort for "top down" organizing "without the benefit of an NLRB secret ballot election." Similar to the facts in Terracon v. Local 150 the Defendant Union submitted authorization cards from employees of GME Consultants, Inc. which resulted in GME Consultants, Inc. voluntarily engaging in the preliminaries of the process of collective bargaining. It quickly became apparent that James Sweeney, Business Representative and Vice President for Operating Engineers Local 150, who was the Union''s representative at such bargaining had no intention of reaching an agreement on any terms other than the terms the Union dictated from the Union''s standard area agreement for Operating Engineers Local 150. Good faith bargaining under the National Labor Relations Act requires an open mind, and give and take, and does not condone a Business Representative coming into a bargaining session with a predetermined idea of not agreeing to any changes in its proposed agreement.

q.    GME Consultants, Inc. filed charges with the National Labor Relations Board alleging that Operating Engineers Local 150 was refusing to bargain in good faith by engaging in sham bargaining. The Chicago Regional Office of the National Labor Relations Board issued a Decision finding merit to the claimed unfair labor practice filed by GME Consultants, Inc. and found that Operating Engineers Local 150 had in fact refused to bargain in good faith.

-14-

r.      The inflexible position that Operating Engineers Local 150 took in violation of the Good Faith Bargaining requirement of the Labor Act forced GME Consultants, Inc. to terminate its agreements with its customers for soils testing in the Chicago Relevant Market and to withdraw from performing work in Chicago as a proximate result of the sham collective bargaining it was forced to participate in with Operating Engineers Local 150, GME Consultants, Inc. withdrew from the Relevant Market at great financial detriment to itself caused by the sham bargaining under which Local 150 would not agree to any changes from its Standard Agreement which were economically not feasible to permit GME Consultants, Inc. to compete in the Relevant Market. GME Consultants, Inc. could only alleviate the economic vise in which GME Consultants, Inc. was placed Defendant Local 150 by removing itself from the market in order not to be subject to the same kind of secondary boycott pressure to which STS and ECS, its competitors had been subjected to compelling its agreement only to terms dictated by Operating Engineers Local 150. As result, GME Consultants, Inc. was forced to pull out of the market.

s.      GME Consultants, Inc. at the time it made its decision to withdraw from the Chicago market was fully aware and cognizant of the picketing and other illegal pressure STS and ECS had been subjected to by Local 150 for their failure to succumb to Local 150's inflexible terms.

t.      GME Consultants, Inc. could see that if it remained in business in the Chicago relevant market it would be driven out of business by Local 150 as a result of the numerous agreements in restraint of trade Local 150 had entered into with its competitors and prior to that with the customers of STS and ECS forcing such customers to stop doing business with STS and ECS, or change the way they did business with STS and ECS. GME Consultants, Inc. could see

that it would be subjected to similar types of restraints by Local 150 visited upon its customers for whom it was performing work.

u.    Operating Engineers Local 150 had engaged in its sham effort to obtain recognition from GME Consultants, Inc. and then proceeded to engage in "bad faith" bargaining with GME Consultants, Inc. as a "cats' paw" to demonstrate to ECS and STS that if they individually did not acquiesce in the efforts to become union signatories the work would go to GME, just as PSI had been forced to withdraw from the market as a result of similar pressures utilized by Defendant Operating Engineers Local 150 against the owner Representative for Soldier Field, Hoffman to do business not with PSI, but with companies who received "target monies" in restraint of trade, *i.e.*, the new union signatory contractors Flood and Holmes.

v.    By the Spring of 2004 Operating Engineers Local 150 had successfully driven PSI and GME Consultants, Inc. out of the greater Chicago relevant market, in which, prior to being driven out each enjoyed a substantial portion of that market. The balance of the Relevant Market for geotechnical services was divided between Terracon, STS and ECS and about 2 dozen smaller companies. Terracon, ECS and STS had about 60% of the market and the smaller companies jointly held less than 10% of the market.

w.    On information and belief Operating Engineers Local 150 agreed not to seek review of the decision won by Terracon in the Seventh Circuit of the United States Supreme Court by Writ of Certiorari, as it saw that its illegal pressures against, PSI, GME, ECS and STS had been successful. This decision by Local 150 not to pursue the Appeals process saved Terracon substantial additional legal fees to further defend its position which on information and belief had already cost close to $1 million.

x.     Terracon as part of an agreement with Defendant Local 150 formed a new local subsidiary of Terracon to operate in the greater Northeastern Illinois market as a unionized company, even though Terracon had been fully successful through its litigation in the Seventh Circuit to remain non-union. That Seventh Circuit Decision had affirmed the NLRB's holding that Terracon had illegally been subjected to sham recognition, top down organizing, and that Terracon did not unlawfully refuse to bargain.

y.     Similarly in early 2004 Operating Engineers Local 150 engaged in settlement agreements with ECS and STS who had each been successful in their respective Federal Court Litigation in the Northern District of Illinois against Operating Engineers Local 150. In those Decisions the District Courts found Operating Engineers Local 150 had violated the secondary boycott provisions of the National Labor Relations Act in the over 30 instances of picketing that those companies were subjected to jointly at various locations.

z.     Defendant Operating Engineers Local 150 not only successfully settled the <u>STS</u> and <u>ECS</u> cases with an agreement that forbade each company to raise these issues again, notwithstanding the resulting restraint of trade that occurred in the relevant market from the very agreements by ECS and STS to each enter into recognition agreements with Operating Engineers Local 150. ECS and STS thereby became Union signatory contractors recognizing Operating Engineers Local 150 even though ECS and STS had respectively won their cases in the United States District Court For the Northern District of Illinois to prevent this very result.

aa.     Even though Local 150 lost its case in the Federal Courts against Terracon, STS and ECS, it ultimately within a period of months in early 2004, continued its illegal pressure forcing entry into further agreements in restraint of trade with Terracon, STS and ECS leading to control of 70% of the Relevant Market in Northeastern Illinois and Northwestern Indiana through

-17-

the collective bargaining agreements it obtained through "top down organizing" (without the benefit of NLRB secret ballot elections) from Terracon, ECS and STS.

    bb.    On information and belief, by the time Operating Engineers Local 150 was successful in coercing and entering into agreements with Terracon, ECS and STS to become union signatory contractors, Flood and Holmes had grown in stature and size, as a result of PSI and GME Consultants, Inc. being forced to leave the market.

    cc.    By the Spring of 2004 the contractors signatory to Local 150 Collective Bargaining Agreements, Terracon, ECS, STS, Flood and Holmes, together with Defendant Local 150 exercised their market power through further restraint on the relevant market with their new found joint market power in keeping competitor "non-union" non-signatory contractors out. Upon information and belief Defendant Local 150 and its unnamed co-conspirators now controlled 70% of the Relevant Market.

    dd.    This 70% of the Relevant Market was obtained illegally by Operating Engineers Local 150, engaging in conduct prohibited by Section 8(b)(4)(A) through primary pressure to obtain agreements in violation of Section 8(e) of the Labor Act entered into between ECS, STS, Terracon and Operating Engineers Local 150.

    ee.    ECS, STS and Terracon became unnamed co-conspirators with Defendant Local 150  Union signatory contractors or to be driven from the market.

    ff.    Accepting all the terms and conditions thrust upon them through "top-down" organizing, and succumbing to union pressure against their customers and suppliers notwithstanding the illegality of the conduct engaged in by Operating Engineers Local 150.

    gg.    As a result of these agreements in restraint of trade the market changed from an open shop non-union market into a 70% unionized market.

hh.    STS, ECS and Terracon's participation in entering into collective bargaining agreements with Operating Engineers Local 150 after being legally successful in their respective law suits in remaining non-signatories entered into these subsequent agreements with Defendant Local 150 becoming unwilling unnamed co-conspirators, who now benefit from the monopoly position Local 150 had created for them by policing the market to keep non-signatories such as Plaintiffs GME, PSI, MES and non-Plaintiff Testing Engineers of Rockford, IL and other non-signatory contractors out of their 70% controlled relevant market.

ii.    The Collective Bargaining Agreements lawful under the National Labor Relations Act if entered into as part of a predatory pattern to monopolize a relevant market by secondary and primary boycotts unlawful under Section 8(b)(4)(B), 8(b)(4)(A) and to obtain agreements under Section 8(e) of the Labor Act are unlawful under Sherman Act Sections 1 and 2 because of their adverse economic impact.  Such conduct engaged in by Defendant Operating Engineers Local 150 and unnamed co-conspirators has injured competition in the Relevant Market.  As result of this conduct Plaintiffs PSI, GME Consultants, Inc. and MES have been largely kept out of the Relevant Market and presently are limited to doing lower volume and less profitable business in the balance of the market in Northeastern Illinois Relevant Market where Local 150 presently enjoys an even greater portion of the market.

jj.    Defendant Operating Engineers Local 150 used target agreements in the first instance to get a toe hold in the market, *i.e.,* by assisting Holmes and Flood and subsequently closing the doors on the lucrative high rise geotechnical relevant market in downtown Chicago by establishing themselves as the beneficiary of their own wrongful secondary boycott actions against STS and ECS and their sham bargaining efforts against Terracon, through their successful efforts in forcing PSI and GME Consultants, Inc. to withdraw from the market so it could be

divided among the remaining new union signatory contractors.  Concurrently the illegal threats, coercion against PSI and sham bargaining were the "cats' paw" together with promise of expansion to convince the unnamed co-conspirators Terracon, STS and ECS to enter into agreements with Operating Engineers Local 150.

kk.     The effect of these agreements in restraint of trade between STS, ECS, Terracon, Flood and Holmes, and Operating Engineers Local 150 has enabled Local 150 to keep PSI, GME Consultants, Inc., MES and other non-signatories out of the lucrative downtown Chicago market and caused them to experience restraint and coercion if they fail to succumb to "top down" organizing throughout the balance of by threatening to close down or otherwise restrain any company in the market that does business with persons other than the Union signatories, *i.e.*, the unnamed co-conspirators.

ll.     As a result of these conspiracies in restraint of trade, Defendants and their unnamed co-conspirators have caused PSI, GME Consultants, Inc. and MES respectively to lose their relevant market share in the downtown Chicago market.  A secondary effect of these conspiracies is to cause Plaintiffs to seek business in the less profitable and smaller balance of the relevant market in Northeastern Illinois and Northwestern Indiana area outside of downtown Chicago.

mm.     Defendant Operating Engineers Local 150 through its ill gotten agreements in restraint of trade in the Relevant Market starting in the Downtown Chicago  area for geotechnical services and soils and materials testing have target MES, the third Plaintiff herein in the mid-size market outside the Downtown Chicago area, subjecting it to illegal pressures in restraint of trade in that subsidiary relevant market.

oo.    GME Consultants of Illinois, Inc., with offices in Rockford, Illinois, is now performing work throughout Northeastern Illinois and has recently as a result of restraint, coercion and interference by Defendant Local 150 lost a project at Perryville Place, Rockford, IL for construction material observation and testing services in December 2004. GME Consultants, of Illinois, Inc. has experienced renewed interest and pressure on the work that it is performing outside the City of Chicago in geotechnical services and soils and materials testing by Local 150.

pp.    Similarly, PSI is presently pursuing a major project outside the primary downtown Chicago relevant market in Northeastern Illinois performing geotechincal services at a new County Courthouse being built in Rockford, Illinois.

qq.    Defendant Local 150 by its Agents is engaging in illegal restraint and coercion directed to technicians employed by Plaintiff PSI since November 2004 and continuing on a daily basis since January 1, 2005, claiming Local 150 will "close down" PSI, because they are non-signatories to Local 150 and thereby through direct threats and coercion of employees is seeking to "strip" such employees from continuing to work for PSI to further their efforts to drive non-signatories out of the market to aid of achieving a 90% monopoly position in the Relevant Market.

rr.    Defendant Local 150 by its agents is engaging in illegal restraint and coercion directed to technicians employed by Plaintiff PSI. Since November 2004 and continuing on a daily basis, claiming Local 150 will "close down" PSI because it is nonsignatory to Local 150's agreement. These direct threats and coercion to stop employees of PSI from working for PSI by Local 150 is meant to "strip" these workers from employment by PSI in order to further Local 150's efforts to drive non-signatory businesses out of the relevant market in aid of achieving a 90% monopoly position in the relevant market.

-21-

ss.     The aforesaid agreements between Operating Engineers Local 150 and its unnamed co-conspirators, and obtaining coerced agreements from customers of Plaintiffs not to do business with non-signatory contractors are by direct threats to its customers not to do business with a non-signatory testing company in violation of Sherman Act Section 1 and 2 have the effect of controlling the market to the detriment of the Plaintiffs.

tt.     The agreements by Defendants Midwest Construction Industries Advancement Fund, Defendant Local 150 and Defendant Illinois Valley Construction Industries Advancement Fund to provide target monies to Flood and Holmes and other similarly situated contractors are agreements in restraint of trade in violation of Sherman Act Sections 1 and 2 and have the effect of and threatening developers, building owners, building managers, and general contractors who do business with Plaintiffs and are in restraint of trade interfering with Plaintiffs and are in restraint of trade with the business opportunities of PSI, GME Consultants, Inc. and MES, Plaintiffs herein.

uu.     Local 150 has conspired with owners and developers and others who did business with STS and ECS prior to those contractors entering into Collective Bargaining Agreements with Local 150 for the purpose of engaging in predatory conduct to coerce ECS and STS to become signatory members in restraint of trade, in violation of Sherman Act Sections 1 and 2 and in violation of Section 8(b)(4)(A) and Section 8(e) of the Labor Act.

vv.     Upon information and belief Operating Engineers Local 150 through its Labor Trustees serving on the two target funds respectively named as Defendants herein, Midwest Construction Industry Advancement Fund (MCIAF) and the Illinois Valley Construction Industry Advancement Fund and the Illinois Valley Construction Industry Labor/Management Funds, administered pursuant to agreements and declarations of trust each in their respective areas

together with the respective Management Trustee Representatives on behalf of Operating

Engineers Local 150 together with the unnamed co-conspirators herein who are signatories to

Operating Engineers Local 150 Collective Bargaining Agreements have administered these

industry advancements funds as "target funds" and utilized said monies to obtain a toe hold in the

market by advancing such target monies to Flood and Holmes and other similarly situated

contractors and all such agreements in restraint of trade in violation of Sherman Act Sections 1

and 2 and have the affect of threatening developers, building owners, building managers, general

contractors and the Plaintiffs herein in restraint of trade with the business opportunities of PSI,

GME and MES.

### THE RELEVANT MARKET

17.     The relevant market for soil and concrete testing and related geotechnical services

utilized in non-residential building construction and multi-family housing construction, as these

terms are defined in the North American Classification System (NAICS), is in the Chicago-

Naperville-Joliet, IL - IN - WI Metropolitan Statistical Area (MSA), excluding Kenosha County,

WI which includes McHenry, Lake, DeKalb, Kane, Cook, DuPage, Kendall, and Will Counties

in Illinois, and Lake, Porter, Newton, and Jasper Counties in Indiana and in addition the Relevant

Market includes Stephenson, Winnebago, Ogle, And Boone Counties in Illinois. There are a

number of relevant submarkets, including downtown Chicago.

18.     Defendants including Operating Engineers Local 150 and unnamed signatory

contractors performing geotechnical services (including STS, ECS, Flood Testing Laboratories,

Holmes, and Terracon) jointly now possess a market share exceeding 70% of the relevant market.

19.     Defendants including Operating Engineers Local 150 and unnamed co-conspirator

companies signatory to Operating Engineers Local 150 agreements that are in the geotechnical

services business such as STS, ECS, Terracon, Flood and Holmes have conspired to bar

Plaintiffs and other non-signatory contractors to Local 150 collective bargaining agreements from

at least 70% of the relevant marketPlaintiffs prior to the pattern of conduct violative of Section

8(b)(4)(A), and Section 8(e) of the Labor Act and in restraint of trade in violation of Sections 1

and 2 of the Sherman Act enjoyed approximately 30% of the downtown Chicago market from

which they have now been excluded as a result of the actions of the Defendants in violation of

the labor laws and Sherman Act Sections 1 and 2 and the anti-monopoly provisions of the Illinois

Anti-Trust Act and more significantly the action of the Defendants in conspiracy with the

unnamed co-conspirator signatories to Defendant Operating Engineers Local 150 collective

bargaining agreement in the geotechnical services industry and other neutral contractors who

were pressured and entered into agreements in restraint of trade with Operating Engineers Local

150 to complete the exclusion of Plaintiffs from the market place now in conspiracy with one

another pressure neutrals not to do business with Plaintiffs, as they are non-signatories.

    20.    Plaintiffs have in the last two years enjoyed some level of work outside of the

Downtown Chicago hi-rise construction in the counties of Northeastern Illinois, including

Winnebago County in the North and contiguous counties thereto, but are presently being

subjected to pressure in violation of Sections 1 and 2 of the Sherman Act and Section 7 of the

Clayton Act and the Illinois Anti-Trust Law in the attempts by Local 150 to follow their vehicles,

learn the parties with whom they are doing business, and putting pressure upon neutrals with

whom they do business for the purpose of entering into agreements in restraint of trade to further

pressure the Plaintiffs who continue to do business in the portions of the market in which they

perform work. These unlawful acts in furtherance of the monopolistic practices which Operating

Engineers Local 150 and their co-Defendants and unnamed co-conspirators have engaged in

Chicago and now being conducted against Plaintiffs and other non-signatory contractors in Northeast Illinois and Northwestern Indiana, the balance of the relevant market.

21.     Defendants have: (a) violated Section 8(b)(4)(A) of the Labor Act to obtain agreements that violate Section 8 of that act; (b) engaged in sham bargaining with Terracon and GME Consultants, Inc., causing injury to each forcing them to abandon their non-signatory market position, and continued to threaten and harass Plaintiffs at their job sites. This coercive strategy, and the resulting foreclosure of Plaintiffs from the Relevant Market, have been facilitated by Defendants' success in organizing employees at ECS, STS, and Terracon through illegal means. Tactics employed include misuse of target funds, misuse of bargaining, misuse of top-down organizing, sham bargaining, and misuse of settlement agreements. It is noteworthy that Defendants' use of these tactics has been found to be unlawful in all the legal proceedings to which they have given rise.

22.     Predicated in part on Local 150's monopolistic control over the services of other operating engineers in the relevant geographic market, Defendants' illegal actions toward Plaintiffs, and illegal assistance to Plaintiffs' competitors, enabled the union to extend its monopoly into a new service area, much to Plaintiffs' detriment, and to the detriment of burden with excessive construction costs.

## NATURE OF TRADE AND COMMERCE

23.     During the last four years, substantial quantities of materials, tools and equipment used in the performance of geotechnical services including but not limited to consulting, various geotechnical services, construction monitoring and materials testing including soils testing and concrete testing and environmental site testing, utilizing materials sold and services sold and

shipped to contractors such as Plaintiffs from suppliers in various states other than the State of

Illinois.

24.    Plaintiffs are engaged in interstate commerce and in an industry affecting

interstate commerce within the meanings of Sections 1 and 2 of the Sherman Act and Section

187 of the Labor Act in the business of geotechnical and material engineering services, including

soils and concrete testing and geotechnical consulting on privately and government funded

commercial low rise and high rise structures in Northeastern Illinois, the City of Chicago and the

surrounding counties of Chicago utilizing products, supplies and equipment coming from outside

the State of Illinois. The general business activities of Defendant Operating Engineers Local 150

and their co-conspirator signatories to collective bargaining agreements who were also

performing work in the geotechnical services area, such as unnamed co-conspirators ECS, STS,

and Terracon, also have a substantial effect upon interstate commerce.

## CO-CONSPIRATORS

25.    Upon information and belief, Defendant, Operating Engineers Local 150 and

Flood Testing Laboratories Inc. and/or its Agent Waldo H. Flood with offices and a place of

business at 1945 East 87th Street, Chicago, Illinois, is a contractor engaged in geotechincal

services entered into an agreement in restraint of trade and co-conspired with Operating

Engineers Local 150 in agreeing to accept "target monies" and/or have target monies paid to

companies with whom it was doing business in order to obtain a toe hold in a market previously

dominated by others, and in order to obtain work previously assigned to non-signatory Local 150

contractors such as Plaintiff PSI on the Soldier Field job.

26.    Defendant Operating Engineers Local 150 and Holmes Construction engaged in

restraint of trade with Operating Engineers Local 150 and with its customers in obtaining "target

monies" from Operating Engineers Local 150 to enable it to obtain a  in a portion of the

Downtown Chicago geotechnical servicesmarket not previously available to it and but for the

purpose of obtaining of these target agreements to obtain work previously done by non-signatory

Local 150 contractors.

27.    Defendant Operating Engineers Local 150 conspired in restraint of trade with

multiple customers, suppliers, owners, and construction managers that did business with ECS,

and were picketed by Operating Engineers Local 150, and otherwise coerced and threatened in

violation of Section 8(b)(4)(A) and Section 8(e) and Section 8(b)(4)(B) of the Labor Act by

Operating Engineers Local 150 who obtained agreements in restraint of trade from such

suppliers, owners, customers and other neutrals dealing with ECS, all for the purpose of forcing

ECS to change the way it did business and ultimately enter into an agreement with Operating

Engineers Local 150 which ultimately also became a further agreement in restraint of trade.  ECS

ultimately became a further co-conspirator with Operating Engineers Local 150 in restraint of

trade in aiding Operating Engineers Local 150 and the co-conspirator signatory contractors to

obtain a monopoly position in the market place.

28.    Defendant Operating Engineers Local 150 conspired in restraint of trade with

multiple customers, suppliers, owners, and construction managers that did business with STS and

were picketed by Operating Engineers Local 150 and otherwise coerced and threatened in

violation of Section 8(b)(4)(A), Section 8(e), and Section 8(b)(4)(B) of the Labor Act by

Operating Engineers Local 150, and it obtained agreements in restraint of trade from such

suppliers, owners, customers and other neutrals dealing with STS all for the purpose of forcing

STS to change the way it did business and ultimately enter into an agreement with Operating

Engineers Local 150 which ultimately also became a further agreement in restraint of trade.  STS

ultimately, therefore, became a further co-conspirator with Operating Engineers Local 150 in

restraint of trade in aiding Operating Engineers Local 150 and the co-conspirator signatory

contractors to obtain a monopoly position in the market place.

Defendant Operating Engineers Local 150 conspired in restraint of trade with multiple

customers, suppliers, owners, and construction managers that did business with Terracon and

were picketed by Operating Engineers Local 150 and otherwise coerced and threatened in

violation of Section 8(b)(4)(A), Section 8(e), and Section 8(b)(4)(B) of the Labor Act by

Operating Engineers Local 150 obtained agreements in restraint of trade from such suppliers,

owners, customers and other neutrals dealing with Terracon all for the purpose of forcing

Terracon to change the way it did business and ultimately enter into an agreement with Operating

Engineers Local 150 which ultimately also became a further agreement in restraint of trade.

Terracon ultimately, therefore, became a further co-conspirator with Operating Engineers Local

150 in restraint of trade in aiding Operating Engineers Local 150 and the co-conspirator signatory

contractors to obtain a monopoly position in the market place.

     29.    As a result of pressures upon ECS, STS and Terracon the restraint of trade

brought by Operating Engineers Local 150 upon the respective suppliers, owners, customers and

construction managers with whom each respective company did business during the period 2000

to 2003 when Settlement Agreements were signed with Operating Engineers Local 150,

Operating Engineers Local 150 having conspired with said neutrals who did business with ECS,

STS and Terracon ultimately succeeded in a further de facto conspiracy between Operating

Engineers Local 150 and ECS, STS, and in the signing of collective bargaining agreements

which had the further effect to monopolize the market in violation of the Sherman Act Sections 1

and 2 and keep non-signatory contractors such as Plaintiffs herein out of the downtown Chicago

market and otherwise restrain their ability to perform work in the Greater Northeastern Illinois

market at a level far below that which they had previously enjoyed in the past 4 years.

30.    Operating Engineers Local 150 further engaged in a co-conspiracy with Terracon

through sham "top down organizing" and sham efforts to force Terracon to engage in collective

bargaining which efforts were found to be contrary to the Labor Act by the Seventh Circuit and

ultimately resulted in Terracon becoming a co-conspirator with Operating Engineers Local 150 in

signing a collective bargaining agreement, notwithstanding Terracon's having prevailed in its law

suit in the Seventh Circuit against Operating Engineers Local 150, for the purpose of Terracon

and Operating Engineers Local 150 mutually benefitting in joining a monopoly position for

signatory contractors resulting in the exclusion of the non-signatory Plaintiffs and other non-

signatories from 100% of the Chicago market and diminishing the work available to Plaintiffs

and other non-signatory contractors in the market in Northeastern Illinois outside the Greater

Chicago area.

31.    Operating Engineers Local 150 and Plaintiff GME Consultants, Inc. became an

unwilling co-conspirator when GME Consultants, Inc. was subjected to the same kind of sham

"top down organizing" previously utilized against Terracon in presenting authorization cards

without any intent by Operating Engineers Local 150 to in fact represent such employees and

bargain in good faith as found by the NLRB Regional Office in the case of GME Consultants,

Inc.

32.    Operating Engineers Local 150 coerced GME Consultants, Inc. to engage in a

conspiracy in restraint of trade by entering into the process of collective bargaining with a closed

mind, never intending to agree to anything except the  that it placed on the table at the outset and

utilized the open and notorious consequences of the ongoing pressures through picketing and

pressures in violation of Section 8(b)(4)(A) and 8(b)(4)(B) and agreements entered into under

Section 8(e) contemporaneously with customers of ECS and STS designed to have the effect to

coerce GME Consultants, Inc. to agree to the terms of the agreement tendered by Operating

Engineers Local 150 and never intended to bargain in good faith concerning the counter

proposals made by GME Consultants, Inc.

33.     Through the process of sham collecting bargaining with GME Consultants, Inc.,

Operating Engineers Local 150 forced and coerced a constructive withdrawal of GME

Consultants, Inc. from the soils testing market in the Greater Chicago area at great financial loss

to itself having to withdraw from contracts that it had already achieved in an amount in excess of

$1,000,000.00.

34.     Operating Engineers Local 150 coerced and conspired with the owner

representatives Hoffman in the building of the Soldier Field project starting in about the year

2000 for the purpose of forcing and coercing PSI which already had the contract and was

performing geotechnical services for the owner representatives, and causing PSI to be replaced

by Flood Laboratory Testing Services and other signatory contractors to Operating Engineers

Local 150.

35.     Similar agreements in restraint of trade are Defendant Operating Engineers Local

150's entry into  with the Architect for Soldier Field and its construction manager not to use the

services of PSI in violation of Section 8(b)(4)(A) and Section 8(e) of the Labor Act and in

violation of the Sherman Act Sections 1 and 2.

36.     The Plaintiff PSI has lost in excess of $1,000,000.00 in profits as a direct and

proximate result of the agreements in restraint of trade in violation of Section 8(b)(4)(A) and

Section 8(b)(4)(B) and Section 8(e) entered into by Operating Engineers Local 150 in conspiracy

with their customers and suppliers resulting in their loss and refusal of such customers and suppliers to continue to perform work with PSI at the same level and in the same manner they had previously performed work with PSI, such customers are as follows:

(a)    Mesirow Stein on a project in downtown Chicago on a high rise building known as "State Place" in which Mesirow Stein was threatened and coerced by Operating Engineers Local 150 which project as a result of such threats was awarded to a union signatory contractor Flood;

(b)    a project at 200 West Grand, Chicago, in which construction manager Tishman was threatened and coerced in violation of Section 8(b)(4)(A), Section 8(b)(4)(B), and Section 8(e) of the Labor Act if they did not refuse to do business with PSI and said project as a result was awarded to a union signatory Flood;

(c)    the Dollar Tree Distribution Center in Joliet, Illinois was lost as a result of illegal threats and pressures in violation of Section 8(b)(4)(A), Section 8(b)(4)(B) and Section 8(e) of the Labor Act against construction manager Clancey and Thase resulting in the loss of the project to PSI;

(d)    the relocation of the submarine U505 at the Museum of Science and Industry in Chicago, Illinois was lost due to illegal pressure in violation of Section 8(b)(4)(A), Section 8(b)(4)(B), and Section 8(e) visited upon Construction Manager Jones Lang LaSalle and O'Neil Construction, the project was lost therefore to PSI;

(e)    Plaintiff PSI initially was awarded a project for a fee of $500,000.00 to perform geotechnical services at McCormick Place West expansion for

their client Mc4 West (Clark Construction) as a result of pressures and

violations of Section 8(b)(4)(A), Section 8(b)(4)(B), and Section 8(e) PSI

lost the project even though it was listed as the environmental engineer of

record for the project and found it was subsequently awarded to union

signatory Holmes;

(f) PSI had a contract with Gilbane the Construction Manager for materials

testing for the University of Illinois residence hall medical building for a

proposed fee of $110,000.00, as a result of pressure in violation of Section

8(b)(4)(A), Section 8(b)(4)(B), and Section 8(e) on the owner of the

project, Gilbane was pulled off the project and the project was awarded to

Turner Construction, a union general contractor, and as a result only union

testing firms would continue to be considered and PSI lost that project as a

consequential result of the pressure brought on the Construction Manager

of Gilbane and Turner Construction by Operating Engineers Local 150.

37.    PSI who had previously done $80,000.00 to $100,000.00 per year in business with

Tishman has not performed any work for Tishman since.  Similarly Walsh Construction and

Turner Construction who previously provided work opportunities for PSI since the monopoly

position and threats under Section 8(b)(4)(A), Section 8(b)(4)(B), and Section 8(e) visited upon

Walsh and Turner by Operating Engineers Local 150, no longer furnished the opportunity to bid

to PSI.

38.    Most recently PSI has been involved in performing geotechnical services for the

construction of the new Winnebago Criminal Justice Center in Rockford, Illinois.  At various

times in 2004 pursuant to a contract it had obtained through Durant Architects, PSI had

-32-

performed boring and drilling services to prepare a geotechnical report on the soundness of the project to be constructed. Most recently PSI has completed its report dated November 16, 2004. As a result of interference from Defendant Local 150, PSI has been unsuccessful in obtaining further soils testing and supervisory work on their ongoing project.

39.    PSI even though successful in obtaining the pre-construction testing for the project absent interference by Defendant Local 150 has not been awarded additional geotechnical service work on the project as the construction started. Because of the interference with Operating Engineers Local 150 with the County of Winnebago, that work has now been awarded to a 150 signatory contractor to the detriment and loss of PSI.

40.    PSI is presently experiencing serious continuing problems with Operating Engineers Local 150 following its employees and threatening its employees that they lose their jobs because Operating Engineers Local 150 is taking control of the market. This activity occurred initially on geotechnical services PSI was performing on the St. Charles Water Treatment Plant when the Operating Engineers business representative visited Trotter and Associates the design firm through which PSI was performing the technical services.

41.    In January 2005 and continuing to date, Operating Engineer Agents continued to follow the employees of PSI out of its office in Elgin, Illinois and continued to seriously disrupt work, not only by coercing and interfering with employees at work, but also threatening and coercing customers with whom PSI was performing work in the area.

42.    Since Plaintiff GME Consultants, Inc. was coerced and forced out of the downtown Chicago market through sham collective bargaining, GME Consultants of Illinois, Inc. has attempted to perform work in Northeastern Illinois on a scaled back basis but the pressures

and violations of Section 8(b)(4)(A), Section 8(b)(4)(B), and Section 8(e) engaged in by Operating Engineers Local 150 persist;

       a.      Most recently GME Consultants of Illinois Inc. prepared a proposal for materials testing services for the Perryville Place project in Rockford, Illinois. On November 23, 2004, it drafted a lengthy proposal to the developer of the project Ms. Ashlesha Niggam of Summit LLC. Following a meeting on December 14, 2004, the project was awarded to GME Consultants of Illinois, Inc. to perform the soils testing and concrete testing and other geotechnical services on the project. On December 15, 2004, Operating Engineers Local 150 through its Agent Mark McCaffrey interfered and caused an agreement to be entered into with Summit LLC not to use the services of GME Consultants of Illinois, Inc. Consultants Inc. and to use a signatory contractor instead.

       b.      GME Consultants of Illinois, Inc. is concerned that unless a temporary restraining order and preliminary injunction is issued to restrain this type of activity by Defendant Local 150 it will again be driven from the Relevant Market.

43.     Plaintiff MES has been confronted in the last year with a series of actions by Defendants Operating Engineers Local 150 engaging in agreements in restraint of trade with its customers, suppliers, construction managers and owners as follows:

       a.      MES was awarded the construction materials testing at Plainfield High School from Frederick Quinn Corporation, Addison, Illinois, in January 2004 for a proposed fee of $55,000.00. MES began work in March 2004. On May 6, 2004, Local 150 told Quinn that it had

to use union-only contractors and provided Project Manager Damien Eallonardo a list signatory

soil testing labs and drilling companies

b.      In June 2004, Terracon, which had placed an unsuccessful bid on the above

project, called Eallonardo and told him that Terracon could make the union problem go away if it

used Terracon for its testing.   In August 2004, Eallonardo informed MES that because of the

union pressure it had no choice but to terminate Quinn's contract with MES.  MES was told by

Quinn that it would not be able to use MES in the future.

c.      In August 2004, MES was working at a jobsite for ORIX Real Estate Equities Inc.

in Romeoville, IL.  Operating Engineers Local 150 agent Stan Simrayh went to the jobsite on

August 19, 2004, and informed ORIX and the general contractor Krusinski that it had to have a

"union man" on the project.  One was put on.  MES which has previously done extensive work

for Orix for over ten (10) years has not been permitted to bid on future projects with ORIX.

d.      MES performed construction materials testing work for the City of Joliet at its

Westside Waste Water Treatment Plant, a project worth over $120,000.00.  Due to their quality

performance on this project MES was recommended by the Department of Public Works

Director Dennis Duffield to perform testing at the new Aux Sable Waste Water Treatment Plant

on a contract worth approximately $120,000.00.

e.      Upon receiving the contract for approval, the Joliet City Council who according to

Mr. Duffield had been previously warned by the 150 representative not to use MES, possibly Mr.

Joe Frank, rejected the MES contract.  MES subsequently lost the contract and has not been

asked to bid on any other City of Joliet testing work. MES has previously performed for the City

of Joliet.

f.     MES did $50-100,000.00 in business per year with Henry Brothers. After Henry Brothers was contacted by agents of Local 150, Steve Deaton told MES that it would no longer use MES for materials testing work until they became signatory.

g.     MES submitted a proposal to City of Schaumburg owners representative HDC International for construction materials testing work at the New Schaumburg Convention Center. After receiving the MES proposal, Mr. Dean Wilkerson of HDC emailed MES and thanked it for the proposal, but felt to prevent labor problems on the job they needed to utilize a Union signatory testing lab. The proposal fee for this project was $380,000.00.

h.     MES submitted a proposal to Concrete Structures of the Midwest Inc., Mr. Tom Moberly, for construction materials testing services at the Reservoir and Pump Station project for Park Ridge, Illinois. Fees for this project would be approximately $15-20,000.00. Mr. Moberly called MES after the work had already started and wanted to hire MES because he was unhappy with the testing lab who started the work. When he discovered that MES was not a Local 150 signatory he said that a union lab was required. When asked who's requirement it was, he said it was Concrete Structures' requirement due to fear of project disruption from labor disputes. He also indicated he could not consider MES for future work.

## DEFINITIONS

44.     As used in this Complaint the following terms have the following meanings assigned to them in the paragraphs set forth below.

45.     A "Local 150 Contractor" or (Local 150 Signatory Contractor) are contractors that are signatory to a collective bargaining agreement with Operating Engineers Local 150 engaged in the geotechnical engineering services and soils testing businesses, such as STS, ECS, Terracon and other similarly situated signatory contractors.

-36-

46.     A "Non-Local 150 Contractor" are contractors engaged in geotechnical engineering services including consulting services, soils testing services who are not signatory to a collective bargaining agreement with Operating Engineers Local 150.

47.     A "developer, building owners, building management, general contractors, construction managers" are unnamed co-conspirators who have been coerced and threatened to enter into agreements with Operating Engineers Local 150 in violation of Section 8(e) of the Labor Act which agreements are the analog to agreements in restraint of trade under Sections 1 and 2 of the Sherman Act as a result of which pressure and coercion said persons who were neutrals in the dispute agreed to cease using or change the way they did business with or entered into other agreements with Operating Engineers Local 150 in restraint of trade in not doing business with the object of such pressure to stop doing business or change the way they do business with the geotechnical engineering services contractor that they had been doing business with.

48.     Developers, building owners, building management, general contractors, construction managers have no employees capable of being organized by Operating Engineers Local 150 and Operating Engineers Local 150 did not seek a collective bargaining agreement from such persons and only sought agreements in restraint of trade in violation of the Sherman Act Sections 1 and 2 from such persons.

49.     A "Job Target Fund" or "Target Monies" or an "Industry Advancement Fund" refers to a job subsidy program financed by contributions from employee hourly wages provided for in the collective bargaining agreement Local 150 has entered into with signatory contractors which monies are provided developers, building owners, construction managers, owners, general contractors with whom it has no collective bargaining agreement and  employees Operating

-37-

Engineers Local 150 does not assert jurisdiction. To grant subsidy funds to induce such persons, *i.e.*, the developers, building owners, building management, general contractors, construction managers to refrain from engaging Plaintiffs and other Non-Local 150 Signatory Contractors and instead engage only Signatory Local 150 Contractors is an agreement in restraint of trade. These subsidies are intended to assist signatory employers in competing in the market place with non-signatory geotechnical service engineering companies and other non-signatory companies. In fact, Defendant Local 150 and its signatory contractors has unlawfully administered the program for target funds and/or industry advancement funds so as to use such monies not only as a threat to deny them to developers, building owners, building management, construction managers who engage Non-Signatory Contractors but instead also used them as a reward for developers, building owners, construction managers and general contractors who utilized Operating Engineers Local 150 Signatory Contractors.

50.     "Stripping" is a practice whereby Operating Engineers Local 150 and its agents, in agreement and through a conspiracy with its signatory contractors and Local 150 Signatory Contractors who are in the geotechnical engineering services, consulting and testing business to leave their non-signatory contractors and obtain work with Local 150 Signatory Contractors in order to severely curb the ability of Plaintiffs and other Non-Signatory Local 150 Contractors in the geotechnical engineering services business to carry on their business. By the patterns and practices described herein, Plaintiffs and other Non-Local 150 Signatory Contractors in the geotechnical services consulting and soils testing business are barred from the relevant market therein, thereby lessening the financial ability of the Plaintiffs and other Non-Signatory Local 150 Contractors to retain their employees, further reducing the ability of Plaintiffs and other Non-Signatory Local 150 Contractors to compete in the relevant market.

## FACTUAL ALLEGATIONS

51.     The restraint of trade and tortious interference with contract and perspective advantage visited by Operating Engineers Local 150 upon MES, Inc.

52.     Plaintiff MES incorporates by reference paragraphs 1 to 50 as part of the conspiracy in restraint of trade engaged in by Local 150 and the co-conspirators plead before as further diminishing the relevant market in which it could compete at the time that additional specific conspiracies were visited against Plaintiff MES.

53.     The City of Joliet, Illinois had been a regular and important client to MES in excess of 5 years during which period MES performed geotechnical engineering services for the City and testing services.

54.     MES had completed a portion of construction testing and inspection services at the Aux Sable Creek Basin WWTP MES Proposal Number 2-4316 and prior to that had completed geotechnical services on the site, preparing report, MES Report Number 2-33097 dated January 23, 2004, notwithstanding completion of this portion of the project and 25 other projects in the past 5 years for the City of Joliet, as a result of specific interference, including visitation and interference with prospective advantage by Operating Engineers Local 150 the City did not go forward and grant to MES its Proposal Number 2-4316 dated July 8, 2004, on information and belief this was as a result of 8(b)(4)(B) conduct through threats and coercion by agents of Operation Engineers Local 150 and his Agent Dennis L. Duffield for public work of the City of Joliet causing him to enter into an agreement with Operating Engineers Local 150 that the project that had been designated and would otherwise have been awarded to MES was instead awarded to a signatory contractor with Operating Engineers Local 150.

55.     This project known as the Joliet Waste Water Treatment Plant but for the restraint

of trade activities of Operating Engineers Local 150 which included entry of an agreement in

violation of Section 8(e) of the Labor Act between Operating Engineers Local 150 and the City

of Joliet would have continued the pattern of favorable dealing between MES and the City of

Joliet as previously MES had specifically been awarded the construction testing work on the east

side Water Treatment Plant which resulted in over $120,000.00 worth of testing service work for

MES and a similar amount had been lost by the interference of Operating Engineers Local 150

with the Aux Sable Creek Basin Water Treatment Plant which would have been an additional

$120,000.00 worth of work for MES.  On information and belief Joe Frank, Agent for Operating

Engineers Local 150 engaged in the agreement and restraint of trade with Mr. Dennis Duffield

for the City of Joliet.

56.     Another project lost through the illegal restraint of trade agreements and pressure

and coercion by Operating Engineers Local 150 by MES was the Schaumburg Convention Center

project.  Dean Wilkerson the owner's representative was forced as a result of agreement in

restraint of trade, coerced by Operating Engineers Local 150 to award the project to a union

signatory geotechnical services company.

**AGREEMENTS IN RESTRAINT OF TRADE**
**TO OBTAIN MARKET POWER**

57.     James M. Sweeney, Secretary and Vice President of Operating Engineers Local

150, personally has been responsible for the campaign in the Northern Illinois relevant market

and the attempt to monopolize the market for the benefit of Operating Engineers Local 150 and

their signatory contractors in the geotechnical services area after having utilized target

agreements in violation of the National Labor Relations Act and in violation of Sherman Act 1

and 2 in obtaining market share in the relevant market through such agreements with Flood

Testing Services and Holmes.

58.     James Sweeney took the lead in establishing the strikes, pickets and threats

against STS Consultants to obtain agreements in restraint of trade in violation of Section 8(e) and

engaged in similar conduct against Terracon/Terragroup.  These activities forced

Terracon/Terragroup to close facilities in the Northern Illinois area and ultimately forced GME

Consultants, Inc. to leave the market as well.

59.     The lead organizer working for James Sweeney in these campaigns was Stan

Simrayh, an Agent of Local 150.  The STS decision in the Federal District Court 174 L.R.R.M.

(BNA) 2403, 2003 WL 229-37926 (N.D. Ill.) (Dec. 9, 2003), shows that Operating Engineers

Local 150 engaged in picketing and threats to obtain agreements in violation of Section 8(e) at

thirty different locations; among the agreements in restraint of trade obtained by Operating

Engineers Local 150 under the directorship of James Sweeney and his campaign with the

assistance of Stan Simrayh are the following:

a.     At the Millennium Park, Tower II Project, Kenny Construction, a neutral

employer, was threatened and was subjected to actual picketing if it did not cease

or change the way it did business with STS, in late 2002 and early 2003.

b.     Similarly, Thomas Black of the Habitat Company and Frank Contamica of

AMEC, a construction company, was subjected to picketing and threats of

picketing at the 400 North LaSalle Street project if they did not cease doing

business or change the way they did business with STS and switch to using a

signatory contractor.

c.    Similarly, John McDermott of Hines Interest Partners and John Frank of Hines
Interest Partners, together with Jim Roosa of Turner Construction, were all
subjected to picketing and threats of picketing at the ABN Amro Plaza
Superstructure Project by representatives of Operating Engineers Local 150 in
connection with entering into agreements in restraint of trade in violation of
Section 8(e) and conduct in violation of Section 8(b)(4)(A) and 8(b)(4)(B).

d.    Michael Pepper of Fifield Residential Realty and Robert C. Owak of Magellan
Development Management Group, Ltd. were subjected to picketing and threats of
picketing in violation of Section 8(b)(4)(A) and 8(b)(4)(B) for the purposes of
obtaining an agreement violative of Section 8(e) of the Labor Act at the Park
Alexandria Condo Project by Representatives of Operating Engineers Local 150.

e.    Jim Brown of Condell Medical Center and Soni Conte of Power Construction
Company were threatened, coerced and restrained in violation of Section
8(b)(4)(A) and 8(b)(4)(B) for the purpose of obtaining agreements prohibited by
Section 8(e) of the Labor Act in restraint of trade at the Condell Medical Center
Expansion Project in Libertyville, Illinois.

f.    John Rogers of Prism Development Co. and Bob Shaw and Bill Schrimpl of
AMEC Construction were subjected to threats and coercion in violation of Section
8(b)(4)(A) and 8(b)(4)(B) for the purpose of obtaining agreements under Section
8(e) including threats and picketing at the Millennium Center Condominium
Project (Tower Superstructure in Chicago, Illinois).

g.    James E. Thornton, Jr. of the Fordam Company and Torbin Jensen of Amec
Construction were threatened with picketing, coercion and restraint in violation of

Section 8(b)(4)(A) and 8(b)(4)(B) for the purpose of obtaining agreements in restraint of trade under Section 8(e) of the Labor Act at the Fordam Tower Construction Project in Chicago, Illinois.

h. Mike Pardee of Federated Department Stores and Bruce Bloomquist of W.E. O'Neil were threatened with picketing and coercion in violation of Section 8(b)(4)(A) and 8(b)(4)(B) to obtain agreements in violation of Section 8(e) of the Labor Act at the Medinah Temple Renovation Project in Chicago, Illinois by agents of Local 150.

i. Rick Lally of Home Depot and Tom Simon of Weis Builders were threatened with picketing and actual picketing in violation of Section 8(b)(4)(A) and 8(b)(4)(B) to obtain an agreement in restraint of trade prohibited by Section 8(e) of the Labor Act at the Home Depot Project at Armitage and Cicero in Chicago, Illinois.

j. Warren Vahle of Sargent and Lundy Engineers and Pete Woeste and Jeff Krause of Turner Construction were threatened with actual picketing and threats of picketing and restraint and coercion in violation of Section 8(b)(4)(A) and 8(b)(4)(B) to obtain agreements in violation of Section 8(e) at the ComEd State Street Substation Project.

60. James Sweeney, Vice President of Operating Engineers Local 150, utilized all of the above threats and threats to obtain agreements in violation of Section 8(e) and in restraint of trade under Sections 1 and 2 of the Sherman Act in demonstrating the inflexible position in refusing to accept any agreement other than the agreement tendered by Operating Engineers Local 150, creating sham bargaining in violation of the National Labor Relations Act for the purpose of obtaining an agreement in restraint of trade from GME Consultants, Inc. As a result

of all of the aforesaid pressures to obtain multiple agreements in restraint of trade against STS and GME Consultants, Inc. had the effect of GME Consultants, Inc. withdrawing from material testing in the Chicago market with great financial detriment to itself.

## FIRST CLAIM FOR RELIEF
### (Violation of the Sherman Antitrust Act Monopoly)

61.    Plaintiffs PSI, MES and GME Consultants, Inc. repeat and reallege and reiterate each and every allegation contained in the above paragraphs in the complaint 1 through 60 inclusive with the same force and effect as though the same were fully set forth at length herein.

62.    From at least as early as March 2001 and continuing to date, Defendants and their co-conspirators have entered into contracts, agreements, combinations, and/or conspiracies in unreasonable restraint of interstate trade and commerce within the relevant product and geographic market, all in violation of Sections 1 and 2 of the Sherman Act.

63.    The Defendant Operating Engineers Local 150, together with unnamed co-conspirator signatory contractors to its collective bargaining agreements, agreements in restraint of trade and target agreements, have conspired, combined and agreed with the aforesaid developers, building owners, building managers, general contractors, and owner's agents to monopolize and/or willfully maintain their monopoly in the Relevant Market.

64.    Defendant, Operating Engineers Local 150, through its agent James Sweeney, Vice President of Operating Engineers Local 150, having ratified and affirmed these activities and acting within the scope of his agency and/or for the benefit of Operating Engineers Local 150, together with unnamed co-conspirators signatory contractors who have contributed to target agreements and industry advancement funds have sought and obtained agreements from developers, building owners, building managers, owner's agents,  general contractors, including but not limited to persons previously having done business with PSI, MES, and GME.   The

terms of these anti-competitive agreements, which are also in violation of Section 8(e) of the National Labor Relations Act, are as follows:

a.   Operating Engineers Local 150 agreed with more than a dozen developers, owners, contractors, construction companies, owner's agents as listed above on projects in which they intended to do business with STS, to change the way they did business with STS and agreed to use persons who were signatory to agreements with Operating Engineers Local 150 rather than proceed with agreements with STS which at the time was not a signatory to Operating Engineers Local 150 agreement.

b.   Similarly Operating Engineers Local 150 entered into numerous agreements with contractors, developers, owners who had contracted to do business with ECS in violation of Section 8(e) of the Labor Act to change the way they did business and no longer continuing to do business with a non-signatory contractor and rather do business in the future only with contractors signatory to agreements with Operating Engineers Local 150.

c.   Operating Engineers Local 150 in conspiracy with employers from whom it had raised funds for the monies in their Target Fund utilized target funds to subsidize Flood Testing Laboratories, Inc. and Holmes Construction to obtain a foot hold in the geotechnical services market in order to attempt to monopolize and control the balance of the relevant market in violation of Sections 1 and 2 of the Sherman Act and by obtaining agreements in violation of Section 8(e) of the National Labor Relations Act. Operating Engineers Local 150 entered into agreements with owner's representatives, developers, general contractors and construction

-45-

managers who had done business with PSI at Soldier Field and other locations for purpose of engaging in agreements in restraint of trade violative of Section 8(e) of the Labor Act and Sections 1 and 2 of the Sherman Act.

d.    Operating Engineers Local 150 and their agents engaged in restraint and coercion in obtaining agreements in violation of Section 8(e) from persons doing business with including with MES, including owners, cities, construction managers and developers who had previously had a relationship to perform work and a history of performing work with MES for the purpose of interfering with the contractual relations had with MES and to enter into agreements with such persons to only do business with persons who were signatory to collective bargaining agreements with Operating Engineers Local 150.

e.    Operating Engineers Local 150 through their agents engaged in a pattern of misuse of "top down organizing," obtaining signature cards from employees for the ostensible purpose of obtaining agreements from such employees to be the representatives of such employees for purposes of collective bargaining, and then force contractors in the geotechnical/materials services industry such as Terracon and GME Consultants, Inc. to recognize Operating Engineers Local 150 for purposes of collective bargaining at a time that Local 150 did not have a good faith interest to ever come to an agreement other than the agreement which was its standard agreement thereby engaging in sham bargaining and bad faith bargaining for the purpose of furthering its monopoly and agreements in restraint of trade in controlling the geotechnical services relevant market in the Northeastern part of the State of Illinois. In the case of Terracon, Operating Engineers Local 150 condoned a sham double-breasted operation to achieve its results and in the case of GME Consultants, Inc. it forced GME Consultants, Inc. out of the soils testing market.

65.    The effect of the aforementioned conspiracies and restraint of trade and agreements in violation of Section 8(e) of the Sherman Act is to willfully maintain monopoly power that has been:

a.    to and continues to be, escalation of cost to consumers in connection with the utilization of geotechnical services and materials testing and deterioration of quality and reduction of competition in the area.

b.    the aforesaid combinations and conspiracies in restraint of and in monopolization of trade consist of policing and obtaining agreements, understandings and a concerted action among Defendants and their unnamed co-conspirators the substantial terms of which are to lessen competition and enhance its 70% monopoly that Local 150 has already obtained with such co-conspirators and to utilize that monopoly power to achieve 100% monopoly power in the relevant market from the remaining contractors which include Plaintiffs and other non-signatory contractors as follows:

i.    To restrain, hinder and impair the trade and business of Plaintiffs and other similarly situated non-signatory Local 150 contractors who engage in geotechnical services and soils testing and consulting work on commercial buildings in the downtown Chicago area and the balance of the counties in Northeastern Illinois and Northwestern Indiana.

ii.    To eliminate, exclude or cause a substantial diminution in the business Plaintiffs and other non-signatory operating engineer contractors by requiring or acquiring agreements with them to contain burdensome and unfair terms for any job and jobs especially the jobs in the relevant market thereby restraining competition and maintaining monopoly for the conspiring operating

engineer contractors in the geotechnical services relevant market who are also co-conspirators in the use of target agreements, stripping, and threats of picketing as a mechanism to obtain these restrictive agreements.

      iii.     To force Plaintiffs and other non-signatory contractors to enter into agreements in restraint of trade and in violation of Section 8(b)(4)(A) and 8(e) of the Labor Act by pressuring such persons to enter into these restrictive agreements under which they refuse to do business with persons other than those who are signatory to agreements with Operating Engineers Local 150 and other signatory contractors to enable Operating Engineers Local 150 to maintain its monopoly together with the signatory contractors in the geotechnical services, consulting and testing and soils testing relevant market in the City of Chicago and the Greater Northeastern Illinois and Northwestern Indiana area, all in substantial restraint of competition in the interstate market.

      iv.     To carry out the terms of these agreements in restraint of trade limiting the market to Local 150 signatory contractors who perform geotechnical consulting, testing and management services in the relevant market and continue to use target agreements and other restraints of trade with other neutral employers to achieve total control of the relevant market by coercing persons doing business with Plaintiffs and other non-signatory contractors to be subjected to such pressure for the purpose of enabling Operating Engineers Local 150 and their signatory contractors to have exclusive control of the geotechnical services, materials testing and soils testing business in the City of Chicago and the Greater

Northeast Illinois relevant market all in restraint of trade under Section 8(e) of the

Labor Act and Sections 1 and 2 of the Sherman Act.

66.    The acts and agreements set forth above were in restraint of trade and Plaintiffs

and other non-signatory Local 150 contractors have been damaged by these and similar acts.

Plaintiffs actual damages are continuing but are believed to be no less than $10,000,000.00

jointly and severally.

## SECOND CLAIM FOR RELIEF
### (Violation of the Sherman Antitrust Act Boycott)

67.    Plaintiffs repeat, reallege and reiterate each and every allegation contained in

paragraphs of the complaint numbered 1 through 66 inclusive, with the same force and effect as

though the same were fully set forth at length herein.

68.    Operating Engineers Local 150 their Officers and Agents acting for the benefit of

their signatory geotechnical service contractors—the unnamed co-conspirators herein, have and

continue to threaten and coerce through obtaining from persons agreements in violation of

Section (8)(b)(4)(A) and Section 8(e) of the Labor Act and Sections 1 and 2 of the Sherman Act

from persons doing business with Plaintiffs and other non-signatory contractors and Plaintiffs

themselves to become a further instrument of Defendants' control of the relevant market for the

benefit of their signatory contractors have conspired, combined and agreed with the aforesaid

signatory contractors, the unnamed co-conspirators herein that Defendants will act as agents and

surrogates for them to monopolize and/or willfully maintain their monopoly in the relevant

market.

69.    Operating Engineers Local 150, their Officers and Agents acting for the benefit of

their signatory geotechnical service contractors the unnamed co-conspirators herein, have and

continue to threaten and coerce through obtaining agreements in violation of Section (8)(b)(4)(A)

-49-

and Section 8(e) of the Labor Act and Sections 1 and 2 of the Sherman Act from persons doing business with Plaintiffs and other non-signatory contractors and Plaintiffs themselves to become a further instrument of Defendants' control of the relevant market for the benefit of their signatory contractors have conspired, combined and agreed with the aforesaid signatory contractors, the unnamed co-conspirators herein that Defendants will act as agents and surrogates for them to enter into contracts, agreements, combinations and/or conspiracies in unreasonable restraint of interstate trade and commerce within the relevant product and geographical market all in violation of Section 1 and 2 of the Sherman Act. Operating Engineers Local 150 for the benefit of their signatory contractors the unnamed co-conspirators herein and acting as their agent in furtherance of agreements to restrain trade and to monopolize the relevant market have engaged in stripping of key employees from Plaintiffs and other non-signatory Local 150 contractors and the assignment of such employees to work for signatory Local 150 contractors for the sole and exclusive purpose of injuring and destroying competition in the relevant market.

70.    The effect of the conspiracy to willfully obtain or maintain monopoly power by Operating Engineers Local 150 for the benefit of their signatory contractors has been:

a.    To and continues to be, escalation of costs to consumers in connection with geotechnical services, deterioration of quality, and restriction of output.

b.    The aforesaid combinations and conspiracies in restraint of trade and the monopolization of trade consist of policing and obtaining agreements, understandings and a concerted action among Defendants and their co-conspirators the substantial terms of which are to lessen competition and maintain the 70% monopoly position Local 150 and its signatory contractors have thus far obtained in the relevant market as follows:

i.      To restrain, hinder and impair the trade and business of Plaintiffs and other similarly situated non-signatory Local 150 contractors who engage in geotechnical services and soils testing and consulting work on commercial buildings in the downtown Chicago area and the balance of the counties in Northeastern Illinois and Northwestern Indiana.

ii.      To eliminate, exclude or cause a substantial diminution in the business Plaintiffs and other non-signatory operating engineer contractors by requiring or acquiring agreements with them to contain burdensome and unfair terms for any job and jobs especially the jobs in the relevant market thereby restraining competition and maintaining monopoly for the conspiring operating engineer contractors in the geotechnical services relevant market who are also co-conspirators in the use of target agreements, stripping and threats of picketing as a mechanism to obtain these restrictive agreements.

iii.      To force Plaintiffs and other non-signatory contractors to enter into agreements in restraint of trade and in violation of Section 8(b)(4)(A) and 8(e) of the Labor Act by pressuring such persons to enter into these restrictive agreements under which they refuse to do business with persons other than those who are signatory to agreements with Operating Engineers Local 150 and other signatory contractors to enable Operating Engineers Local 150 to maintain its monopoly together with the signatory contractors in the geotechnical services, consulting and testing and soils testing relevant market in the City of Chicago and the Greater Northeastern Illinois area all in substantial restraint of competition in the interstate market.

iv.    To carry out the terms of these agreements in restraint of trade

limiting the market to Local 150 signatory contractors who perform geotechnical,

consulting, testing and management services in the relevant market and continue

to use target agreements and other restraints of trade with other neutral employers

to achieve total control of the relevant market by coercing persons doing business

with  Plaintiffs and other non-signatory contractors to be subjected to such

pressure for the purpose of enabling Operating Engineers Local 150 and their

signatory contractors to have exclusive control of the geotechnical services,

consulting testing and soils testing business in the City of Chicago and the Greater

Northeast Illinois relevant market all in restraint of trade under Section 8(e) of the

Labor Act and Sections 1 and 2 of the Sherman Act.

71.    The effect of the conspiracy to boycott Plaintiffs set forth above is to maintain

monopoly power to restrain trade of Plaintiffs and other non-signatory 150 contractors have been

damaged by these and similar acts. Plaintiffs' actual damages are continuing but believed to no

less than $10,000,000.00 jointly and severally.

## THIRD CLAIM FOR RELIEF
### (Violation of the Sherman Antitrust Act Horizontal Monopoly)

72.    Plaintiffs repeat, reallege, and reiterate each and every allegation contained in the

paragraphs of the complaint numbered "1" through "71" inclusive, with the same force and effect

as though same were fully set forth at length herein.

73.    Local 150 and its signatory geotechnical service contractors acting as agents and

under control of its horizontally aligned Local 150 signatory contractors each (acting as agents

for the other together with Operating Engineers Local 150) have agreed to refuse to subcontract

or otherwise do business with Plaintiffs and exclude Plaintiffs and other similarly situated non-

signatory contractors from geotechnical service jobs within the Relevant Market. The means agreed upon include commitment of target subsidies to persons who will aid them in this pursuit from using Plaintiffs and other non-signatory Local 150 contractors and other threats of job site slow downs or picketing against those who do not agree to refuse to hire Plaintiffs and other non-signatory contractors in contravention of Section 8(e), Section 8(b)(4)(A) and Section 8(b(4)(B) of the Labor Act and restraint of trade, and stripping of key employees of Plaintiffs and others to injure and destroy their ability to compete in the market place all in violation of Sections 1 and 2 of the Sherman Act.

74. The effect of the conspiracy to refrain from using Plaintiffs and other non-signatory Local 150 Contractors and to willfully maintain monopoly power has been the following:

a. the escalation of cost to consumers, deterioration of quality, and restriction of output.

b. the aforesaid combinations and conspiracies in restraint of and to monopolize trade consist of policing and obtaining agreements, understandings and a concert of action among Defendants and their unnamed co-conspirators the substantial terms of which are to lessen competition in the performance of geotechnical services, consulting and soils testing market and generally maintain and attempt to increase their 70 % monopoly position for the benefit of Local 150 and their geotechnical services members enjoy in the relevant geographic and product market to restrain hinder and impair the trade and business of Plaintiffs and other non-signatory Local 150 Contractors which compete in the geotechnical services, consulting and soils testing business in the City of Chicago and the balance of Northeastern Illinois relevant market.

75.    Over the last three (3) years Plaintiffs have sought and been awarded substantially fewer jobs in the relevant market because of direct restraint and interference from Operating Engineers Local 150 and their unnamed co-conspirators as a result of agreements in restraint of trade entered into by those persons and persons with whom they do business all for the purpose of barring Plaintiffs and other non-signatory contractors from the relevant market as a result of anti-competitive conspiracy described herein.

76.    The acts and agreements set forth above were in restraint of trade and Plaintiffs and other non-signatory Local 150 Contractors have been damaged by these and similar acts. Plaintiffs damages are believed to be in excess of $10,000,000.00 jointly and severally.

### FOURTH CLAIM FOR RELIEF
### (Illinois Anti-Trust Law 740 ILCS 10/3)

77.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 76 inclusive, with the same force and effect as though the same were fully set forth at length herein.

78.    Plaintiffs on behalf of themselves and similarly situated non-signatory Local 150 contractors seek preliminary injunctive relief, declaratory relief and damages under the Illinois Anti-Trust Law as plead and set forth in paragraph 11 et seq at page 5 of this Complaint which pleadings under the Illinois Anti-Trust Law incorporate the first, second and third claim for relief under the Sherman Anti-Trust Act Sections 1 and 2 now here specifically reincorporated to obtain such relief.

79.    Plaintiffs are competitors of the unnamed co-conspirators who together with Operating Engineers Local 150 maintain substantial market power to the detriment of Plaintiffs.

80.    Defendants and their unnamed co-conspirators have acquired and maintained that power apart from permissible competitive means such as growth or development of a superior service, business acumen or a stark accident.

81.    Defendants together with their unnamed co-conspirators possess monopoly power, the power to control and lessen competition in the area.

82.    Defendants and their co-conspirators' improper conduct is designed to continue to maintain their monopoly power by any anti-competitive means.

83.    Defendants and their co-conspirators since 2000 have utilized their dominant position in the market to control competition and engage in other unfair methods of competition.

84.    Defendants acted with a willful intent with unreasonable exclusionary and anti-competitive effects establishing that Defendants' conduct is predatory rather than merely efficient practice.

85.    Defendants have established, maintained and used monopoly power over a substantial portion of the trade or business and commerce of the State of Illinois.

86.    Defendants actions are and were for the purpose of excluding competition.

87.    Defendants acted by and through themselves and their agents and have violated Section 10/3(3) of the Illinois Anti-Trust Act by the contracts, combinations, and conspiracies described in this Complaint which are in unreasonable restraint of trade and have created monopoly power over the Relevant Market for the purpose of excluding Plaintiffs and similarly situated non-signatory contractors.

88.    Defendants engaged in predatory practices designed to achieve monopoly power over substantial part of the trade or commerce of this state.

89.    Wherefore Plaintiff respectfully requests a preliminary injunction, actual damages, reasonable attorneys fees and costs and jury trial on these issues.

## FIFTH CLAIM FOR RELIEF
### (Illinois Anti-Trust Law
### 740 ILCS 10/3(3) (Attempted Monopoly))

90.    Plaintiffs repeat, reallege and reiterate each and every allegation contained in paragraphs of the complaint numbered 1 through 89 inclusive, with the same force and effect as though the same were fully set forth at length herein.

91.    Plaintiffs on behalf of themselves and similarly situated non-signatory Local 150 contractors complain of Defendants and their unnamed co-conspirators have engaged in predatory and anti-competitive conduct.

92.    Defendants and their unnamed co-conspirators have acted with specific intent to monopolize.

93.    There is a dangerous probability and their unnamed co-conspirators achieving their monopoly power.

94.    Plaintiffs are competitors of Defendants unnamed co-conspirators in the market for geotechnical services.

95.    Defendants with its co-conspirators maintain substantial market power.

96.    Defendants and their co-conspirators have gross revenues in excess of $50,000,000.00 per year.

97.    Defendants and their co-conspirators have acquired and maintain that power apart from permissible competitive means such as growth, development, or by providing a superior service, business acumen or historic accident.

98.    Defendants attempt to possess monopoly power including the power to control the availability of geotechnical services in the market has cause irreparable harm to Plaintiffs.

99.    Defendants and their co-conspirators improper conduct is designed to acquire and maintain that power by any competitive means.

100.    Defendants and their co-conspirators have utilized their dominant position in the market to attempt to drive Plaintiffs out of the market or diminish their ability to continue to be in the market through unfair competitive means.

101.    Defendants and their co-conspirators acted with a willful intent with unreasonable exclusionary and anti-competitive effects establishing that Defendants' conduct is predatory rather than merely efficient practices.

102.    Defendants and their co-conspirators have established, maintained and used attempted monopoly power over substantial part of trade or commerce in this State.

103.    Defendants actions are and were for the purpose of excluding competition in a significant area of trade or commerce.

104.    Defendants and their co-conspirators acting by themselves and through their agents have violated Section 10/3(3) (Attempted Monopoly) of the Illinois Anti-Trust Act.

105.    Wherefore Plaintiffs respectfully request preliminary injunction, actual damages, reasonable attorneys fees and costs and Plaintiffs request a jury trial for the at law issues.

## SIXTH CLAIM FOR RELIEF
### (Illinois Anti-Trust Law 740 ILCS 10/3
### For Preliminary And Permanent Injunctive Relief)

106.    Plaintiffs repeat, reallege and reiterate each and every allegation contained in paragraphs of the complaint numbered "1" through "105" inclusive, with the same force and effect as though the same were fully set forth at length herein.

107.    The Illinois Anti-Trust Act provides that any person who has been injured in his business or property by a violation of the Act may maintain an action for damages or for an injunction or both against any person who has committed such violation.

108.    Where a Statute provides injunctive relief, the Plaintiff need show only that there has been a violation of the Statute by the Defendant and the Plaintiff has standing to bring the action. It is therefore unnecessary for the Plaintiffs to prove irreparable damage in the absence of an adequate remedy at law, see Jerry Stephens, et al v. Springdale Cemetery Inc. et al 98 CH 156 10th Judicial Circuit of the State of Illinois, Peoria County Illinois, decided July 3, 1998, a copy attached as Exhibit A.

109.    In Stephens v. Springdale Cemetery, Inc., a permanent injunction was issued based upon a Verified Complaint, affidavits and unchallenged documents finding that the Defendants had substantially and unfairly eliminated competition violated the Illinois Anti-Trust law. Such decision in Stephens v. Springdale Cemetery by Circuit Judge Richard E. Grawey was consistent with Rosebrough Monument Co. v. Memorial Park Cemetery Association, 666 F 2d 1130 (8th Cir. 1998) and Moore v. Jas. H. Matthews & Co., 550 F 2d 1207 (9th Cir. 1977). Each of these federal cases found tying arrangements prohibited by the Federal Anti-Trust Law just as the tying arrangement in Stephens v. Springdale were found to violate Section 10/11 of the Illinois Anti-Trust Act as the wording of the State Act and the Federal Act were identical. In the instant case the monopoly provisions of the Illinois Anti-Trust Act and Sherman Act 1 and 2 are similarly identical. Injunctive relief against a labor organization may be sought where the activities to be enjoined are exempt because the labor organization is not pursuing a "legitimate labor objective" and the conduct is violative of under the Illinois Anti-Trust Law as well as Sections 1 and 2 of the Sherman Act. Defendant Operating Engineers Local 150 together with its

unnamed co-conspirators have already achieved 70% market power and 70% monopoly control of the Relevant Market as described above.

110.    Since the close of the 2004 construction season on an ever increasing basis as demonstrated by the Affidavit of Plaintiff PSI's employee Tammy Barker attached hereto as Exhibit B, Defendant Local 150's activity to obtain total monopoly power is not only increasing but is creating irreparable injury for the Plaintiffs and other non-signatory employers;

a.    Testing Engineers Inc., a Rockford, Illinois non-signatory company, employing technicians has been subjected to "top down" organizing not protected under the decision of the United States Supreme Court in Connell Construction Co. Inc. v. Plumbers & Steam Fitters Local 100, 421 U.S. 616 (1975). Testing Engineers, Inc. engages in soils testing and related consulting services as the other Plaintiffs herein, also purchasing goods from outside the State of Illinois in excess of $50,000.00 per year, had recently submitted a proposal to its longstanding customer Swedish American Hospital of Rockford, Illinois to perform the soils testing on a new cardiovascular center. The proposal was accepted by the Hospital in the middle of December 2004 at which time Operating Engineers Local 150 engaged in unprotected conduct in restraint of trade including threats and picketing violative of Section 8(b)(4)(A) to obtain an agreement prohibitive by Section 8(e) of the Labor Act, 29 U.S.C. § 158(e), from Swedish American Hospital. This activity is in restraint of trade under the Sherman Act Sections 1 and 2 is conduct typical of the ongoing activities that are described in this Complaint. It is a recent example that has included coercive picketing. As a result of this activity Testing Engineers Inc. lost the opportunity of doing business with its long standing customer and was dismissed from the job in January 20, 2005.

b.      Plaintiff PSI was retained to perform soils testing and consulting engineering

services in the preconstruction phase of the new County Court House in Rockford, Illinois.

When PSI sought to bid for the balance of the consulting services on the job, Operating

Engineers Local 150 went to the County and succeeded in keeping PSI, a non-signatory, out of

the market and having the job awarded to union signatory contractor Terracon.

c.      Plaintiff PSI and MES are presently being subjected to a practice known as

'stripping." Stripping is a practice whereby Operating Engineers Local 150 in agreement and

through a conspiracy with its unnamed co-conspirators and agents such as Thomas Rottman,

Operating Engineers Local 150 induces employees of Plaintiffs such as PSI and MES to leave

their job to become employed by one of Operating Engineers Local 150 signatory contractors in

order to severely curb the ability of Plaintiff and other non-signatory contractors to carry on their

business.  By this pattern and practice Plaintiffs and their non-signatory contractors  are being

barred from the Relevant Market thereby lessening the financial ability of the Plaintiffs and other

non-signatory contractors to retain their employees further reducing the ability of Plaintiffs and

other non-signatory contractors to compete in the Relevant Market.

d.      Beginning on or about January 1, 2005, Defendant Operating Engineers and its

Agents including but not limited to Joe Farrell, Jim Schweins, Mike Aprile, and Mike Kresge

each on information and belief business representatives or organizing representatives of

Operating Engineers Local 150 began following and engaged in a practice presently continuing

on a daily basis of harassing PSI employees including Barker.

e.      Defendants and their Agents listed above engaged in a broad variety of unlawful

activities including:

- Assaulting Barker as prohibited by 720 ILCS 5/12-1;

- Engaging in criminally reckless conduct as prohibited by 720 ILCS 5/12-5;

- Performing acts of criminal intimidation against Barker and other PSI employees as prohibited by 720 ILCS 5/12-6;

- Stalking Barker and other PSI employees as prohibited by the Illinois Criminal Code at 720 ILCS 5/12-7.3 which has risen to the level of "aggravated stalking" as defined by 720 ILCS 5/12-7.4 based on the physical harm that Barker has suffered;

- Interfering with PSI's contractual relationship with Barker and its other employees;

- (See Affidavit of Tammy Barker attached as Exhibit B);

f.      During the pattern of illegal "stripping," stalking and intimidation of PSI's employee Tammy Barker as forth in paragraph 20 of the Affidavit of Barker, Local 150 Business Representative Mike Aprile responded to Barker's statement that "It sound[s] as if the union was starting a monopoly.  Aprile said, "Honey, that is exactly what we're doing".  After handing Ms. Barker a union authorization card to sign, Aprile told her". . . If you don't sign ". . . PSI "was going down...that the union had "millions to spend on attorneys", "PSI would not protect [you]" and that PSI does not have the money to hire a lawyer to protect just a few technicians."  (See Ex B.-Barker Affidavit ¶ 20).

g.      Plaintiff GME Consultants of Illinois, Inc. who has an office an do business in Rockford, Illinois recently through its Branch Manager Rick Lou prepared a proposal to do soils testing and perform consulting engineering services at a project known as Perryville Place in Rockford, IL.  Plaintiffs GME Consultants of Illinois, Inc. has successfully bid and agreed upon the terms of such project with the Project Representative Ashlesha Niggam of Summit LLC of Rockford, IL.  As a result of conduct in violation of Section 8(b)(4)(A) through threats and coercion seeking to obtain an agreement violative of Section 8(e) of the Labor Act with Niggam not to do business with a signatory contractor rather than a non-signatory contractor.  On information and belief Mark McCaffrey an Organizer/Business Representative of Operating Engineers Local 150 caused GME Consultants, Inc. to lose that job on or about December 15, 2004.

h.      Similarly the Chicago Branch Manager Plaintiff Midwest Engineering Services Inc. (MES) has bid a series of jobs in the last 3 months in which Defendant Operating Engineers Local 150 engaged in conduct in violation of Section 8(b)(4)(A) in going to the principals and interfering with the opportunities of Midwest Engineering Services, Inc. to obtain such work thereby violating Section 8(e) of the Labor Act which is the analog of the restraint of trade provisions of the Sherman Act.

i.      Consistent with these efforts James Sweeney a Vice President of Operating Engineers Local 150 confirmed his illegal "top-down" organizing plans stating to Jeremy Fortier, project manager for Duke Construction, Lisle, Illinois, on February 2, 2005, that "he is going to . . . start "chasing" MES to become union signatory and wanted us to "know about it".

j.      The above pattern of activity in restraint of trade and to drive the Plaintiffs and other non-signatory contractors out of business unless they become signatory contractors.

### SEVENTH CLAIM FOR RELIEF
### (Interference with Prospective Advantage)

111.    Plaintiffs repeat, reallege and reiterate each and every allegation contained in paragraphs of the complaint numbered "1" through "110" inclusive, with the same force and effect as though the same were fully set forth at length herein.

112.    Since on or about July 1, 2000 and continuing to date Defendants Operating Engineers Local 150 have interfered with the perspective economic advantage of Plaintiffs causing Plaintiffs economic harm from such tortuous interference with respect to economic advantage and causing each of the Plaintiffs to lose substantial numbers of jobs in particular as follows:

  (a)    Losses By Plaintiff PSI have been in excess of $500,000.00

  (b)    Losses By Plaintiff MES have been in excess of $500,000.00

  (c)    Losses By Plaintiff GME Consultants, Inc. have been in excess of $500,000.00

113.    By the above acts and activities Operating Engineers Local 150 have tortiously interfered with Plaintiffs with the perspective advantage for future contracts.

114.    Plaintiffs damages are continuing and are believed to exceed $5,000,000 jointly and severally.

### EIGHTH CLAIM FOR RELIEF
### (Tortious Interference with Contract)

115.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs numbered 1 through 114 with the same force and effect as though they were fully set forth at length herein.

116.    This claim for economic relief is brought under the tort laws of the State of Illinois as a supplementary proceeding to this Federal claim.

117.    The wanton, intentional conduct, set forth above, of the Defendants, committed without justification or excuse, has:

      a.    Intentionally interfered with the tortious interference with contract of the Plaintiffs in their businesses;

      b.    Intentionally interfered with the tortious interference with contract of the Plaintiffs in their contractual relations.

118.    As a direct and proximate result of the foregoing illegal conduct, including violence, threats, coercion, and destruction of property engaged in by the Defendants, Plaintiffs have been and continue to be injured in their business and property in substantial amounts not yet ascertained with particularity, in that they have been:

      a.    Deprived on the fundamental constitutional right of the opportunity to contract;

      b.    Forced to expend large sums of money to protect and repair equipment;

      c.    Caused to lose sales and business.

119.    As a result, Plaintiffs are entitled to recover:

      a.    All damages sustained by reason of the unlawful acts complained of herein;

      b.    Exemplary and punitive damages.

120.    As a result of the aforesaid unlawful conduct by Defendants jointly and severally, Plaintiffs has suffered and continues to suffer substantial damages to its business and property in

an exact amount which is not known at this time but believed to be in excess of $5,000,000.00

jointly and severally.

121.    As a result of the aforesaid unlawful conduct by Defendants, Plaintiffs seek

permanent injunctive relief for the injury it has suffered and continues to suffer.

**NINTH CLAIM FOR RELIEF**
**(Violation of Labor Management Relations Act)**

122.    Plaintiffs repeat, reallege and reiterate each and every allegation contained in the

paragraphs of the complaint numbered 1 through 121 inclusive, with the same force and effect as

though same were fully set forth at length herein.

123.    Plaintiffs in the alternative and additionally claims a violation under 29 U.S.C.

Section 187(a) and (b) which states:

> "(a) It shall be unlawful, for the purpose of this Section only, in an
>
> industry or activity affecting commerce, for any labor organization
>
> to engage in any activity or conduct defined as an unfair labor
>
> practice in Section 158(b)(4) of this title."
>
> "(b) whoever shall be injured in his business or property by reason of any
>
> violation of subsection (a) of this section may sue therefore in any District
>
> Court of the United States subject to the limitation and provisions of
>
> Section 185 of this title without respect to the amount in controversy or
>
> any other court having jurisdiction of the parties and shall recover the
>
> damages by him sustained and cost of this suit."

This Section provides a damage remedy for certain secondary and primary activity engaged in by

labor organizations.

124.    Since on or about July 2000, Operating Engineers Local 150 has violated Sections 8(B)(4)(ii)(A) and (B) of the Labor Act by engaging in threats of picketing and other restraint and coercion against Plaintiffs and against others to obtain agreements prohibited by § 8(e) of the Labor Act and where an object is to cause the above named Developers, building owners, building management, general contractors, and fabricating contractors to change the way they do business with Plaintiffs or other non-signatory Operating Engineers Local 150 Contractors or cease doing business with Plaintiffs and other Non-Local 150 Contractors and give the business instead to Operating Engineers Local 150 Contractors.

WHEREFORE, Plaintiffs demands judgment on the complaint as follows:

125.    On the First, Second and Third Claims for relief:

a.    judgment against Defendants and in favor of Plaintiffs for treble the damages determined to have been sustained by it which are to be proved at trial but believed to be no less than $25,000,000.00 together with cost of suit including pre-judgment interest and reasonable attorneys fees.

b.    judgment enjoining the Defendants from continuing the acts, conduct and conspiracies here and before alleged; and a declaration that Defendant's unlawful acts are in violation of Sections 1 and 2 of the Sherman Act.

126.    On the Fourth, Fifth, and Sixth Claims for Relief, Preliminary and Permanent Injunctive relief, actual damages, reasonable attorneys' fees and costs.

127.    On the Seventh and Eighth Claims for Relief: judgment in an amount to be proved at trial but to be no less than $15,000,000.00 together with its cost of suit, interest and reasonable attorneys fees, together with punitive damages in an amount to be determined at trial.

128.    On the Ninth Claim for Relief, damages to be proved at trial but believed to be no less than $5,000,000.00 and costs against Operating Engineers Local 150 including pre and post judgment interest and costs.

129.    Preliminary and permanent injunctive relief under the Illinois Anti Trust Act, the Sherman Act I and II and Section 7 of the Clayton Act enjoining Operating Engineers Local 150, the Defendants, their officers, agents, members, employees, and all persons acting in concert with Defendants, from the commission of the following acts, and ordering Defendants to specifically and unequivocally instruct their officers, agents, members, employees, attorneys, and all persons acting in concert with Defendants to cease and desist from the following acts:

a.    Directly or indirectly, agreeing to take money that was contributed as wages and benefits paid by any employer engaged in public works subject to the federal Davis-Bacon or other federal prevailing wage law and contributing it to an employer.

b.    Causing directly or indirectly any unsolicited offer of employment to be presented to any agent or employee of Plaintiffs;

c.    Causing directly or indirectly the recording, by voice or video, of any kind of work done on a jobsite by Plaintiffs or their employees;

d.    Placing, maintaining or stationing any pickets or persons in excess of two (2) within ten(10) feet of any entrance to a worksite;

e.    Obstructing, blocking, hindering or in any manner slowing, the ingress or egress of Plaintiffs' customers, employees, suppliers and others seeking to do business with Plaintiffs on worksites where one of the Plaintiffs is erecting steel;

f.      Threatening physical violence to the person or property of customers, suppliers, or employees of Plaintiffs, or other persons seeking to do business with Plaintiffs or invitees of Plaintiffs;

g.      Threatening and/or committing acts of intimidation, destruction or removal of property, physical violence and/or harassment of Plaintiffs' officers, agents, employees, customers, suppliers, tenants or others desiring to do business with or perform work for Plaintiffs; and

h.      Following Plaintiffs' officers, agents, employees, customers, suppliers, or others desiring to do business with, or perform work for Plaintiff in motor vehicles in a menacing and/or threatening manner.

130.    Attorneys' fees and costs of suit.

131.    On all the claims for relief, such other and further relief as may appear necessary and appropriate.

Respectfully submitted,

_Gerard C. Smetana_

Gerard C. Smetana
39 S. La Salle Street, Suite 1218
Chicago, IL 60603
312-357-0250
312-357-0251 - Fax

_Michael E. Avakian_

Michael E. Avakian
3211 Port Royal Road, Suite 103
Springfield, VA 22151
703-321-9181
703-321-9325 - Fax

Local Counsel:

_Donald Q. Manning_

Donald Q. Manning
Christopher J. Cocoma
McGreevey, Johnson & Williams
6735 Vistagreen Way
Rockford, IL
815-639-3700
815-639-9400 - Fax

OF COUNSEL:
Smetana & Avakian
39 S. LaSalle Street, Suite 1218
Chicago, IL 60603
312-357-0250
312-357-0251-Fax

(Motion for admission
*pro hac vice* to be filed)
Thomas M. Triplett
Schwabe Williamson & Wyatt
PacWest Center, Suites 1600-1800
1211 Southwest Fifth Avenue
Portland, Oregon 97204-3795
503-222-9981
503-796-2900 - Fax

Dated:  February 10, 2005

-69-

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

| | |
|---|---|
| MIDWEST ENGINEERING SERVICES, INC., | ) |
| PROFESSIONAL SERVICE INDUSTRIES | ) |
| INC., GME CONSULTANTS, INC., and | ) |
| GME CONSULTANTS OF ILLINOIS, INC. | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| INTERNATIONAL UNION OF OPERATING | ) |
| ENGINEERS, LOCAL 150, AFL-CIO, *et al*, | ) |
| | ) |
| Defendants. | ) |

State of Illinois )
)
County of Winnebago )

## VERIFICATION

I, Lawrence P. Zablock, being duly sworn, depose and state as follows:

I am Chicago Branch Manager of Midwest Engineering Services, Inc's Oak Forest, Illinois office. Midwest Engineering Services, Inc. is a corporation organized and existing under the laws of the State of Wisconsin.

I have read the Verified Complaint and Petition herein. Under the penalties of perjury as provided by law, I hereby certify that the statements set forth in this instrument relating to Midwest Engineering Services, Inc. are true and correct, except as to matters therein stated to be on information and belief and as to such matters I certify as aforesaid that I believe the same to be true.

Subscribed to and sworn before me
this 8th day of February, 2005

Notary Public

"OFFICIAL SEAL"
SHARON L. McKENZIE
Notary Public, State of Illinois
My Commission Expires 2/10/2007

My commission expires:

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## WESTERN DIVISION

MIDWEST ENGINEERING SERVICES, INC., )
PROFESSIONAL SERVICE INDUSTRIES )
INC., GME CONSULTANTS, INC., and )
GME CONSULTANTS OF ILLINOIS, INC. )
                         )
           Plaintiffs, )
                         )
           v. )
                         )
INTERNATIONAL UNION OF OPERATING )
ENGINEERS, LOCAL 150, AFL-CIO, *et al,* )
                         )
           Defendants. )

State of Illinois           )
                         )
County of Winnebago    )

## VERIFICATION

    I, John Balun, being duly sworn, depose and state as follows:

    I am Branch Manager of Professional Service Industries, Inc's Elgin, Illinois office. Professional Service Industries, Inc. is a corporation organized and existing under the laws of the State of Delaware.

    I have read the Verified Complaint and Petition herein. Under the penalties of perjury as provided by law, I hereby certify that the statements set forth in this instrument relating to Professional Service Industries are true and correct, except as to matters therein stated to be on information and belief and as to such matters I certify as aforesaid that I believe the same to be true.

Subscribed to and sworn before me
this 8th day of February, 2005

Notary Public

My commission expires:

"OFFICIAL SEAL"
SHARON B. McKENZIE
Notary Public State of Illinois
My Commission Expires 2/10/2007

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### WESTERN DIVISION

MIDWEST ENGINEERING SERVICES, INC.,    )
PROFESSIONAL SERVICE INDUSTRIES    )
INC., GME CONSULTANTS, INC., and    )
GME CONSULTANTS OF ILLINOIS, INC.    )
    )
    Plaintiffs,    )
    )
    v.    )
    )
INTERNATIONAL UNION OF OPERATING    )
ENGINEERS, LOCAL 150, AFL-CIO, *et al,*    )
    )
    Defendants.    )
_____ )

State of Illinois    )
    )
County of Winnebago    )

## VERIFICATION

I, William Kwasny, being duly sworn, depose and state as follows:

I am President of GME Consultants, Inc. GME Consultants, Inc. is a corporation organized and existing under the laws of the State of Minnesota.

I have read the Verified Complaint and Petition herein. Under the penalties of perjury as provided by law, I hereby certify that the statements set forth in this instrument relating to GME Consultants, Inc. are true and correct, except as to matters therein stated to be on information and belief and as to such matters I certify as aforesaid that I believe the same to be true.

Subscribed to and sworn before me
this ___ day of February, 2005

Notary Public

My commission expires:

"OFFICIAL SEAL"
SHARON      McKENZIE
Notary Public State of Illinois
My Commission Expires 2/10/2007

## UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### WESTERN DIVISION

| | |
|---|---|
| MIDWEST ENGINEERING SERVICES, INC., | ) |
| PROFESSIONAL SERVICE INDUSTRIES | ) |
| INC., GME CONSULTANTS, INC., and | ) |
| GME CONSULTANTS OF ILLINOIS, INC. | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| INTERNATIONAL UNION OF OPERATING | ) |
| ENGINEERS, LOCAL 150, AFL-CIO, *et al,* | ) |
| | ) |
| Defendants. | ) |
| | ) |

| | |
|---|---|
| State of Illinois | ) |
| | ) |
| County of Winnebago | ) |

### VERIFICATION

I, Rick Lou, being duly sworn, depose and state as follows:

I am Rockford Branch Manager of GME Consultants of Illinois, Inc's Rockford, Illinois office. GME Consultants of Illinois, Inc. is a corporation organized and existing under the laws of the State of Illinois.

I have read the Verified Complaint and Petition herein.  Under the penalties of perjury as provided by law, I hereby certify that the statements set forth in this instrument relating to GME Consultants of Illinois, Inc. are true and correct, except as to matters therein stated to be on information and belief and as to such matters I certify as aforesaid that I believe the same to be true.

Subscribed to and sworn before me
this ___ day of February, 2005

_____
Notary Public

My commission expires:

"OFFICIAL SEAL"
SHARON J. McKENZIE
Notary Public State of Illinois
My Commission expires 2/10/2007

EXHIBIT A

IN THE TENTH JUDICIAL CIRCUIT OF THE STATE OF ILLINOIS

PEORIA COUNTY, ILLINOIS

Jerry Stephens, et al.                          )
                                                )
        Plaintiffs                              )
                    vs                          )        Case No. 98 CH 156
Springdale Cemetery Inc., Larry Leach, and      )
        Cynthia Leach                           )
        Defendants                              )        FILED F.O. KENNY

                                                         JUL 0 8 1998

                        ORDER                            CIRCUIT CLERK PEO. COUNTY

        The Illinois Antitrust Act provides that any person who has been
injured in his business or property by a violation of the Act may maintain an
action for damages or for an injunction, or both, against any person who has
committed such violation. Where a statute specifically provides injunctive
relief, the plaintiff need show only that there has been a violation of the
statute by the defendant and that the plaintiff has standing to bring the action.
It is therefore unnecessary for the plaintiffs to prove irreparable damage or
the absence of an adequate remedy at law. The Court finds that the Plaintiffs
have standing to bring this action and to request injunctive relief.

        Based upon the verified complaint, the affidavits, and the unchallenged
documents, that Court finds that Springdale Cemetery Inc.'s. scheme of
charging exorbitant application and access fees to monument vendors and its
discriminatory and burdensome requirements for the installation of
monuments have no reasonable relationship to any legitimate interests of the
cemetery owner. The purpose, intent, and affect of Springdale Cemetery
Inc.'s application process, application fees, access fees, and installation
requirements are to substantially and unfairly eliminate competition and all
violate the Illinois Antitrust Act.

        Therefore, the Court grants the Petition for Temporary Restraining
Order. The Defendants Springdale Cemetery Inc., Larry Leach, and Cynthia
Leach are enjoined and restrained from the following:

1.    Imposing its current application process and application fees on monument vendors, engravers, and installers.

2.    Imposing its access/inspection fee on monument vendors, engravers, and installers.

This Order was entered at 1:45 p.m., on July 8, 1998, and will expire on July 18, 1998.

Richard E. Grawey,  Circuit Judge

IN THE TENTH JUDICIAL CIRCUIT OF THE STATE OF ILLINOIS

PEORIA COUNTY, ILLINOIS

Jerry Stephens, et al.                                )
                                                      )
        Plaintiffs                                    )
                                vs.                   )        Case No. 98 CH 156
Springdale Cemetery Inc., Larry Leach, and            )
        Cynthia Leach                                 )
        Defendants                                    )

## ORDER

Plaintiffs William Stuebinger and Tom Matheny have filed a motion for summary judgment as to liability on Count III against Springdale Cemetery Inc. and Larry Leach and Cynthia Leach, individually and as officers of the corporation. The individual Defendants have filed cross motions for summary judgment. Upon consideration of the motions, briefs, the arguments of counsel, and the testimony previously heard on the Temporary Restraining Order and Preliminary Injunction, the Court grants the Plaintiffs' motion and denies the motion of the Defendants.

There is no genuine issue as to any material fact and the Plaintiffs are entitled to a judgment as a matter of law. The Court finds that Springdale Cemetery, Inc.'s rules, regulations practices and procedures relating to the application process, application fees, access fees, road fees, memorial specifications and installation requirements constitute an illegal tying arrangement which violates Section 3(4) of the Illinois Antitrust Act.

The sale of burial lots is the "tying product" and the sale of markers, installation services, the repair and engraving of markers are the "tied" products and services. The tie that binds the products together is the provision in the sales agreement that purchasers must abide by all the rules and regulations of the cemetery, then existing or to be promulgated in the future, at the sole discretion of Springdale Cemetery.

Judgment is entered for Plaintiffs Stuebinger and Matheny on the issue of liability on Count III against Springdale Cemetery Inc., Larry Leach and Cynthia Leach, individually and as corporate officers. The Court makes no ruling regarding the certification of a class as requested in Count III. A hearing on the issue of damages shall be set before Judge Vespa.

Entered   1/26/a.

Richard E. Grawey,  Circuit Judge

EXHIBIT B

STATE OF ILLINOIS    )
                     ) SS
COUNTY OF KANE       )


## AFFIDAVIT OF TAMMY BARKER

Tammy Barker, upon being duly sworn on oath, states as follows:

1.    I am employed by PSI where I perform construction services. I work out of PSI's office at 665H Tollgate Road in Elgin, Illinois. I have worked for PSI since October 2, 2000.

2.    Representatives of Local 150 of the International Union of Operating Engineers ("Union" or "Local 150") first began following and harassing me beginning in May 2004. Joe Farrell (Opie), as he later identified himself to the police, followed me during that week.

3.    On one occasion in May, I arrived at PSI's offices at 665 Tollgate Road at around 7:00 am. When I arrived, I saw three people and two Ford Crown Victorias in the parking lot. The cars had video cameras mounted on the dashboards. Farrell was one of the three people there in the parking lot.

4.    I parked my personal car next to my Company pick-up truck and went into the office. Approximately fifteen minutes thereafter, I left the office, went to my car, and retrieved my son's backpack. I put the backpack in the Company pick-up. Before heading to the job site, I had planned to stop at home to drop off my son's backpack.

5.    One of the Crown Victoria's, which I later learned was driven by Farrell, immediately began to follow me as I left the office. He drove so close behind me that many times I could not even see his headlights in the rear view mirrors. At one point, a car managed to get between me and Farrell when I was on Route 31 heading into Dundee. At one intersection, I believe it was just past Route 72, I managed to go through the intersection just as the light changed to yellow. The car behind me stopped. Farrell swerved into the next lane and blew through a red light to keep behind me.

6.    I did not know why this man was following me. I was scared and concerned about the way he was driving, was afraid he would cause me to get in an accident, and feared what would happen to me when I got home. I especially did not want this person knowing where I lived. I was so shaken up by this man following me, and the lengths he was going to stay right behind me, that I was in tears.

7.    I decided to go to the police for help. I drove to the West Dundee police station, with Farrell right on my tail. As I pulled up to the station a police officer was just leaving the building. Farrell stopped when I stopped. I do not think he realized I had stopped at a police station until he saw the officer.

CHI 10844928.3

8.    In tears, I told the officer that I was headed home, that the Crown Victoria had been following me, that I did not know who he was, and that I wanted him to stop following me. The officer then went back and spoke to Farrell.

9.    When the officer returned to my car, he told me that he had asked the man what he was doing. The man identified himself as Joe Farrell, and stated that he worked for Operating Engineers Local 150. The officer told me that he would keep Farrell at the station long enough for me to leave without him tailing me. The Dundee police officer had told me that since PSI was located in Elgin that I should talk to the Elgin police. I then left and proceeded home without incident.

10.    After work that day I went to the Elgin Police Department to report what had happened. I spoke to the officer at the desk, and after I explained what had happened he said that he would make some telephone calls to the Union about the situation. Given what he promised I did not file a police report. While I do not know if he made any calls, the Union stopped following me after that incident, at least until recently.

11.    The day after the incident at the West Dundee police station, Joe Farrell approached me while I was getting into a PSI pick-up and handed me a Local 150 contract and his business card.

12.    After these incidents, Local 150 stopped following me for a short period. They began contacting me again in November 2004.

13.    On Saturday morning, January 8, 2005, around 10:15 am, a Union organizer identifying himself as Mike Aprile left me a message on my work cell phone. I actually did not receive that message until Wednesday. In his message gave me a number to reach him and said he would be pursuing PSI actively. I never contacted Mike Aprile by telephone.

14.    The next time I was followed was on January 14, 2004. My initial assignment that morning was at the St. Charles water treatment plant, I arrived at the PSI office at around 7:00 am and shortly thereafter headed to St. Charles in my PSI pick-up. As soon as I left, I realized that I was being followed by a Crown Victoria. I later determined that Union organizer Jim Schweins was the person following me. Like the other Local 150 cars, his car had a video camera prominently displayed on the dash.

15.    On the drive to St. Charles, I contacted Mike Kresge and asked him to tell his guys to stop following me and explained that they were following extremely close and it was creeping me out causing me to fear for my safety.

16.    As before, this driver followed me as closely as possible. Many times, I could not even see his headlights behind my car. As soon as I arrived at the treatment plant, I got out of my car, walked back to his car, and asked Schweins why he was following me and what he wanted. Schweins told me that he just wanted to talk to me. I asked him what he wanted to talk to me about, and he invited me into his car. I refused. He told me that he would stop following me if I talked to him. He then gave me his phone number, (708) 927-6060, drove out of the water treatment plant's property and parked right near the entrance of the plant.

2

17.    When I completed my work at the treatment plant, I snuck out the back entrance to avoid being followed. I decided that, to keep Local 150 from following me, I would agree to meet with them and hear what they had to say. I called Schweins on my cell phone and told him that I would listen to him if he agreed to stop following me. Schweins agreed, and I arranged to meet him later that day at Alexander's Restaurant in Elgin.

18.    I left work at around 12:30 pm that day and met Schweins at Alexander's Restaurant on Route 31 in Elgin. As we were walking in, Schweins told me he was new at this and said he was going to call in Mike Aprile. Approximately five minutes later, Aprile showed up and about the first thing he told me was that it was not illegal for the Union to follow me. I became upset and we got into an argument. I finally said that I would only talk to Schweins or else I would leave. Schweins told Aprile to settle down, and once he did, we began to talk.

19.    Aprile handed me contracts the Union had with other employers. During the discussion that followed, Aprile told me that it was unfair that PSI "underbid them," and that PSI was working in "their jurisdiction." During the course of this conversation, Aprile showed me how the Union's jurisdiction stretched from Northern Indiana in the east all the way into Iowa in the west.

20.    I told Aprile that it sounded as if the Union was starting a monopoly. He said, "honey, that is exactly what we are doing." Towards the end of the conversation, he gave me a union authorization card and told me to sign it. He told me that if I did sign, that the Union's lawyers would protect me. If I did not sign, he told me that PSI was "going down," that the Union had "millions to spend on attorneys," that "PSI would not protect me," and that "PSI does not have the money to hire a lawyer to protect just a few technicians." He further said, "if you do not sign this card you won't be protected and if you're not union you won't be working in our jurisdiction again." He told me that there will be no non-union companies left when they get done.

21.    I understood this to mean that the Union intended to drive PSI out of business and that the Union would prevent me from working in this industry again if I did not sign a Union card. I asked Aprile why I just could not wait and see. He told me that I had to sign, that I could not have it both ways and work for PSI until the Union closed it down and then sign on later. He told me that signing the card did not mean I had to work for the Union now, but that the Union lawyer would protect me when they took PSI down. Aprile told me that if I did not sign the card before the Union closed PSI down I would not be protected. I told Aprile and Schweins I would think about what they said and get back to them.

22.    During our meeting, Mike Kresge called Mike Aprile and discussed the fact that I was there talking with Aprile. Aprile then indicated that he was aware I had called Kresge and requested that people stop following me. Aprile then indicated to me that Kresge could not protect me.

23.    Twice on the following Monday morning, while I was at work Aprile called on my work cell phone. I recognized the number and did not answer the phone. The first time he left no message. The second time he left a message wanting to know my answer and telling me that he knew I had been at work for a few hours. That Mike was watching my every move

worried me, especially after I had been promised they would stop following me after I heard them out.

24.    On Tuesday, January 18, 2005, at 8:30 a.m. Mike called me again and left a message saying he would call me back.

25.    On that same day, the Union again followed me, despite my telling them to stop, as described above, and despite their promises they would after I had heard them out. That morning I was to report to a job site in Crest Hill to make concrete cylinders and possibly compact testing. In order to do this, I needed to use a nuclear density gauge, which I had placed in the back of my PSI pick-up truck. Nuclear density gauges contain radioactive materials, and only certified operators are permitted to handle them. If the gauges were damaged, radioactive materials could be released and the Illinois Department of Nuclear Safety and the state police would have to be called in to investigate.

26.    When I left the office that morning to head to Crest Hill, a person I later learned to be Schweins, again began following me in a Union Crown Victoria just as he had before. Again, he followed right behind me whenever possible. I was upset that the Union was following me after Schweins had promised they would stop.

27.    While on U.S. 20 heading east towards Route 59, I decided to exit Route 20 on an exit ramp which would take me to Bluff City Road. I had hoped to lose Schweins. Both Schwiens and I were in the left hand lane at the time. I moved to the right hand lane and then the exit ramp. Schwiens should not have been able to do the same since there was a car next to him in the right hand lane. Moreover, a truck was also parallel to him in the off ramp.

28.    Schweins sped up and cut off the car next to him to get into the right lane. Then when it became apparent to him he could not squeeze between me and the truck on the exit ramp, he sped up even faster to get in front of me on the exit ramp. He then slammed on his brakes and stopped.

29.    I had to slam on my brakes and stop to avoid hitting him. The truck behind me also had to slam on his brakes to avoid hitting me. Everyone began honking. I was extremely upset at nearly being hit, and was concerned about what Schweins would do next.

30.    When Schweins started moving forward again he proceeded down the exit ramp. I decided not to follow him and instead moved back onto U.S. 20. When Schweins realized I had not followed him, he performed an illegal U-turn on the exit ramp, and proceeded up the exit ramp to get back onto U.S. 20, and then sped up to get right behind me.

31.    Whenever I switched lanes, he did the same, to try to avoid getting any cars between us. On several occasions, he would cut cars off to keep behind right me.

32.    I was so distraught that I called the Elgin Police on my cell phone to report what was happening. The person I spoke to, however, told me I would have to come in to file a complaint.

33.    While on Route 59, heading south, just where it veers off onto Route 30, I actually was able to get a truck between me and Schweins. As we exited onto Route 30, the road is only two lanes, one in each direction. Schweins nevertheless attempted to pass the truck using the opposing traffic lane. When he realized that there was not enough space for him to get between me and the truck, he sped up and passed me. Then he swerved back into my lane and slammed on his brakes, forcing me to slam on my brakes to avoid him. The truck behind me had to slam on its brakes and swerve off the road to avoid hitting me.

34.    I was in tears and very afraid for my safety. I pulled off on the shoulder for a few minutes wondering what to do, for there was no one to call.

35.    I then proceeded on Route 30. While waiting at a traffic light on Route 30 and Gaylord at about 8:40 a.m., a state trooper car passed me in the left hand turn lane. Seeing this as my only chance to get some help, I pulled behind the trooper and into the left turn lane. After passing an Explorer that was behind the trooper, I got behind him and tried to get his attention by honking and flashing my lights.

36.    By the time I was able to get the state trooper to pull over, which he did, I was once again in tears. We both got out of our cars and I told him that I was being followed dangerously close by a man in a Crown Victoria. I also informed him that I was carrying a nuclear density gauge in my pick-up and I feared for my safety and those around me. He asked me if I knew who the man was or if I had obtained his license plate number. I informed him that I did not know the man but I knew he was from the Union, and that I did not have the license plate number.

37.    The officer escorted me to Weber Road to make sure Schweins did not start following me again. I then proceeded to the job site. I arrived at the job site at 9:00 a.m. and tried to hide my pick-up so it would not be seen while I was working. After taking some time to wipe away my tears and try to compose myself I proceeded to the job site where I worked for the next 30 minutes.

38.    After traveling for about 15 minutes after leaving the job site, Schweins drove past me going the opposite direction. He immediately turned around and began following me again. I finally pulled into a gas station, got out of my car, recognized Schweins and walked up to his vehicle. At that point, I noted that the car had a license plate of ML9119, and I saw he had his video camera with him. I told him that I was going to tell him one more time to stop following me. I made it absolutely clear that I was afraid someone would get hurt if they continue to do this and pleaded with him to stop it now. He made no response.

39.    I returned to my car and began heading back to Elgin. He continued to follow me. I drove to the Elgin Police Department. Schweins followed me there. It was approximately 11:00 a.m. when we arrived. I went inside and waited for my opportunity to speak to an officer. While I was waiting, I could see that Schweins' vehicle was still outside of the station.

40.    I explained my situation to Officer Rog of the Elgin Police force. I asked to complete a police report. He refused my request, and told me I needed to get a civil attorney and file a restraining order. After that, I returned to the office. Schweins followed me there.

5

41.    I was an emotional wreck by the time I got home Tuesday night.  I was so upset about what had happened that I became physically ill.  I threw up several times that evening and into Wednesday morning as a result of what happened.

42.    I was so distraught that I called into work on Wednesday morning and asked to be laid off because I did not want to be followed like that again.  I did not work the rest of that week because I remained physically ill and emotionally unable to handle being subjected to the harassment at work.

43.    Since that time, I have been temporarily assigned to a project that allows me to drive my own car to avoid being recognized by Local 150.  I remain scared to travel to the PSI office in Elgin and only do so on rare occasions when the Local 150 organizers are not waiting outside.

44.    I know that this temporary assignment will end soon and I will need to again drive a PSI pick-up.  I am scared of what will happen when I have to do so because I know that I cannot handle dealing with the Local 150 people.

Further affiant sayeth not.

Tammy Barker

Subscribed and Sworn to before me

this 4th day of February, 2005.

OFFICIAL SEAL
RACHEL B MCDOUGALL
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 05-11-08

Rachel B. McDougall
Notary Public