# Exhibit A

Michael J. Quigley          March 24, 2010

Page 1

                  IN THE UNITED STATES DISTRICT COURT

               FOR THE NORTHERN DISTRICT OF ILLINOIS

                          WESTERN DIVISION


TAMMY BARKER, TIMOTHY ROBERT      )
BARKER and MELISA MERRYMAN, On    )
Behalf of Themselves and On Behalf )   HONORABLE JUDGE
of Those Similarly Situated,      )
                                  )    FREDERICK KAPALA
                  Plaintiffs,     )
                                  )
         -vs-                     )    No. 08-cv-50015
                                  )
LOCAL 150, INTERNATIONAL UNION    )
OF OPERATING ENGINEERS, AFL-CIO,  )    MAGISTRATE JUDGE
                                  )
                  Defendant.      )    P. MICHAEL MAHONEY



         Deposition of MICHAEL J. QUIGLEY, taken before

KAREN KOSTAS, CSR, RMR, CRR, RDR and Notary Public,

pursuant to the Federal Rules of Civil Procedure for the

United States District Courts pertaining to the taking

of depositions, at 70 West Madison Street, Suite 3500,

in the City of Chicago, Cook County, Illinois, at

1:00 p.m. on the 24th day of March, 2010.

0162f31d-b805-410d-9a04-daed491ee0d1

Michael J. Quigley          March 24, 2010

---

**Page 2**

```
 1   APPEARANCES:
 2
 3      LAW OFFICES OF ROBERT T. HANLON by
        MR. ROBERT T. HANLON
 4      14212 Washington Street
        Suite 200
 5      Woodstock, Illinois  60098
        (815) 206-2200
 6      rob @ rhanlonlaw.com
 7          on behalf of the Plaintiffs;
 8
        LOCAL 150 LEGAL DEPARTMENT by
 9      MS. ELIZABETH A. LaROSE
        6140 Joliet Road
10      Countryside, Illinois  60525
        (708) 579-6663
11
            on behalf of the Defendant;
12
13      McGARRY and McGARRY LLC by
        MS. ANNETTE M. McGARRY
14      120 North LaSalle Street
        Suite 1100
15      Chicago, Illinois  60602
        (312) 354-4600
16
            on behalf of the Deponent.
17
18
19
20
21
22
23
24      - - - - - - - - - -
```

---

**Page 3**

```
 1            I N D E X
 2
 3   WITNESS                      PAGE
 4   MICHAEL J. QUIGLEY
 5      Examination by Mr. Hanlon ...................4
 6      Examination by Ms. McGarry .................53
 7      Examination by Mr. Hanlon ..................53
 8
 9
10
11            E X H I B I T S
12
                             MARKED
13   NUMBER                  FOR ID
14   Quigley Deposition Exhibit
15      No. A ......................................12
16      No. B ......................................12
17
18   EXHIBITS ATTACHED
19
20
21
22
23
24      - - - - - - - - - -
```

---

**Page 4**

```
 1      MR. HANLON:  My name is Robert T. Hanlon, I'm
 2   one of the attorneys for the plaintiffs in the case now
 3   pending in the United States District Court for the
 4   Northern District of Illinois, Case No. 08-cv-50015,
 5   before District Court Judge Frederick Kapala and
 6   Magistrate Judge P. Michael Mahoney, captioned
 7   Tammy Barker, et al. versus Local 150, International
 8   Union of Operating Engineers, AFL-CIO.
 9      This deposition is being taken pursuant to the
10   Federal Rules of Civil Procedure and the local Rules of
11   the U.S. District Court for the Northern District of
12   Illinois.
13      I note the time now is 1:01 p.m.
14
15            (WITNESS SWORN)
16
17      MICHAEL J. QUIGLEY,
18   called as a witness herein, having been first duly sworn,
19   was examined and testified as follows:
20            EXAMINATION
21         by Mr. Hanlon:
22   Q  Would you please state your name for the record
23   and spell your name.
24   A  Michael J. Quigley.
```

---

**Page 5**

```
 1   Q  Mr. Quigley, have you ever given a deposition
 2   before?
 3   A  I have.
 4   Q  I'm sorry?
 5   A  I have.
 6   Q  Okay.  What I'd like to do is go over a couple
 7   of ground rules, because what your recollection may have
 8   been as to how that transpired may be different than how
 9   I would intend for this to proceed.
10      So I'd like you to listen to a series of rules
11   which will help us get through this deposition quicker
12   and clear up a couple of things that you may have a
13   question about ahead of time.
14      So during this deposition I will ask you a
15   series of questions about the lawsuit and the facts
16   associated with it.  It is important that you answer
17   each question verbally so that the court reporter can
18   accurately record your answers.
19      Is that fair?
20   A  Yes.
21   Q  It is also important that only one person speak
22   at a time so it is easier to transcribe what is said.
23      Is that fair?
24   A  Yes.
```

Merrill Legal Solutions
(800) 868-0061      (312) 386-2000

0162f31d-b805-410d-9a04-daed491ee0d1

Michael J. Quigley          March 24, 2010

Page 6

1    Q  Okay.  So if you could wait until I finish my
2  question before answering it, I will extend the same
3  courtesy to you and I will try to wait until you finish
4  your answer before I ask another question.  I'm not
5  always good at that.  And if I do interrupt you, please
6  feel free to let me know.
7         During the deposition opposing counsel may
8  raise an objection.  Her objection will preserve the
9  objection for the record.  However, you'll still be
10  required to answer the question unless you are asserting
11  a privilege.
12         If I ask a question and you answer it, I will
13  assume that you understood the question.
14         Is that fair?
15    A  Yes.
16    Q  If you don't understand a question, would you
17  please let me know.  This deposition is not being taken
18  to trick you into answering a question.  Is that clear?
19    A  Yes.
20    Q  Okay.  And you'll let me know if you don't
21  understand?
22    A  Yes.
23    Q  Okay.  And if you need to take a break, if
24  there's no question pending, you can take a reasonable

Page 7

1  break.  If there's a question pending, I will ask that
2  you answer the question before taking the break.
3  However, as I mentioned, if there's no question pending,
4  we can take a reasonable break.  I will note the time
5  that the break is taking place and when we return for
6  the record.
7         Is that fair?
8    A  Yes.
9    Q  If during the course of this deposition I use
10  the term this lawsuit, I mean Case No. 08-cv-50015
11  before Judge Frederick Kapala captioned Tammy Barker,
12  et al. versus Local 150.
13         Is that clear?
14    A  Yes.
15    Q  If during the course of this deposition I use
16  the term personal information, I mean information that
17  identifies an individual including an individual's
18  photograph, social security number, driver's
19  identification number, name, address, telephone number
20  and medical or disability information, but does not
21  include information on vehicle accidents or driving
22  violations or a driver's status.
23         Is that clear?
24    A  Yes.

Page 8

1    Q  If during the course of this deposition I use
2  the term motor vehicle record, I mean any record that
3  pertains to a motor vehicle operator's permit, a
4  motor vehicle title, a motor vehicle registration or
5  identification card issued by the Department of
6  Motor Vehicles.
7         Is that clear?
8    A  Yes.
9    Q  Okay.  If during the course of this deposition I
10  use the term FFC or IIIFFC, I mean the Indiana,
11  Illinois, Iowa Foundation for Fair Contracting which you
12  previously served as its executive director.
13         Is that clear?
14    A  Yes.
15    Q  If during the course of this deposition you
16  identify any person, could you please use their first
17  and last name, and if you know the spelling, please
18  spell the last name.
19    A  Yes.
20    MR. HANLON:  For the record, the following persons
21  are present for this deposition:  The court reporter;
22  Robert Hanlon, the attorney for plaintiffs;
23  Elizabeth LaRose, attorney for the defendant, Local 150,
24  International Union of Operating Engineers;

Page 9

1  Michael Quigley; and Annette McGarry, attorney for
2  Michael Quigley.
3         Annette, could you spell your name so that she
4  has that?
5    MS. McGARRY:  Sure.  M-c capital G-a-r-r-y.
6    MR. HANLON:  Thank you.
7    Q  Mr. Quigley, you mentioned that you were deposed
8  before.  Can you tell me on how many occasions you were
9  deposed before?
10    A  Maybe four or five.
11    Q  Four or five.  Can you tell me how long ago they
12  were?
13    A  No.
14    Q  Would it be more or less than ten years ago?
15    A  Less.
16    Q  Less.  More or less than five years?
17    A  Maybe the most recent one, three years.
18    Q  Okay.  Can I ask what that action was three
19  years ago?
20    A  I think I'm going to respectfully refuse to
21  testify based on my privilege of self-incrimination
22  under the Fifth Amendment of the Constitution.
23    Q  Just to speed things along, if you wish at any
24  point in time to exercise your Fifth Amendment

3 (Pages 6 to 9)

0162f31d-b805-410d-9a04-daed491ee0d1

Michael J. Quigley          March 24, 2010

Page 10

1   privilege, I will accept the words take five so that you
2   don't have to repeat that whole long thing and we don't
3   have to sit here for an inordinate period of time.
4       A   Thank you.
5       MS. McGARRY:  Thank you.  We all appreciate that.
6       MR. HANLON:  Q   Can you tell me what your highest
7   level of education is?
8       A   Two years of junior college.
9       Q   Okay.  And where was that at?
10      A   Kankakee Community College.
11      Q   And you were born in Kankakee, right?
12      A   Yes.
13      Q   Went to St. Pat's Church, right?
14      A   Yes.
15      Q   Went to St. Pat's High School, too?
16      A   No.
17      Q   Where did you go to high school?
18      A   Kankakee High School.
19      Q   Kankakee High School.
20          You're here pursuant to a subpoena that was
21  served upon you and an agreed order entered in the court
22  in this case, is that correct?
23      A   Yes.
24      Q   Have you had any discussions with any federal

Page 11

1   agent regarding Local 150 or any of its employees?
2       A   Take five.
3       Q   Has any federal agent or any Assistant U.S.
4   Attorney conveyed any grant of immunity to you?
5       A   Take five.
6       Q   Have you ever spoken to Patrick Fitzgerald?
7       A   Take five.
8       Q   Are you currently employed?
9       A   No.
10      Q   Were you employed previously by Local 150?
11      A   Yes.
12      Q   When were you employed by Local 150?
13      A   Up until 1999.  Well, from 1986 to 1999.
14      Q   And what was your position at Local 150?
15      A   Business representative.
16      Q   What was the function of a business
17  representative?
18      A   Take five.
19      Q   Can you tell me how you got your job as a
20  business agent for Local 150?
21      A   Take five.
22      Q   Can you tell me how come you came to leave your
23  employment at Local 150?
24      A   Take five.

Page 12

1       Q   Were you employed at any place after you were
2   employed by Local 150?
3       A   Take five.
4       Q   Were you employed by the IIIFFC?
5       A   Take five.
6       Q   You were the executive director of the IIIFFC,
7   isn't that correct?
8       A   Take five.
9       Q   Have you ever heard the saying that all that is
10  necessary for the triumph of evil is for good men to do
11  nothing?
12      A   Take five.
13      Q   You have that published on a Web site that you
14  operate, isn't that correct?
15      A   Take five.
16
17          (Quigley Exhibit A marked.)
18
19          (Quigley Exhibit B marked.)
20
21      MR. HANLON:  Q   I'll show you what has been
22  previously marked as Exhibits A and B.
23          I'm handing them to the witness and I'm handing
24  a copy to opposing counsel and then I'm handing a copy

Page 13

1   to Mr. Quigley's counsel.
2       MS. McGARRY:  Thank you.
3       MR. HANLON:  And Annette, I need a copy to give back
4   to the court reporter.
5       MS. McGARRY:  I understand.
6       MR. HANLON:  Q   At the bottom of the exhibits, does
7   your signature appear on the affidavits that are shown
8   in Exhibits A and B?
9       MS. LaROSE:  Let me just -- excuse me for one
10  moment -- interpose an objection, because the copies of
11  these documents that we were served with, at least in
12  connection with this deposition, have parts of them cut
13  off such that we can't see the complete document.
14      MR. HANLON:  I appreciate that, Liz.  And I know
15  that these have been served upon Local 150 before.  And
16  they've been, you know, submitted to the Court.  So I
17  think you have the full content.
18      MS. LaROSE:  I'm sorry.  I didn't hear what you
19  said, Counsel.
20      MR. HANLON:  I said I think that Local 150 does have
21  the full content of them, but you have them here.  Your
22  objection is noted.
23      Q   And all I want to know, Mr. Quigley, you signed
24  two affidavits?

4 (Pages 10 to 13)

0162f31d-b805-410d-9a04-daed491ee0d1

Page 14

1    A  Take five.
2    Q  So you signed the affidavit that's marked as
3  Exhibit A, is that correct?
4    A  Take five.
5    Q  And you signed the affidavit that's marked as
6  Exhibit B, is that correct?
7    A  I'll take five.
8    Q  You served as the executive director for the FFC
9  from 1999 to 2006, is that correct?
10   A  Take five.
11   Q  After you executed what has previously been
12  marked as Exhibit A, can you tell me what, if anything,
13  you did with Exhibit A after you executed it?
14   A  Take five.
15   Q  Isn't it true that you mailed Exhibit A to
16  Attorney Hanlon's office?
17   A  Take five.
18   Q  You've been involved with litigation involving
19  Local 150, is that correct?
20   A  Take five.
21   Q  Have you received anything of value from
22  Local 150 in order to induce you to exercise your
23  Fifth Amendment privilege today?
24   A  I take five.

Page 15

1    Q  Have you executed any settlement agreements with
2  Local 150 with respect to any litigation pending against
3  you and Local 150 -- or between you and Local 150?
4    A  Take five.
5    I can't quite hear you.
6    MS. LaROSE:  Yeah, I can't hear you either,
7  Mr. Hanlon.  You have to speak up, please.
8    MR. HANLON:  Miss LaRose, I appreciate that you
9  cannot hear me and I will speak up for your benefit.
10   MS. LaROSE:  Thank you.
11   MS. McGARRY:  Q  When you worked at the FFC, what
12  was the purpose of the FFC?
13   A  Take five.
14   Q  Where were the offices of the FFC when you
15  worked there?
16   A  Take five.
17   Q  Did the FFC pay Local 150 rent for its space?
18   A  Take five.
19   Q  Did the IIIFFC use motor vehicle records to
20  obtain personal information about contractors or workers
21  at job sites?
22   A  Take five.
23   Q  Can you define for me the word regularly?
24   A  Take five.

Page 16

1    Q  Did the FFC or the IIIFFC ever disclose personal
2  information from motor vehicle records to Local 150?
3    A  Take five.
4    Q  Do you know if the IIIFFC has ever pursued any
5  legal remedy related to any personal information from
6  motor vehicle records it obtained?
7    MS. LaROSE:  Objection, form of the question.
8    MS. McGARRY:  Objection.
9    MR. HANLON:  Will you repeat my question.
10
11   (From the record above, the reporter read
12   the following:
13   "Q  Do you know if the IIIFFC has ever
14   pursued any legal remedy related to any
15   personal information from motor vehicle
16   records it obtained?")
17
18   MS. McGARRY:  Same objection, calls for a legal
19  conclusion.
20   MS. LaROSE:  The question is ambiguous.
21   MR. HANLON:  Q  Okay.  As the executive director of
22  the IIIFFC, did you ever hire counsel to initiate any
23  litigation in connection with any personal information
24  obtained from motor vehicle records?

Page 17

1    A  I'll take five.
2    Q  Do you know Bill Dugan?
3    A  Take five.
4    Q  Bill Dugan recently pled guilty to federal
5  charges related to buffalo feeders, isn't that correct?
6    A  Take five.
7    Q  Have you ever seen a sign that read This Is
8  Still Bill Dugan Country?
9    A  Take five.
10   Q  Can you tell me what your understanding is of
11  the meaning of the words This Is Still Bill Dugan
12  Country?
13   A  Take five.
14   MS. LaROSE:  And I'd like to interpose just a
15  standing objection.  I don't think that this is going to
16  lead to anything --
17   MR. HANLON:  I don't have a question pending at the
18  moment, Counsel.  He's exercising his Fifth Amendment
19  privilege.  Do you want to stand there and tell me about
20  those sort of superfluous things after the question has
21  been answered?  You know, if you want to raise an
22  objection, raise an objection.
23   MS. LaROSE:  I'm raising it now.
24   MR. HANLON:  Well, wait for a question to object to.

5 (Pages 14 to 17)

0162f31d-b805-410d-9a04-daed491ee0d1

Michael J. Quigley          March 24, 2010

Page 18

1     MS. LaROSE: I'm objecting to the last question.
2     MR. HANLON: Q  Can you tell me the --
3     MS. LaROSE: The last question is objectionable.
4 The last question is objectionable --
5     MR. HANLON: Fine.
6     MS. LaROSE: -- because it's not going to lead to
7 any discoverable evidence.
8     MR. HANLON: Well, I guess that would be your
9 position and I disagree with it.
10    MS. LaROSE: It is my position.
11    MR. HANLON: Okay.  Great.
12    Q  Can you tell me the circumstances surrounding
13 Bill Dugan's resignation?
14    MS. LaROSE: Same objection.
15    A  Take five.
16    MR. HANLON: Q  Wasn't there a federal raid on his
17 buffalo ranch in Hancock, Maryland?
18    MS. McGARRY: Calls for speculation.
19    MS. LaROSE: And same objection.
20    MS. McGARRY: Lacks foundation.
21    MR. HANLON: Okay.  I'll get you some foundation
22 here, Counsel.
23    Q  You posted newspaper articles about a federal
24 raid on William Dugan's Hancock, Maryland ranch on the

Page 19

1 Internet, isn't that correct?
2     A  Take five.
3     Q  And that was just prior to Bill Dugan's
4 resignation as president/business manager of Local 150,
5 isn't that correct?
6     A  Take five.
7     Q  You were never given any explicit job
8 description for your role as a business agent when you
9 worked at Local 150, isn't that correct?
10    A  Take five.
11    Q  Do you know who Jim Schweihs is?
12    A  Take five.
13    Q  Jim Schweihs' first name is James, isn't that
14 correct?
15    A  Take five.
16    Q  Jim Schweihs a/k/a James Schweihs are the same
17 person, correct?
18    A  Take five.
19    Q  And do you know if Jim Schweihs was also known
20 as Jimmy Schweihs or simply Jimmy?
21    A  Take five.
22    Q  If I use the term Jimmy during the rest of this
23 deposition, you will know that I'm talking about
24 Jim Schweihs, is that clear?

Page 20

1     A  Take five.
2     Q  Jim Schweihs' father was Frank the German, isn't
3 that correct?
4     A  Take five.
5     Q  Frank the German was a reputed member of the
6 Chicago Outfit, isn't that correct?
7     MS. LaROSE: Same objection.
8     MS. McGARRY: Objection.
9     MR. HANLON: Q  And Frank the German Schweihs was
10 believed to be a hit man, isn't that correct?
11    MS. McGARRY: It calls for speculation.
12    MS. LaROSE: Same objection.
13    MR. HANLON: Q  Frank the German had been indicted
14 in Operation Family Secrets, isn't that correct?
15    A  Take five.
16    Q  Do you know if Local 150 hired James Schweihs
17 knowing his father was a known associate of organized
18 crime?
19    A  Take five.
20    Q  While you were employed by Local 150 did
21 Local 150 obtain personal information from motor vehicle
22 records?
23    A  Take five.
24    Q  At any time did you see any microfiche at

Page 21

1 Local 150?
2     A  Take five.
3     Q  Did you ever discuss motor vehicle records with
4 any employee at Local 150?
5     A  Take five.
6     Q  Do you know if Local 150 obtained computer disks
7 from the Illinois Secretary of State containing personal
8 information of motorists on CDs?
9     A  Take five.
10    Q  You were employed by Local 150,
11 International Union of Operating Engineers commencing in
12 1986 and ending in 1999, is that correct?
13    MS. McGARRY: Asked and answered.
14    MR. HANLON: Not exactly.
15    A  I answered that.  Yes.
16    MR. HANLON: Q  And you were employed by the
17 Midwest Operating Engineers Construction Industry
18 Research and Trust Fund, is that correct?
19    A  Take five.
20    Q  And the Midwest Operating Engineers Construction
21 Industry Research and Trust Fund was sometimes known as
22 the CRF office, is that correct?
23    A  Take five.
24    Q  You were the executive director of the IIIFFC

6 (Pages 18 to 21)

0162f31d-b805-410d-9a04-daed491ee0d1

Michael J. Quigley          March 24, 2010

Page 22

1   from 1999 until April of 2006, is that correct?
2       A   Take five.
3       Q   During your employment at Local 150 you held the
4   position of both business agent and organizer, is that
5   correct?
6       A   Take five.
7       Q   Can you tell me your date of birth?
8       A   9-24-46.
9       Q   Thank you.
10          During your employment at Local 150 you used
11  personal information including names and addresses from
12  motor vehicle records, is that correct?
13      A   Take five.
14      Q   To obtain personal information about the owner
15  of a vehicle, you had previously telephoned Linda Soria
16  and given her a license plate number, is that correct?
17      A   Take five.
18      Q   Linda Soria would then tell you the name and
19  address of the owner of the motor vehicle associated
20  with the plate number that you made inquiries about, is
21  that correct?
22      A   Take five.
23      Q   While you were a business agent at Local 150, it
24  was a business practice for Local 150 business agents to

Page 23

1   obtain personal information from motor vehicle records,
2   isn't that correct?
3       A   Take five.
4       Q   And while you were the executive director of the
5   IIIFFC, the FFC would provide personal information from
6   motor vehicle records to Local 150, is that correct?
7       A   Take five.
8       Q   You knew that Local 150 had computerized
9   databases for motor vehicle records at the time that you
10  were the director of the IIIFFC, is that correct?
11      A   Take five.
12      Q   You were personally aware that Local 150
13  maintained microfiche on motor vehicle records -- Strike
14  that.
15          You have personal knowledge that Local 150
16  maintained motor vehicle records on microfiche, is that
17  correct?
18      A   Take five.
19      Q   And when you've given testimony previously, your
20  testimony was truthful, is that correct?
21      A   I'm sorry?
22      Q   Your testimony was truthful when you've given
23  testimony previously?
24      A   What testimony?

Page 24

1       Q   Well, you indicated that you testified at
2   deposition, right?
3       A   Yes.
4       Q   And you raise your hand and tell the truth?
5       A   Yes.
6       Q   All right.  Did you testify truthfully at those
7   depositions?
8       A   I did.
9       Q   Did you ever testify falsely in any criminal or
10  civil proceeding?
11      A   No.
12      Q   Thank you.
13          Did you ever make a false statement in an
14  affidavit?
15      A   Not to my knowledge.
16      Q   Do you know if Local 150 obtained computer disks
17  from the Illinois Secretary of State containing personal
18  information of motorists?
19      A   Take five.
20      Q   Do you know how many times Local 150 obtained
21  motor vehicle records from the Illinois Secretary of
22  State's office?
23      A   Take five.
24      Q   Do you know the form in which Local 150 obtained

Page 25

1   motor vehicle records from the Illinois Secretary of
2   State?
3       A   Take five.
4       Q   Did Local 150 ever disclose personal information
5   from motor vehicle records to the IIIFFC while you were
6   its executive director?
7       A   Take five.
8       Q   Did Local 150 ever pay the FFC for personal
9   information from motor vehicle records?
10      A   Take five.
11      Q   Can you tell me why the FFC would have provided
12  personal information from motor vehicle records?
13      A   Take five.
14      Q   Did anyone ever accuse you of misconduct while
15  you were employed at Local 150?
16      A   Take five.
17      Q   When I use the term Local 150 during the course
18  of this deposition, you understood that to mean
19  Local 150, International Union of Operating Engineers,
20  is that correct?
21      A   I do.
22      Q   Do you know a Mr. Lombardo?
23      A   Take five.
24      Q   During the period of time in which you were

7 (Pages 22 to 25)

0162f31d-b805-410d-9a04-daed491ee0d1

Michael J. Quigley        March 24, 2010

Page 26

1  employed by Local 150, Mr. Lombardo would provide -- a
2  Mr. Lombardo would provide personal information from
3  motor vehicle records to Local 150's business agents, is
4  that correct?
5      A  Take five.
6      MR. HANLON:  Could we take a break here?
7
8          (Off the record at 1:29 p.m.)
9
10         (RECESS)
11
12         (On the record at 1:29 p.m.)
13
14     MR. HANLON:  We're back on the record.  I think our
15  elapsed time was about 20 seconds.
16     Q  Was there ever a time that you came to contact
17  the Illinois Secretary of State for motor vehicle
18  records?
19     A  Take five.
20     Q  When you were employed by the FFC, whom, if
21  anyone, did you report to?
22     A  Take five.
23     Q  Do you know if Local 150 obtained personal
24  information from motor vehicle records in a form on

Page 27

1  microfiche?
2      A  Take five.
3      MS. LaROSE:  Objection, asked and answered at least
4  twice.
5      MR. HANLON:  He said take five.
6      Q  Do you know when Local 150 stopped receiving
7  motor vehicle records on microfiche?
8      A  Take five.
9      Q  Do you know when Local 150 began receiving
10  motor vehicle records on CDs?
11     A  Take five.
12     Q  Do you know when Local 150 stopped receiving
13  motor vehicle records on CDs?
14     A  Take five.
15     Q  Do you know when Local 150 began receiving
16  personal information from motor vehicle records on CDs?
17     A  Take five.
18     Q  Do you know when Local 150 stopped receiving
19  personal information from motor vehicle records on CDs?
20     A  Take five.
21     Q  Do you know if Local 150 placed any limits on
22  the use of personal information from motor vehicle
23  records?
24     A  Take five.

Page 28

1      Q  Do you know if Local 150 ever copied any of the
2  CDs containing personal information from motor vehicle
3  records?
4      A  Take five.
5      Q  Did Bill Dugan ever personally ask you to run
6  any license plates for him?
7      A  Take five.
8      Q  And when I say run a license plate, did you
9  understand what I mean by run a license plate?
10     A  Take five.
11     Q  Did Jim Miller ever ask you to run any license
12  plates?
13     A  Take five.
14     Q  Do you know if any of the attorneys for
15  Local 150 shared personal information from motor vehicle
16  records with any of the business agents of Local 150?
17     A  Take five.
18     Q  Do you know if the Assistance Fund was used to
19  pay for motor vehicle records?
20     A  Take five.
21     Q  Can you tell me what the Task Force is?
22     A  Take five.
23     Q  Do you know who runs the Task Force?
24     A  Take five.

Page 29

1      Q  During the period of time in which you were a
2  business agent for Local 150 were any checks cut without
3  Bill Dugan's signature or approval?
4      A  Take five.
5      Q  Isn't it true that the IIIFFC would e-mail
6  personal information from motor vehicle records to
7  officers of Local 150?
8      A  Take five.
9      Q  Isn't it true that Marshall Douglas -- Strike
10  that.
11         Do you know Marshall Douglas?
12     A  Take five.
13     Q  Where do you know Marshall Douglas from?
14     A  Take five.
15     Q  When did you first meet Marshall Douglas?
16     A  Take five.
17     Q  Did Marshall Douglas ever ask you to e-mail him
18  personal information from motor vehicle records?
19     A  Take five.
20     Q  Marshall Douglas worked in the District 8 office
21  of Local 150, is that correct?
22     A  Take five.
23     Q  And that was in Rock Island, correct?
24     A  Take five.

8 (Pages 26 to 29)

0162f31d-b805-410d-9a04-daed491ee0d1

Michael J. Quigley          March 24, 2010

Page 30

1    Q   Marshall Douglas had a computer with e-mail
2   capabilities, is that correct?
3    A   Take five.
4    Q   Did Marshall Douglas ever ask you to run plates
5   for him?
6    A   Take five.
7    Q   Can you tell me what equipment has
8   been installed on the vehicles of Local 150's
9   business agents?
10   A   Take five.
11   Q   Can you tell me what, if any, equipment has
12  been installed on vehicles operated by Local 150's
13  business agents?
14   A   Take five.
15   Q   Can you tell me which of the business agents at
16  Local 150 had computers when you were at Local 150?
17   A   Take five.
18   Q   Have you been contacted by any of the
19  business agents for Local 150 before your testimony
20  today?
21   A   Take five.
22   Q   Did any officer or employee of Local 150 contact
23  you about your testimony before today?
24   A   Take five.

Page 31

1    Q   Do you know Bill Callahan?
2    A   Take five.
3    Q   Is there a lawsuit presently pending between you
4   and Local 150?
5    A   Take five.
6    Q   Is it more than one case?
7    A   Take five.
8    Q   Where are the cases pending?
9    A   Take five.
10   Q   What is the status?
11   A   Take five.
12   Q   Has any case against you settled?
13   A   Take five.
14   Q   When you worked at the IIIFFC, what was the
15  purpose of the IIIFFC?
16   A   Take five.
17   Q   Who were the officers of the IIIFFC when you
18  worked there?
19   A   Take five.
20   Q   Do you know why the IIIFFC was located in the
21  offices in which it's located?
22   A   Take five.
23   Q   When you worked for the FFC, at any time did
24  employees of the FFC obtain personal information from

Page 32

1   motor vehicle records?
2    A   Take five.
3    Q   Can you tell me why they would do that?
4    A   Take five.
5    Q   Did the FFC ever share with Local 150 personal
6   information from motor vehicle records?
7    A   Take five.
8    Q   You stated in your affidavits that the FFC would
9   regularly share personal information from motor vehicle
10  records on a regular basis, is that correct?
11   A   Take five.
12   Q   While you were the executive director of the
13  FFC, how often did the FFC share personal information
14  from motor vehicle records with Local 150?
15   A   Take five.
16   Q   Did the IIIFFC run more than 40 license plates a
17  year for Local 150?
18   A   Take five.
19   Q   Do you know why the FFC shared information with
20  Local 150?
21   A   Take five.
22   Q   Do you know why the FFC shared personal
23  information with Local 150?
24   A   Take five.

Page 33

1    Q   Is the FFC a separate entity from Local 150?
2    A   Take five.
3    Q   Can you tell me if the FFC operates
4   independently from Local 150?
5    A   Take five.
6    Q   How was the original FFC board of directors
7   selected?
8    A   Take five.
9    Q   You were the founding director or founding
10  executive director of the FFC, is that correct?
11   A   Take five.
12   Q   Do you know if the FFC ran Tammy Barker's
13  license plate?
14   A   Take five.
15   Q   Do you know if the FFC ran Timothy Barker's
16  license plate?
17   A   Take five.
18   Q   Do you know if the FFC ran Melisa Merryman's
19  license plate?
20   A   Take five.
21   Q   The FFC provided personal information regarding
22  Tammy Barker to Local 150, is that correct?
23   A   Take five.
24   Q   The FFC provided personal information regarding

9 (Pages 30 to 33)

0162f31d-b805-410d-9a04-daed491ee0d1

Michael J. Quigley        March 24, 2010

Page 34

1  Timothy Robert Barker from motor vehicle records to
2  Local 150, is that correct?
3     A  Take five.
4     Q  The FFC provided Tammy Barker's personal
5  information from motor vehicle records to Local 150, is
6  that correct?
7     A  Take five.
8     Q  The FFC provided personal information regarding
9  Melisa Merryman from motor vehicle records to Local 150,
10  is that correct?
11     A  Take five.
12     Q  When you were employed at the FFC did you ever
13  have occasion to enter Local 150's offices where
14  Linda Soria worked?
15     THE REPORTER:  Who?
16     MR. HANLON:  Linda Soria.
17     MS. McGARRY:  S-o-r-i-o.
18     MR. HANLON:  No.  S-o-r-i-a.
19     A  Take five.
20     MR. HANLON:  Q  And with all that going on, you
21  still understood the question, correct?
22     A  Yes.
23     Q  You mentioned in your affidavit, as did
24  Miss Soria, that Local 150 had microfiche, is that

Page 35

1  correct?
2     A  Take five.
3     Q  Have you ever seen the microfiche at Local 150?
4     A  Take five.
5     Q  Have you ever seen Linda Soria using microfiche
6  to look up personal information from motor vehicle
7  records?
8     A  Take five.
9     Q  Do you know if Linda Soria is a truthful person?
10     A  Take five.
11     Q  She wouldn't lie, would she?
12     A  Take five.
13     MS. LaROSE:  Objection.
14     MR. HANLON:  Do you have a basis for your objection,
15  counsel?
16     MS. LaROSE:  Yes.  This is not within this witness'
17  personal knowledge as to whether she's truthful or not.
18  And I don't see where we're going with this in
19  connection with this case.
20     MR. HANLON:  Okay.  Great.  I guess your objection
21  is noted for the record.
22     MS. LaROSE:  Right.  Exactly.  That's why I made it.
23     MR. HANLON:  Well, I would prefer that you state
24  your objection and the basis for the objection as

Page 36

1  opposed to just simply --
2     MS. LaROSE:  I understand what your preference is.
3  Let's move on.
4     MR. HANLON:  It's the rules.
5     MS. LaROSE:  It's not the rules, but we're not going
6  to be here debating that right now.  Please move on.
7     MR. HANLON:  Q  Do you know if the FFC
8  ever initiated a lawsuit in connection with the
9  license plates it ran?
10     A  Take five.
11     Q  That was take five?
12     A  Yes.
13     Q  Do you know if the attorneys for Local 150 are
14  also business agents of Local 150?
15     A  Take five.
16     MS. McGARRY:  And objection, asked and answered.
17     MR. HANLON:  Q  Would Local 150's counsel attend
18  meetings of the business agents?
19     A  Take five.
20     Q  Did you ever attend any meetings where the
21  availability of personal information from motor vehicle
22  records was discussed?
23     A  Take five.
24     Q  Can you tell me where that meeting took place?

Page 37

1     A  Take five.
2     Q  Can you tell me when that meeting took place?
3     A  Take five.
4     Q  Can you tell me the job description of a
5  business agent of Local 150?
6     A  Take five.
7     Q  Can you tell me how Local 150 employees would in
8  your experience come to work for the FFC?
9     A  Take five.
10     Q  When you were the executive director of the FFC
11  did Bill Dugan ever give you any direction?
12     A  Take five.
13     Q  After you became the executive director of the
14  FFC were you required to make any payments to Bill Dugan
15  in any way?
16     A  Take five.
17     Q  What, if any, did Bill Dugan provide to you by
18  way of direction with respect to motor vehicle records?
19     A  Take five.
20     Q  When was the first time you were able to run a
21  license plate for Local 150?
22     A  Take five.
23     Q  Approximately how many license plates did you
24  run while a BA for Local 150?

10  (Pages 34 to 37)

0162f31d-b805-410d-9a04-daed491ee0d1

Michael J. Quigley     March 24, 2010

Page 38

1    A  Take five.
2    MR. HANLON:  The remainder of my questions have a
3  time period commencing with January 21st, 2004 to the
4  present date.
5    MS. McGARRY:  I'm sorry.  That was 1-21-04?
6    MR. HANLON:  That's correct.  Actually, let's just
7  say from February 1st, 2004.
8    MS. McGARRY:  Okay.  So 2-04 to the present.
9    MR. HANLON:  2-04 to the present.
10   MS. McGARRY:  And you'll let us know if for some
11  reason that switches out in the question.
12   MR. HANLON:  That's correct.
13   MS. McGARRY:  Otherwise make that assumption.
14   MR. HANLON:  Okay.  So from this point forward until
15  I notify you otherwise --
16   MS. McGARRY:  Everything is February of 2004 to the
17  present time.
18   MR. HANLON:  February of 2004 to the present.
19   MS. McGARRY:  Thank you.
20   MR. HANLON:  Q  In your position as the executive
21  director of the FFC, you instructed employees of the FFC
22  to obtain personal information from motor vehicle
23  records, is that correct?
24   A  Take five.

Page 39

1    Q  The personal information which you directed the
2  employees of the FFC to obtain was for use in connection
3  with matters not authorized by the Drivers Privacy
4  Protection Act?
5    A  Take five.
6    Q  Personal information which the FFC employees
7  obtained at your direction was for use by -- or strike
8  that -- was not for use by any government agency
9  including any court of law, enforcement agency, is that
10  correct?
11   A  Take five.
12   Q  Personal information which the FFC employees
13  obtained at your direction --
14   A  Take five.
15   Q  I'm not done yet.  I'm sorry.  I know these
16  questions all kind of run together.
17   MS. McGARRY:  Just wait to take your five when he
18  finishes.
19   MR. HANLON:  Q  I'll tell you what, I'll just look
20  up.  I'll look up, okay?  Because it's kind of a long
21  question.
22   A  Yeah, it is.
23   Q  In fact, I'm going to go for a little bit and it
24  will be somewhat redundant.  But there are little

Page 40

1  nuances to it.  So please listen carefully.
2    Personal information obtained from
3  motor vehicle records at your direction at the IIIFFC
4  was not for use in connection with matters of
5  motor vehicle safety or driver safety or theft, is that
6  correct?
7    A  Take five.
8    Q  Personal information which the FFC obtained at
9  your direction was not for use for motor vehicle
10  emissions, motor vehicle product alteration, recalls or
11  advisories, is that correct?
12   A  Take five.
13   Q  Personal information from motor vehicle records
14  obtained by the FFC at your direction was not for
15  performance or monitoring of motor vehicles, is that
16  correct?
17   A  Take five.
18   Q  Personal information from motor vehicle records
19  obtained by the IIIFFC at your direction was not for
20  motor vehicle parts and dealers, is that correct?
21   A  Take five.
22   Q  Personal information obtained from motor vehicle
23  records at your direction by the employees of the FFC
24  was not for use in connection with motor vehicle market

Page 41

1  research activities including survey research and/or
2  removal of non-owner records from the original owner
3  records of motor vehicle manufacturers, is that correct?
4    A  Take five.
5    Q  Personal information from motor vehicle records
6  obtained by the FFC at your direction was not for the
7  use in the normal course of business by Local 150 or its
8  agents or contractors, is that correct?
9    A  Take five.
10   MS. McGARRY:  Calls for a legal conclusion and is
11  vague.
12   You can answer.
13   A  Take five.
14   MR. HANLON:  Why don't you tell the statutory
15  authorities that their statutes are vague.
16   MS. McGARRY:  It is vague.  I'm sorry.
17   MR. HANLON:  Okay.
18   Q  The IIIFFC was not using personal information
19  from motor vehicle records to verify the accuracy of
20  personal information submitted by the motor vehicle
21  owner to the FFC, is that correct?
22   A  Take five.
23   Q  Personal information obtained by the IIIFFC
24  employees pursuant to your direction was not for the

11 (Pages 38 to 41)

0162f31d-b805-410d-9a04-daed491ee0d1

Michael J. Quigley          March 24, 2010

Page 42

1  purpose of correcting information or preventing fraud or
2  pursuing legal remedies against or recovering a debt or
3  security interest against the owner of a motor vehicle,
4  is that correct?
5      MS. McGARRY:  Objection, vague and calls for a legal
6  conclusion.
7      A  Take five.
8      MR. HANLON:  Q  Personal information from
9  motor vehicle records obtained by the FFC at your
10 direction was not for use in connection with any civil,
11 criminal, administrative or arbitral proceeding in any
12 federal, state or local court or agency or before any
13 self-regulatory body including service of process,
14 investigation in anticipation of litigation and the
15 execution or enforcement of judgments and orders or
16 pursuant to an order of federal or state or local court,
17 is that correct?
18     MS. McGARRY:  Same objection and compound.
19     MS. LaROSE:  I adopt that objection.
20     A  Take five.
21     MR. HANLON:  Q  The IIIFFC was not involved in
22 research activities, is that correct?
23     MS. McGARRY:  Objection, vague.
24     A  Take five.

Page 43

1      MR. HANLON:  Q  The FFC did not produce statistical
2  reports using motor vehicle records, correct?
3      MS. McGARRY:  Same objection.
4      A  Take five.
5      MR. HANLON:  And your objection was that it was
6  what?
7      MS. McGARRY:  It's vague.  I don't know what a
8  statistical report is.  I realize you're reading from
9  the statute, so yes, we can complain to the government,
10 but I'm making my objection for the record.
11     MS. LaROSE:  Same objection.
12     MR. HANLON:  Q  The IIIFFC used personal
13 information -- I'm sorry, strike that -- did not --
14 Strike all that.  Starting over.
15        The IIIFFC did not use personal information it
16 obtained from motor vehicle records to provide notice to
17 the owners of towed or impounded vehicles, correct?
18     A  Take five.
19     MR. HANLON:  I passed one.
20     MS. McGARRY:  It was close.  I got to tell you,
21 impounded was close.
22     MR. HANLON:  Q  The IIIFFC obtained personal
23 information from motor vehicles for a use other than to
24 provide it to a private investigative agency?

Page 44

1      A  Take five.
2      Q  The IIIFFC is not a private investigative
3  agency, correct?
4      A  Take five.
5      Q  The IIIFFC is not a licensed security service,
6  is that correct?
7      A  Take five.
8      Q  The IIIFFC did not use personal information from
9  motor vehicle records to verify information relating to
10 a holder of a commercial driver's license, is that
11 correct?
12     A  Take five.
13     Q  The FFC obtained personal information from
14 motor vehicle records for a use other than in connection
15 with the operation of a private toll facility, is that
16 correct?
17     A  Take five.
18     Q  The FFC obtained personal information from
19 motor vehicle records for a use other than a use in
20 response to a request for individual motor vehicle
21 records -- I'm sorry.  Strike that.
22     MS. McGARRY:  Yeah.  I'm sorry.  I need that back.
23     MR. HANLON:  I'm with you, Counsel.
24     Q  The IIIFFC obtained personal information from

Page 45

1  motor vehicle records for something other than bulk
2  distribution surveys, is that correct?
3      A  Take five.
4      Q  The IIIFFC obtained personal information from
5  motor vehicle records for a use other than marketing or
6  solicitations by the Illinois Secretary of State, is
7  that correct?
8      MS. LaROSE:  Objection to this question and all
9  those that precede it, and I'm going to bet those that
10 follow, on the grounds that you're asking the witness to
11 coopt what is a specific statutory definition.
12     MR. HANLON:  I'm asking him about facts.
13     MS. LaROSE:  We don't have to argue it, Counsel.  I
14 made my objection, you can ask the witness to answer.
15 It just will take all afternoon if we're going to debate
16 them here.
17     MR. HANLON:  Right.
18     MS. LaROSE:  So let me make my objection and we
19 won't do that.
20     MR. HANLON:  Great.  I'm not arguing with you.
21     MS. LaROSE:  Good deal.
22     MR. HANLON:  Where was I?
23     MS. McGARRY:  You hit tollbooths.
24     MR. HANLON:  Yeah, I know where I'm at.

12  (Pages 42 to 45)

0162f31d-b805-410d-9a04-daed491ee0d1

Michael J. Quigley          March 24, 2010

Page 46

1    MS. McGARRY: Okay. A couple past there.
2    MR. HANLON: Q  Personal information that IIIFFC
3  obtained from motor vehicle records at your direction
4  was not for the purpose of marketing or sending bulk
5  distribution surveys, is that correct?
6    A  Take five.
7    Q  The IIIFFC did not obtain the written consent of
8  Tammy Barker for the personal information pertaining to
9  Tammy Barker, is that correct?
10   A  Take five.
11   Q  The FFC did not obtain the written consent of
12 Timothy Robert Barker with respect to the personal
13 information from his motor vehicle records, is that
14 correct?
15   A  Take five.
16   Q  And the FFC did not obtain the written consent
17 of Melisa Merryman regarding her personal information
18 from motor vehicle records, is that correct?
19   A  Take five.
20   MR. HANLON: Now I would like to address the period
21 of time prior to five years prior to today. So in
22 contrast to the questions that I've asked him, the
23 following questions are all entirely about activity
24 taking place prior to five years from today, but after

Page 47

1  February of 2004.
2    MS. McGARRY: So you're talking 2-04 to March of
3  2005.
4    MR. HANLON: That would be correct.
5    MS. McGARRY: So it's that one year.
6    MR. HANLON: That one year.
7    MS. McGARRY: Well, one year and one month.
8    MR. HANLON: Yes.
9    MS. McGARRY: Thirteen months. Okay. Tell us when
10 you stop with the year.
11   MR. HANLON: I will tell you when I stop, just as I
12 did just now.
13   MS. McGARRY: Absolutely. It was very good.
14   MR. HANLON: Thank you.
15   Q  In that year period of time had the IIIFFC
16 provided to Local 150 any personal information from
17 motor vehicle records?
18   A  Take five.
19   MS. McGARRY: I also think it has been asked and
20 answered because you asked the question before without a
21 time limitation.
22   MR. HANLON: Well, it included up until now, and now
23 I'm narrowing it to a very narrow area. And so it's a
24 slightly different question and I'm defining it within

Page 48

1  that period of time.
2    MS. McGARRY: I don't think it's a slightly
3  different question because the first question included
4  this year of 2004 to March of 2005 that you're talking
5  about.
6    MR. HANLON: Counsel, I think --
7    MS. McGARRY: Ask your questions, but I'm making my
8  objection.
9    MS. LaROSE: She has got to make her objection.
10   MS. McGARRY: Okay. So I think it's all included.
11 I think it has been asked and answered.
12   MR. HANLON: Okay. I think you realize, and we
13 all agree, that there's a five-year statute of
14 limitations.
15   MS. LaROSE: Please, let's not argue this, otherwise
16 we'll be here all afternoon. Just ask your questions.
17 The way it should be done is you ask your question, we
18 object, and then you go ahead and ask for your answer.
19   MR. HANLON: Miss LaRose, I don't need instructions
20 from you on how to --
21   MS. LaROSE: But you keep doing it. You keep doing
22 it. So please stop. Let her make her objection and
23 move on.
24   MR. HANLON: Well, you know, I'm just explaining to

Page 49

1  Counsel, you know, we've got a five-year statute of
2  limitations.
3    MS. LaROSE: You're arguing with her.
4    MS. McGARRY: I understand why you're doing it, but
5  my objection is not going to change. It's asked and
6  answered.
7        You can answer the question.
8    MS. LaROSE: And I'll note for the record that the
9  time is 1:58 and we're now covering old ground. And I
10 am adopting Miss McGarry's objection to this line of
11 questions concerning this time frame.
12   MR. HANLON: Q  With respect to that time frame
13 that I just mentioned, --
14   MS. McGARRY: February, 2004 to March, 2005.
15   MR. HANLON: Yes.
16   Q  -- during that period of time you were the
17 executive director of the FFC, correct?
18   A  Take five.
19   MR. HANLON: And earlier when we defined it, it was
20 on the advice of counsel. Does that continue?
21   MS. McGARRY: I'm sorry. Earlier when what?
22   MR. HANLON: When we defined the word take five, it
23 was under the advice of counsel. I just want to make
24 sure that it continues, because I changed the time

13 (Pages 46 to 49)

0162f31d-b805-410d-9a04-daed491ee0d1

Michael J. Quigley     March 24, 2010

Page 50

1  frame.
2     MS. McGARRY:  Oh, yes.  You gave us the definition
3  that take five is the Fifth Amendment.
4     MR. HANLON:  But it's based upon your advice,
5  correct?
6     MS. McGARRY:  Yes.
7     MS. LaROSE:  She's not --
8     MS. McGARRY:  Yeah, I know.
9     MR. HANLON:  You can laugh, mock, smirk all you
10  want, that's fine.
11     MS. LaROSE:  It's just an odd question to put to
12  counsel, but...  It's fine.  Let's move on.
13     MR. HANLON:  Q  If I ask you any of the same
14  questions that I asked you earlier in this deposition,
15  relative to the new established time frame of that year,
16  would any of your answers be different or would they all
17  be the same?
18     A  Same.
19     MS. McGARRY:  That was absolutely wonderful.
20  Thank you.
21     MS. LaROSE:  Yeah, thank you very much.
22     MR. HANLON:  Q  Just two minor things.
23        During that period of time, we're talking --
24     MS. McGARRY:  February, 2004.

Page 51

1     MR. HANLON:  Q  -- from February of 2004 to March
2  of 2005, you saw microfiche used at Local 150, correct?
3     A  Take five.
4     Q  In that same period of time you saw -- I'm
5  sorry -- Local 150 had computerized disks containing
6  personal information of motor vehicle records, correct?
7     A  Take five.
8     MS. LaROSE:  Objection, cumulative.
9     MR. HANLON:  If you don't mind, I just need to take
10  a five-minute break.  And I'm going to walk down the
11  hall and I'm going to come right back.  And I think we
12  may even be out of here early so you guys can miss
13  traffic.
14     MS. McGARRY:  Fantastic.  Thank you very much.
15
16        (Off the record at 2:02 p.m.)
17
18        (RECESS)
19
20        (On the record at 2:05 p.m.)
21
22     MR. HANLON:  Q  While you were the executive
23  director of the FFC, you ran motor vehicle license
24  plates for Local 150, correct?

Page 52

1     A  Take five.
2     Q  And while you were the executive director
3  of the FFC, you disclosed personal information from
4  motor vehicle records to Local 150, is that correct?
5     A  Take five.
6     Q  And while you were the executive director of the
7  FFC, you ran more than 40 license plates, is that
8  correct?
9     MS. LaROSE:  Objection, cumulative, this question,
10  the last two as well.
11     A  Take five.
12     MR. HANLON:  Q  And while you were the
13  executive director of the FFC, you provided more than
14  40 -- I'm sorry.  Strike that entire question.
15        While you were the executive director of the
16  FFC, on more than 40 occasions, you provided personal
17  information from motor vehicle records to Local 150, is
18  that correct?
19     A  Take five.
20     MR. HANLON:  Counsel.
21     MS. McGARRY:  I have a couple questions.  Do you
22  have any?
23     MS. LaROSE:  No.
24

Page 53

1        EXAMINATION
2        by Ms. McGarry:
3     Q  Mr. Quigley, have you spoken with Mr. Hanlon
4  before today's deposition?
5     A  Yes.
6     Q  How many times have you spoken with him?
7     A  A couple, three.
8     Q  At the time times that you spoke to him, did you
9  have legal counsel in this matter?
10     A  No.
11     Q  Did Mr. Hanlon ever tell you that you should
12  retain legal counsel with regard to this matter?
13     A  Not to my knowledge.
14     Q  Did Mr. Hanlon ever tell you that you may have
15  any legal exposure for anything in this action when he
16  was speaking with you?
17     A  No.
18     MS. McGARRY:  That's all I have.
19
20        RE-EXAMINATION
21        by Mr. Hanlon:
22     Q  During that conversation or conversations which
23  you and I had, did I not articulate to you that I
24  represented Tammy Barker, Timothy Barker and

14  (Pages 50 to 53)

0162f31d-b805-410d-9a04-daed491ee0d1

Page 54

1    Melisa Merryman in a position adverse to Local 150?
2        A   I believe so.
3    MS. McGARRY:  Is that it?
4        Anything Liz?
5    MS. LaROSE:  No.
6    MS. McGARRY:  We reserve signature.
7
8        (Off the record at 2:08 p.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24        - - - - - - - - - -

Page 55

1    STATE OF ILLINOIS  )
2                       ) ss:
3    COUNTY OF COOK  )
4
5
6        The within and foregoing deposition of the
7    aforementioned witness was taken before KAREN KOSTAS, CSR,
8    RMR, CRR, RDR and Notary Public, at the place, date and
9    time aforementioned.
10       There were present during the taking of the
11   deposition the previously named counsel.
12       The said witness was first duly sworn and was
13   then examined upon oral interrogatories; the questions and
14   answers were taken down in shorthand by the undersigned,
15   acting as stenographer and Notary Public; and the within
16   and foregoing is a true, accurate and complete record of
17   all of the questions asked of and answers made by the
18   aforementioned witness, at the time and place hereinabove
19   referred to.
20       The signature of the witness was not waived,
21   and the deposition was submitted, pursuant to Rules 30 (e)
22   and 32 (d) of the Rules of Civil Procedure for the
23   United States District Court, to the deponent per copy of
24   the attached letter.

Page 56

1        The undersigned is not interested in the within
2    case, nor of kin or counsel to any of the parties.
3        Witness my official signature and seal as
4    Notary Public in and for Cook County, Illinois, on this
5    _____ day of _____, _____.
6
7
8
9
10
        _____
11      KAREN KOSTAS, CSR, RMR, CRR, RDR
        CSR No. 084-001400
12      311 South Wacker Drive
        Suite 300
13      Chicago, Illinois 60606
        Phone: (312) 386-2000
14
15
16
17
18
19
20
21
22
23
24

Page 57

1        IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF ILLINOIS
2                   WESTERN DIVISION
3
4    TAMMY BARKER, TIMOTHY ROBERT    )
     BARKER and MELISA MERRYMAN, On  )
     Behalf of Themselves and On Behalf )  HONORABLE JUDGE
     of Those Similarly Situated,    )
6                           )  FREDERICK KAPALA
         Plaintiffs,  )
7        -vs-         )  No. 08-cv-50015
8                     )
     LOCAL 150, INTERNATIONAL UNION   )
9    OF OPERATING ENGINEERS, AFL-CIO, )  MAGISTRATE JUDGE
                     )
10       Defendant.   )  P. MICHAEL MAHONEY
11
12
13       I, MICHAEL J. QUIGLEY, being first duly sworn,
14   on oath say that I am the deponent in the aforesaid
15   deposition taken on March 24th, 2010; that I have read
16   the foregoing transcript of my deposition, consisting of
17   Pages 1 through 57.
18
19
         _____
20             MICHAEL J. QUIGLEY
21   SUBSCRIBED AND SWORN TO
     before me this _____ day
22   of _____, A.D. 2010.
23
         _____
24       Notary Public

Michael J. Quigley          March 24, 2010

Page 58

1         MERRILL LEGAL SOLUTIONS
          311 South Wacker Drive - Suite 300
2           Chicago, Illinois 60606
             (312) 386-2000
3
4          April 26, 2010
5    Mr. Michael J. Quigley
     c/o McGarry and McGarry LLC
6    Ms. Annette M. McGarry
     120 North LaSalle Street
7    Suite 1100
     Chicago, Illinois 60602
8
9    CASE:     Tammy Barker, et al. vs. Local 150
     DEPONENT:  Michael J. Quigley
10   DATE TAKEN: March 24, 2010
11
     Dear Mr. Quigley:
12
     The above-referenced deposition has been transcribed
13   pursuant to the Rules of Court and is ready for review.
14   Please contact our office at your earliest convenience for
     an appointment to review the deposition transcript, or you
15   may contact counsel for a copy of the transcript for your
     review.
16
     Upon failure to comply within 30 days, we shall forward an
17   appropriate affidavit of noncompliance to counsel without
     further notice.
18
            Very truly yours,
19
20   _____
        MERRILL LEGAL SOLUTIONS
21
22   cc: Mr. Robert T. Hanlon (L/O of Robt. T. Hanlon)
       Ms. Elizabeth A. LaRose (Local 150 Legal Dept.)
23
24   Inv. KK177623

Page 59

1   CASE: Tammy Barker, et al. vs. Local 150
2   DEPONENT: Michael J. Quigley   DATE: March 24, 2010
3
4   PAGE  LINE       ERRATA SHEET
5   ____ ____    CHANGE: _____
6   ____ ____    REASON: _____
7   ____ ____    CHANGE: _____
8   ____ ____    REASON: _____
9   ____ ____    CHANGE: _____
10  ____ ____    REASON: _____
11  ____ ____    CHANGE: _____
12  ____ ____    REASON: _____
13  ____ ____    CHANGE: _____
14  ____ ____    REASON: _____
15  ____ ____    CHANGE: _____
16  ____ ____    REASON: _____
17  ____ ____    CHANGE: _____
18  ____ ____    REASON: _____
19  ____ ____    CHANGE: _____
20  ____ ____    REASON: _____
21  ____ ____    CHANGE: _____
22  ____ ____    REASON: _____
23  (signed) _____ DATE _____
24  Reporter: KAREN KOSTAS, CSR, RMR, CRR, RDR

Page 60

1   CASE: Tammy Barker, et al. vs. Local 150
2   DEPONENT: Michael J. Quigley   DATE: March 24, 2010
3   PAGE LINE       ERRATA SHEET
4   ____ ____    CHANGE: _____
5   ____ ____    REASON: _____
6   ____ ____    CHANGE: _____
7   ____ ____    REASON: _____
8   ____ ____    CHANGE: _____
9   ____ ____    REASON: _____
10  ____ ____    CHANGE: _____
11  ____ ____    REASON: _____
12  ____ ____    CHANGE: _____
13  ____ ____    REASON: _____
14  ____ ____    CHANGE: _____
15  ____ ____    REASON: _____
16  ____ ____    CHANGE: _____
17  ____ ____    REASON: _____
18  ____ ____    CHANGE: _____
19  ____ ____    REASON: _____
20  ____ ____    CHANGE: _____
21  ____ ____    REASON: _____
22
23  (signed) _____ DATE _____
24  Reporter: KAREN KOSTAS, CSR, RMR, CRR, RDR

Merrill Legal Solutions
(800) 868-0061          (312) 386-2000

0162f31d-b805-410d-9a04-daed491ee0d1