# Exhibit B

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

TAMMY BARKER, TIMOTHY ROBERT )
BARKER, AND MELISA MERRYMAN, ON )
BEHALF THEMSELVES AND ON BEHALF )
OF THOSE SIMILARLY SITUATED, )
                              )
          Plaintiffs, )
                              )
      vs. )
                              )
LOCAL 150, INTERNATIONAL UNION )
OF OPERATING ENGINEERS, AFL-CIO,)
                              )
        Defendant. )

# ORIGINAL

No. 08 C 50015

The deposition of LINDA SORIA, taken before GARY SCHNEIDER, CSR, RPR, within and for the State of Illinois, pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, at 3500 Three First National Plaza, 70 West Madison, Chicago, IL, 60602 , commencing at 1:00 p.m., on May 28, 2008.

2

1                    A P P E A R A N C E S

2   S. IRA MILLER

3   111 West Washington Street

4   Suite 1900

5   Chicago, IL 60602

6   (312) 372-2215

7   By:  S. Ira Miller
         On behalf of Linda Soria;
8

9   UNGARETTI & HARRIS

10  3500 Three First National Plaza

11  70 West Madison

12  Chicago, IL, 60602

13  (312) 977-4883

14  By:  Mr. Dean Polales,
         On behalf of Tammy Barker, Timothy
15        Robert Barker, and Melisa Merryman;

16

17  LOCAL 150 OF THE INTERNATIONAL UNION OF

18  OPERATING ENGINEERS

19  6140 Joliet Road

20  Countryside, IL, 60525

21  (708) 579-6663

22  By:  Mr. Bryan P. Diemer,
         Ms. Lauren S. Shapiro, on behalf of Local
23       150 of the International Union of Operating
          Engineers;

24

3

1          A P P E A R A N C E S  (Continued)

2

3   Robert Hanlon & Associates, P.C.

4   14212 Washington Street

5   Suite 200

6   Woodstock, IL 60098

7   (815) 206-2200

8   By:   Mr. Robert T. Hanlon
            on behalf of Local 150 of the International
9           Union of Operating Engineers.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

4

1                MR. POLALES: Okay. Can you swear the

2  witness.

3                (Witness sworn.)

4                MR. POLALES: Would you state your

5  name, please, and spell your last name.

6                THE WITNESS: Linda Soria, S-o-r-i-a.

7                MR. POLALES: Hi, Ms. Soria. My name

8  is Dean Polales. We've met before, but I want to

9  tell you on the record I am one of the attorneys for

10  the plaintiffs in this case, which is a case brought

11  by Tammy Barker, Timothy Barker, and a lady named

12  Melissa Merryman, against Local 150 of the

13  International Union of Operating Engineers.

14                We're taking this deposition pursuant

15  to the Federal Rules of Civil Procedure and the local

16  rules of court for the U.S. District Court for the

17  Northern District of Illinois.

18                It's now about 1:04 in the afternoon.

19                Linda Soria,

20  Having been called as a witness and having been first

21  duly worn, was examined and testified as follows:

22                DIRECT EXAMINATION

23  BY MR. POLALES:

24    Q    I would ask you, have you ever given

5

1  testimony before?

2      A     In a divorce case.

3      Q     And was that in a courtroom or was that at

4  a deposition like this?

5      A     It was in a courtroom.

6      Q     And during this deposition, I'll ask you a

7  series of questions that I think are about this

8  lawsuit, facts associated with it.  And it's

9  important that you answer each question verbally

10  rather than with a nod of the head --

11      A     Okay.

12      Q     -- or a shake of the head so that the court

13  reporter can take down your answers.

14              If I ask you a question, which

15  sometimes I do, that doesn't seem to make sense,

16  please tell me, and I'll try and rephrase the

17  question so that it's understandable.

18              Sometimes counsel for the defendant,

19  Mr. Diemer --

20              MR. POLALES:  I'm sorry.  I forgot

21  your last --

22              MS. SHAPIRO:  Shapiro.

23  BY MR. POLALES:

24      Q     Ms. Shapiro may object to a question that I

6

1   ask. Just wait for their objection, listen to it,

2   and then we'll go on from there.

3              You're represented by counsel here

4   today, yes?

5      A    Yes.

6      Q    And that's Mr. Ira Miller --

7              MR. MILLER: Yes.

8              MR. POLALES: -- correct?

9   BY MR. POLALES:

10     Q    And I don't know if you've met all of the

11   counsel. I know that Rob Hanlon, who is sitting next

12   to me, who is an attorney for the plaintiff, has

13   introduced himself to you.

14              And I presume you've had an

15   opportunity to at least talk with Mr. Diemer. He

16   represents Local 150, as does Ms. Shapiro, okay?

17              So this divorce case that you

18   testified about before, was that a state court or a

19   federal court case, if you know?

20     A    A state.

21     Q    And can you tell me how far you went in

22   school, Ms. Soria?

23     A    How far I went to school?

24     Q    In school, yeah. Did you finish high

7

1  school?  Go to college?

2      A    Two years of college.

3      Q    Two years of college?

4      A    Um-hmm.

5      Q    What was your major in college, if you had

6  one?

7      A    Business.

8      Q    And what is your birth date, ma'am?

9      A    December 1st, 1948.

10     Q    Do you have a driver's license?

11          MR. MILLER:  Now, prior to her

12  answering any further questions, I intend to have her

13  assert her privilege under the Fifth Amendment.

14          However, we will let some of your

15  questions get answered if you agree that you will not

16  contend that any of the answers we allow her to make

17  will not constitute grounds for waiver of her Fifth

18  Amendment privilege.

19          MR. POLALES:  Well, I think we'll have

20  to go case by case on that, Mr. Miller.

21          MR. MILLER:  Okay.

22          MR. POLALES:  Okay?  Or question by

23  question on that, I should say.

24  BY MR. POLALES:

8

1     Q    Do you have a driver's license with you?

2     A    Yes.

3     Q    May I see it, please.

4             Your driver's license, rather than

5 mark it as an exhibit, I'll just lean over your

6 shoulder and ask you if I'm reading this exactly.

7             Your driver's license says you are

8 Linda M. Soria of 16152 South Leach Drive, Lockport,

9 Illinois, 60441, and that your driver's license

10 number is S600-5334-8942, issued on November 30th,

11 '02, and expiring on 12/01/06.

12    A    Well, actually --

13    Q    Did I get it right?

14    A    -- I got it renewed.

15    Q    You got it renewed on the back.

16    A    From four years from the expiration on the

17 face of this --

18    Q    Okay.

19    A    -- license.

20    Q    Was the rest of it right that I read?

21    A    Yeah.

22    Q    Okay.  And your birth date is 12/1/48.

23 You're '5 "4, 150 pounds, with --

24    A    Well, they never --

9

1     Q    -- eyes of blue.  They didn't --

2     A    -- adjusted that.

3     Q    -- correct it?

4     A    Yeah.

5     Q    But that's what it says; is that correct?

6     A    Yeah, um-hmm.

7     Q    And you have organization, where it says

8 type and class, it says DM, and restriction says B.

9              Do you know what that is?

10           MR. MILLER:  Objection -- well,

11 objection.

12           MR. POLALES:  You're going to instruct

13 the witness?

14           MR. MILLER:  Kindly assert your

15 privilege under the Fifth Amendment.

16           THE WITNESS:  Okay.  I respectfully

17 refuse to testify based on my privilege against

18 self-incrimination under the Fifth Amendment to the

19 United States Constitution.

20           MR. POLALES:  Okay.

21 BY MR. POLALES:

22     Q    For the record, did I read it correctly?

23     A    Yes.

24     Q    Okay.  And, ma'am, where did you grow up?

1     A    Chicago.

2     Q    Do you have any children?

3     A    Yes.

4     Q    How many?

5     A    Four.

6     Q    Are they all grown?

7     A    Yes.

8     Q    All out of the house?

9     A    Yes.

10    Q    And you were served with a subpoena for

11 your appearance here today?

12    A    Yes.

13    Q    And did that subpoena request that you

14 furnish documents?  Do you remember?

15    A    Yeah.

16          MR. DIEMER:  I'm going to just make an

17 observation for the record.  The last time we

18 appeared in front of Judge Mahoney, Mr. Hanlon

19 advised the court that Mr. Hanlon was going to advise

20 the witness that she not -- it was not necessary to

21 bring any documents to this deposition.

22          MR. HANLON:  That's correct.

23          MR. POLALES:  Oh, you did?

24          MR. HANLON:  I did.

1          MR. POLALES:   Okay.

2    BY MR. POLALES:

3      Q     Do you remember whether the subpoena asked

4    you to furnish documents?

5      A     It did.

6      Q     And were you advised that you didn't have

7    to bring any documents today?

8      A     No.

9      Q     Okay.  Well --

10     A     But I don't have any, so...

11     Q     -- that's okay.

12                Have you had any discussions with

13   anyone in law enforcement in the last two years about

14   Local 150?

15     A     I respectfully refuse to testify based on

16   my privilege against self-incrimination under the

17   Fifth Amendment to the United States Constitution.

18     Q     Okay.  And have you talked to anyone from

19   federal law enforcement in particular about Local

20   150?

21     A     I respectfully refuse to testify based on

22   my privilege against self-incrimination under the

23   Fifth Amendment to the United States Constitution.

24     Q     Has anyone from law enforcement indicated

12

1  to you, implied to you, given you any hints about

2  whether or not you're the subject of any law

3  enforcement inquiry?

4      A    I respectfully refuse to testify based on

5  my privilege against self-incrimination under the

6  Fifth Amendment to the United States Constitution.

7      Q    Has anyone from law enforcement ever

8  threatened you in any way in the last two years?

9      A    I respectfully refuse to testify based on

10  my privilege against self-incrimination under the

11  Fifth Amendment to the United States Constitution.

12      Q    Has anyone associated with law enforcement

13  ever told you or given you an indication that you

14  would not be prosecuted in the last two years?

15      A    I respectfully refuse to testify based on

16  my privilege against self-incrimination under the

17  Fifth Amendment to the United States Constitution.

18      Q    Have you ever talked to anyone from the FBI

19  in the last two years?

20      A    I respectfully refuse to testify based on

21  my privilege against self-incrimination under the

22  Fifth Amendment to the United States Constitution.

23      Q    And if I asked you any other questions

24  about what, if any, contacts you've had with law

13

1   enforcement over the last two years, would your

2   answers be the same?

3       A    I respectfully refuse to testify based on

4   my privilege against self-incrimination under the

5   Fifth amendment to the United States --

6                   MR. MILLER:  Her answers would --

7                   THE WITNESS:  -- Constitution.

8                   MR. MILLER:  -- be the same.

9                   THE WITNESS:  Would be the same.

10                  MR. POLALES:  Okay.

11  BY MR. POLALES:

12      Q    So would you assert the same Fifth

13  Amendment privilege in answer to any other question I

14  could ask you about contacts with law enforcement of

15  any kind over the last two years?

16      A    Yes.

17      Q    Is that true?

18      A    True.

19      Q    Are you currently employed, ma'am?

20      A    No.

21      Q    What was your last employment?

22      A    I did clerical work for an attorney last

23  year.

24      Q    And the kind of clerical work that consists

14

1   of filing or typing or both?

2       A    Notaries, when they needed it, you know.

3       Q    Did you go to a place of work or work out

4   of your house?

5       A    I worked out of my home and sometimes at

6   their office.

7       Q    And who was that attorney?

8       A    Horwitz.

9       Q    And where does he live or work?

10      A    I was in the -- out of the Joliet office.

11      Q    So Mr. Horwitz has a practice in Joliet?

12      A    Yeah.

13      Q    Is it a private practice?  Does he work for

14  a company?

15      A    Yeah.

16      Q    How long did you work for him?

17      A    Just a few months after I retired, just to

18  help supplement my income for a while.

19      Q    Can you give me the time frame, from when

20  to when?

21      A    Gosh, I'm not sure exactly.  It might have

22  been from January 2007 to maybe August.

23      Q    Might it have been as early as October of

24  '06 through August of '07?

15

1    A    You know, it might have been, but I don't

2 remember exactly.

3    Q    Prior to working for that attorney, you say

4 you had retired?

5    A    Um-hmm.

6    Q    And where did you retire from?

7    A    Local 150.

8    Q    And what were your dates of employment by

9 Local 150?

10    A    May 3rd, 1993, to October, like

11 October 1st, 2006.

12    Q    Okay.  And during the period of time that

13 you worked at Local 150 -- when you say "Local 150,"

14 are you referring to Local 150 of the International

15 Union of Operating Engineers, the defendant in this

16 case?

17    A    Yes.

18    Q    And during that period of time, can you

19 tell me what job responsibilities or duties you had?

20    A    I respectfully refuse to testify based on

21 my privilege against self-incrimination under the

22 Fifth Amendment to the United States Constitution.

23    Q    How did you obtain your employment at Local

24 150?

1     A    I respectfully refuse to testify based on

2  my privilege against self-incrimination under the

3  Fifth Amendment to the United States Constitution.

4     Q    You came to leave your employment at Local

5  150 and retired with a pension effective October 1st,

6  2006; is that correct?

7     A    Yes.

8     Q    Can you tell me why you decided to leave

9  your employment and retire?

10     A    I respectfully refuse to testify based on

11  my privilege against self-incrimination under the

12  Fifth Amendment to the United States Constitution.

13     Q    Befire you retired, were you the executive

14  to a man named Joe Ward?

15     A    I respectfully refuse to testify based on

16  my privilege against self-incrimination under the

17  Fifth Amendment to the United States Constitution.

18     Q    Before you retired, did you hold a position

19  in the accounting department?

20     A    I respectfully refuse to testify based on

21  my privilege against self-incrimination under the

22  Fifth Amendment to the United States Constitution.

23     Q    Can you tell me what functions that you had

24  in the last two years before you retired from Local

17

1    150?

2        A    I respectfully refuse to testify based on

3    my privilege against self-incrimination under the

4    Fifth Amendment to the United States Constitution.

5        Q    In the last, let's say, five or six years,

6    let's say six years before you retired, did you do

7    secretarial work for Joe Ward?

8        A    I respectfully refuse to testify based on

9    my privilege against self-incrimination under the

10   Fifth Amendment to the United States Constitution.

11       Q    Did you make sure that leases were current?

12       A    I respectfully refuse to testify based on

13   my privilege against self-incrimination under the

14   Fifth Amendment to the United States Constitution.

15       Q    Did you deal with landlord-type problems?

16       A    I respectfully refuse to testify based on

17   my privilege against self-incrimination under the

18   Fifth Amendment to the United States Constitution.

19       Q    Did you have some duties with respect to

20   insurance?

21       A    I respectfully refuse to testify based on

22   my privilege against self-incrimination under the

23   Fifth Amendment to the United States Constitution.

24       Q    Ma'am, did you run plates, that is, motor

18

1    vehicle license plates, for the business agents of

2    Local 150?

3        A    I respectfully refuse to testify based on

4    my privilege against self-incrimination under the

5    Fifth Amendment to the United States Constitution.

6        Q    Ma'am, can you tell me if your retirement

7    was forced upon you in your view?

8        A    I respectfully refuse to testify based on

9    my privilege against self-incrimination under the

10   Fifth Amendment to the United States Constitution.

11       Q    Why did you decide to retire?  I may have

12   asked it.  I'm sorry if I did.

13       A    I respectfully refuse to testify based on

14   my privilege against self-incrimination under the

15   Fifth Amendment to the United States Constitution.

16       Q    Is it true that in 2006, Local 150 members,

17   including Mr. Ward and Jim Miller, used you as their

18   secretary?

19       A    I respectfully refuse to testify based on

20   my privilege against self-incrimination under the

21   Fifth Amendment to the U.S. Constitution.

22       Q    Is it true that Mr. Ward and Mr. Miller put

23   together a slate of candidates to run for office in

24   the Local 150 elections in about the spring of 2006?

19

1     A    I respectfully refuse to testify based on

2  my privilege against self-incrimination under the

3  Fifth Amendment to the U.S. Constitution.

4     Q    Is it true that after that occurred,

5  Mr. Dugan started firing staff at the Local,

6  including Mr. Miller and Mr. Allen?

7     A    I respectfully refuse to testify based on

8  my privilege against self-incrimination under the

9  Fifth Amendment to the U.S. Constitution.

10     Q    And is it true that a number of BAs were

11  fired as well in about July of 2007?

12     A    I respectfully refuse to testify based on

13  my privilege against self-incrimination under the

14  Fifth Amendment to the U.S. Constitution.

15     Q    In or about September of 2006, did

16  Mr. Dugan call you to your office and tell you that

17  Mr. Ward wouldn't be needing a secretary anymore and

18  he was going to find a different position for you?

19     A    Yeah, I respectfully refuse to testify

20  based on my privilege against self-incrimination

21  under the Fifth Amendment to the U.S. Constitution.

22     Q    Did Mr. Dugan then call Mr. Garza

23  (phonetic) in and ask him to find a spot for you?

24     A    I respectfully refuse to testify based on

1  my privilege against self-incrimination under the

2  Fifth Amendment to the U.S. Constitution.

3      Q    Did Mr. Dugan then assign you to an

4  accounting position?

5      A    I respectfully refuse to testify based on

6  my privilege against self-incrimination under the

7  Fifth Amendment to the U.S. Constitution.

8      Q    And after that, did you find that you were

9  locked out of your computer?

10     A    I respectfully refuse to testify based on

11 my privilege against self-incrimination under the

12 Fifth Amendment to the U.S. Constitution.

13     Q    The following day, were you given a desk

14 and a computer in the accounting area on the first

15 floor?

16     A    Yeah, I respectfully refuse to testify

17 based on my privilege against self-incrimination

18 under the Fifth Amendment to the U.S. Constitution.

19     Q    And were you not provided with a computer

20 access password so that you basically couldn't do

21 anything?

22     A    I respectfully refuse to testify based on

23 my privilege against self-incrimination under the

24 Fifth Amendment to the U.S. Constitution.

21

1           MR. POLALES:  Let me just have a

2   moment.

3                (Brief pause.)

4   BY MR. POLALES:

5       Q    Were you instructed to write down your job

6   description?

7       A    I respectfully refuse to testify based on

8   my privilege against self-incrimination --

9       Q    Did you write down some of your job

10  description?

11      A    -- under the Fifth Amendment to the U.S.

12  Constitution.

13      Q    And did you work a lot of overtime?

14      A    I respectfully refuse to testify based on

15  my privilege against self-incrimination under the

16  Fifth Amendment to the U.S. Constitution.

17      Q    After you were assigned to accounting, were

18  you told that you would not get any overtime?

19      A    I respectfully refuse to testify based on

20  my privilege against self-incrimination under the

21  Fifth Amendment to the U.S. Constitution.

22      Q    While you were employed by Local 150, did

23  you ever gain knowledge or information that Local 150

24  had obtained motor vehicle records containing

22

1  personal information from the Secretary of State of

2  Illinois?

3      A    I respectfully refuse to testify based on

4  my privilege against self-incrimination under the

5  Fifth Amendment to the U.S. Constitution.

6      Q    While you were employed at Local 150, did

7  you ever gain or obtain any information that Local

8  150 obtained personal information contained in motor

9  vehicle records of the State of Illinois?

10     A    I respectfully refuse to testify based on

11 my privilege against self-incrimination under the

12 Fifth Amendment to the U.S. Constitution.

13     Q    Ms. Soria, did you -- I'm sorry.  I didn't

14 mean to cut off your answer.

15              MR. POLALES:  You got it, right?

16              THE COURT REPORTER:  Um-hmm.

17              MR. POLALES:  Okay.  They're all the

18 same.

19              MR. DIEMER:  He's quick.

20 BY MR. POLALES:

21     Q    Ms. Soria, did you happen to obtain

22 information while you were employed at Local 150 that

23 Local 150 had obtained computer disks from the State

24 of Illinois?

23

1    A    I respectfully refuse to testify based on

2  my privilege against self-incrimination under the

3  Fifth Amendment to the U.S. Constitution.

4    Q    And what about information that you

5  obtained while you were working at Local 150 that

6  Local 150 had obtained other forms of media

7  containing motor vehicle records of individuals and

8  businesses in the State of Illinois?

9    A    I respectfully refuse to testify based on

10  my privilege against self-incrimination under the

11  Fifth Amendment to the U.S. Constitution.

12    Q    Can you tell me in what form you saw, if

13  you did, the Illinois Secretary of State deliver

14  motor vehicle records to Local 150?

15    A    I respectfully refuse to testify based on

16  my privilege against self-incrimination under the

17  Fifth Amendment to the U.S. Constitution.

18    Q    Can you tell me how many times Local 150

19  obtained motor vehicle records from the Illinois

20  Secretary of State?

21    A    I respectfully refuse to testify based on

22  my privilege against self-incrimination under the

23  Fifth Amendment to the U.S. Constitution.

24    Q    Did you ever see the contents of the disks

24

1    Local 150 obtained which contained personal

2    information such as a driver's license number or home

3    address?

4        A    I respectfully refuse to testify based on

5    my privilege against self-incrimination under the

6    Fifth Amendment to the U.S. Constitution.

7        Q    Did Local 150, to your knowledge, ever

8    obtain microfiche from the Illinois Secretary of

9    State containing personal information from motor

10   vehicle records?

11       A    I respectfully refuse to testify based on

12   my privilege against self-incrimination under the

13   Fifth Amendment to the U.S. Constitution.

14                  MR. POLALES:  Okay.  We'll take a

15   short break, 30 seconds.  Is that going to be enough?

16                  (Brief recess.)

17   BY MR. POLALES:

18       Q    So, Ms. Soria, did you ever obtain, during

19   of course of your employment at Local 150, access to

20   Illinois Secretary of State motor vehicle records?

21       A    I respectfully refuse to testify based on

22   my privilege against self-incrimination under the

23   Fifth Amendment to the U.S. Constitution.

24       Q    During your employment at Local 150, did

1  you obtain possession of computer disks from the

2  Illinois Secretary of State containing personal

3  information from motor vehicle records?

4      A    I respectfully refuse to testify based on

5  my privilege against self-incrimination under the

6  Fifth Amendment to the U.S. Constitution.

7      Q    And, ma'am, did you also obtain possession,

8  during your employment at Local 150, of microfiche

9  containing personal information from motor vehicle

10  records from the State of Illinois?

11      A    I respectfully refuse to testify based on

12  my privilege against self-incrimination under the

13  Fifth Amendment to the United States Constitution.

14      Q    Ma'am, did you become aware that Local 150

15  paid for motor vehicle records from the Illinois

16  Secretary of State?

17      A    I respectfully refuse to testify based on

18  my privilege against self-incrimination under the

19  Fifth Amendment to the United States Constitution.

20      Q    In fact, ma'am, isn't it true that part of

21  your job at Local 150 was handling of and causing

22  checks to be signed by Mr. Dugan; isn't that true?

23      A    I respectfully refuse to testify based on

24  my privilege against self-incrimination under the

26

1 | Fifth Amendment to the United States Constitution.

2 |     Q    And didn't you cause checks to be made out

3 | and signed by an officer of the Local in order to pay

4 | for motor vehicle records from the Illinois Secretary

5 | of State?

6 |     A    I respectfully refuse to testify based on

7 | my privilege against self-incrimination under the

8 | Fifth Amendment to the U.S. Constitution.

9 |     Q    And didn't you do that within the last four

10 | years of your employment?

11 |     A    I respectfully refuse to testify based on

12 | my privilege against self-incrimination under the

13 | Fifth Amendment to the U.S. Constitution.

14 |     Q    And, ma'am, can you tell me when Local 150

15 | obtained motor vehicle records containing personal

16 | information from the State of Illinois?

17 |     A    I respectfully refuse to testify based on

18 | my privilege against self-incrimination under the

19 | Fifth Amendment to the United States Constitution.

20 |     Q    I already asked you, ma'am, did business

21 | agents call you to ask you to check on motor vehicle

22 | record information.  But let me ask you in that

23 | context, did you write down license plates that you

24 | checked against motor vehicle data provided to Local

27

1   150 by the Illinois Secretary of State?

2       A    I respectfully refuse to testify based on

3   my privilege against self-incrimination under the

4   Fifth Amendment to the U.S. Constitution.

5       Q    After you were assigned to accounting in

6   your employment at Local 150, did you have any

7   discussion with Mr. Dugan again after that?

8       A    I respectfully refuse to testify based on

9   my privilege against self-incrimination under the

10  Fifth Amendment to the United States Constitution.

11      Q    Do you know Bill Dugan?

12      A    Yes.

13      Q    Okay.  During the course of your

14  employment, you had occasion to deal with him?

15      A    I respectfully refuse to testify based on

16  my privilege against self-incrimination under the

17  Fifth Amendment to the U.S. Constitution.

18      Q    Ma'am, can you tell me whether you worked

19  with a lady named Peggy in accounting?

20      A    I respectfully refuse to testify based on

21  my privilege against self-incrimination under the

22  Fifth Amendment to the U.S. Constitution.

23      Q    At Local 150, did you work with Judy in

24  accounting?

28

```
 1        A     I respectfully refuse to testify based on
 2   my privilege against self-incrimination under the
 3   Fifth Amendment to the United States Constitution.
 4        Q     Did you work with Sandy in accounting?
 5        A     I respectfully refuse to testify based on
 6   my privilege against self-incrimination under the
 7   Fifth Amendment to the U.S. Constitution.
 8        Q     Did you work with John in accounting?
 9        A     I respectfully refuse to testify based on
10   my privilege against self-incrimination under the
11   Fifth Amendment to the U.S. Constitution.
12        Q     Ma'am, did you have -- after you left your
13   employment at Local 150, after you left your
14   employment at Local 150, did you work pretty much
15   full time on the campaign of Mr. Ward and Mr. Miller,
16   slate candidates, the period after you were
17   employed -- you retired, after you retired?
18        A     I volunteered.
19        Q     Okay.  So you worked hard on that?
20        A     Yes.
21        Q     Okay.  And about how long did that take?
22   How many months?
23        A     I don't understand.
24        Q     Well, as I understand it, you retired on
```

1   about October 1st, effective October 1st of 2006.

2   You worked on -- I don't know the time line in my

3   head, so I'm asking you to give me the time line of

4   what the election -- kind of campaign from that time

5   to the time of the election.

6       A    The election was over August 25th or 6th or

7   something.

8       Q    Of 2007?

9       A    Um-hmm.

10      Q    Okay.  So over the course of the next,

11  let's say, October of '06 to August of '07, did you

12  put time in working on the campaign?

13      A    Yes.

14      Q    Okay.  And you would say you worked hard on

15  that?

16      A    That's true.

17      Q    Okay.  You say it is true in your

18  estimation --

19      A    Um-hmm.

20      Q    -- right?

21           Did anyone ever accuse you of

22  misconduct while you were working at Local 150 for

23  doing campaign work on union time?

24      A    I respectfully refuse to testify based on

1    my privilege against self-incrimination under the

2    Fifth Amendment to the United States Constitution.

3        Q    Okay.  Have you discussed -- aside from

4    discussions that you had with Mr. Miller after you

5    retained him as your lawyer -- by the way, I didn't

6    ask you that, but you have retained Mr. Miller as

7    your lawyer --

8        A    Yes.

9        Q    -- in connection with your appearance here

10   today?

11       A    Yes.

12       Q    And aside from discussions you had with

13   Mr. Miller after you retained him as your lawyer,

14   have you discussed this lawsuit with any other

15   lawyers?

16              MR. MILLER:  Time frame.  Ever?

17              MR. POLALES:  Yeah.  This lawsuit.

18              MR. MILLER:  And I assume --

19              MR. POLALES:  Limited to this lawsuit.

20              MR. MILLER:  I assume you're excluding

21   Hanlon and yourself?

22              MR. POLALES:  No, I'm not.

23              MR. MILLER:  Okay.

24              MR. POLALES:  Any other lawyers.  Then

1  we'll go one at a time, if she's willing to tell me

2  who she discussed it with.

3              THE WITNESS:  I respectfully refuse to

4  testify based on my privilege against

5  self-incrimination under the Fifth Amendment to the

6  U.S. Constitution.

7              MR. POLALES:  Okay.

8  BY MR. POLALES:

9      Q    More specifically, did you discuss this

10 lawsuit, the subject matter of this lawsuit, with

11 anyone from Local 150?

12     A    I respectfully refuse to testify based on

13 my privilege against self-incrimination under the

14 Fifth Amendment to the U.S. Constitution.

15     Q    Okay.  Have you had occasion to meet

16 Mr. Diemer before, before today?

17             MR. MILLER:  One moment.

18             THE WITNESS:  Yes.

19 BY MR. POLALES:

20     Q    And did you meet him before today in person

21 or over the telephone?

22     A    In person.

23     Q    Okay.  And when was that?

24     A    When I worked at the Local.

32

1    Q    Okay.  So your employment overlapped with

2  Mr. Diemer's?

3    A    Um-hmm, yes.

4    Q    But since you left the Local, have you met

5  with him in person to discuss matters relating to

6  this lawsuit in person?

7    A    I respectfully refuse to testify based on

8  my privilege against self-incrimination under the

9  Fifth Amendment to the U.S. Constitution.

10   Q    Have you talked to Ms. Shapiro since the

11  lawsuit was filed about this lawsuit?

12   A    No.

13   Q    Have you talked to Mr. Pearson about the

14  lawsuit --

15   A    No.

16   Q    -- since the lawsuit was filed?

17        Did you receive a letter from

18  Mr. Pearson advising you or telling you in one way or

19  the other to get a lawyer?

20   A    Yes.

21   Q    You didn't bring it with you?

22        MR. POLALES:  Do we have a copy of it?

23        MR. HANLON:  I can get a copy.  Do you

24  mind if I step out?

1          MR. POLALES:  Is it in your briefcase?

2          MR. HANLON:  It may be.

3          MR. POLALES:  Okay.  We'll come back

4    to it.  Remind me.  But you can go and get it.

5          MR. HANLON:  All right.

6          MR. POLALES:  Okay.

7    BY MR. POLALES:

8       Q    And that would have been within the last

9    couple of weeks?

10         MR. MILLER:  If you recall.

11         THE WITNESS:  It seems like it, yeah.

12         MR. POLALES:  Okay.

13   BY MR. POLALES:

14      Q    Relatively recently?

15      A    Recent, we have.

16      Q    But you did not talk to Mr. Pearson about

17   the lawsuit?

18      A    No.

19      Q    Okay.  After you got the letter from

20   Mr. Pearson, then you retained Mr. Miller?

21      A    Yes.

22      Q    Okay.  Did Mr. Diemer call you on the

23   telephone and talk to you about your having signed an

24   affidavit, whether you had signed an affidavit in

34

1  connection with this lawsuit?

2      A     I respectfully refuse to testify based on

3  my privilege against self-incrimination under the

4  Fifth Amendment to the U.S. Constitution.

5      Q     Did Mr. Diemer ask you about the contents

6  of an affidavit and whether you signed one?

7      A     I respectfully refuse to testify based on

8  my privilege against self-incrimination under the

9  Fifth Amendment to the U.S. Constitution.

10     Q     Did you tell Mr. Diemer that it was part of

11 your job to deal with the database from the secretary

12 of state containing motor vehicle record information?

13     A     I respectfully refuse to testify based on

14 my privilege against self-incrimination under the

15 Fifth Amendment to the U.S. Constitution.

16     Q     Did you tell Mr. Diemer, in substance, that

17 when you didn't have the database, you'd call a guy

18 named Mr. Lombardo, and he would get the information

19 you needed over the phone from motor vehicle records?

20     A     I respectfully refuse to testify based on

21 my privilege against self-incrimination under the

22 Fifth Amendment to the U.S. Constitution.

23     Q     And did you tell Mr. Diemer, in substance,

24 that when Mr. Lombardo got sick, he was the fellow

35

1  that told you to contact the secretary of state and

2  that they could help you?

3       A    I respectfully refuse to testify based on

4  my privilege against self-incrimination under the

5  Fifth Amendment to the U.S. Constitution.

6       Q    Do you know a Mr. Lombardo?

7       A    I respectfully refuse to testify based on

8  my privilege against self-incrimination under the

9  Fifth Amendment to the U.S. Constitution.

10      Q    In a different way, I presume the same

11 answer, who is Mr. Lombardo?

12      A    I respectfully refuse to testify based on

13 my privilege against self-incrimination under the

14 Fifth Amendment to the U.S. Constitution.

15      Q    Did you ever check license plate

16 information for Local 150?

17      A    I respectfully refuse to testify based on

18 my privilege against self-incrimination under the

19 Fifth Amendment to the U.S. Constitution.

20      Q    When did you first start checking license

21 plate information for Local 150?

22      A    I respectfully refuse to testify based on

23 my privilege against self-incrimination under the

24 Fifth Amendment to the U.S. Constitution.

36

1     Q    Do you know a man named Jim Sweeney?

2     A    Yes.

3     Q    Was he an assistant to the president of

4 Local 150?

5     A    Yes.

6     Q    And do you know a man named Jim Ness?

7     A    Yes.

8     Q    When Mr. Ness retired from Local 150, was

9 Mr. Sweeney appointed vice president to fill

10 Mr. Ness' spot?

11    A    I respectfully refuse to testify based on

12 my privilege against self-incrimination under the

13 Fifth Amendment to the U.S. Constitution.

14    Q    Do you know a man named Steve Sisco

15 (phonetic)?

16    A    Yes.

17    Q    Can you tell me what his job was at Local

18 150 while you were employed there?

19    A    I respectfully refuse to testify based on

20 my privilege against self-incrimination under the

21 Fifth Amendment to the U.S. Constitution.

22    Q    Did he do recording secretary or

23 corresponding secretary work?

24    A    I respectfully refuse to testify based on

37

1    my privilege against self-incrimination under the

2    Fifth Amendment to the U.S. Constitution.

3        Q    At Local 150, is there something called a

4    Municipality Department consisting of staff attorneys

5    and BAs when you were employed there?

6        A    I respectfully refuse to testify based on

7    my privilege against self-incrimination under the

8    Fifth Amendment to the U.S. Constitution.

9        Q    If I asked you any more questions about a

10   task force at Local 150 of any kind, would you answer

11   them the same way with respect to asserting --

12       A    Taking the Fifth.

13       Q    -- your Fifth Amendment right?

14       A    I would.

15       Q    Okay.  Did Jim Sweeney have a secretary at

16   Local 150 when you were employed there?

17       A    Yes.

18       Q    Do you know who it was?

19       A    During what time frame?

20       Q    Well, let's say the last -- you left in

21   October of '06.  How about '02 to '06?

22       A    I think he had a couple.

23       Q    Do you remember their names?

24       A    Amy, Tammy.

38

1     Q    Only first names?

2     A    Amy, I can't remember her last name.

3     Q    Tammy?  Do you remember her last name?

4     A    No.

5     Q    Do you remember anybody else that may have

6 acted as secretary from '02 to '06 for Mr. Sweeney?

7     A    To '06?

8     Q    Um-hmm.  Until you retired.

9     A    Maybe Carol.

10    Q    Do you remember her last name?

11    A    Tiscarino (phonetic).

12    Q    Tiscarino.

13         What about Steve Sisco?  Did he have a

14 secretary assigned to him?

15    A    Yes.

16    Q    And do you remember her name, '02 to '06,

17 or his name?

18    A    Lucille Mathis.

19    Q    And was she with Mr. Sisco for that

20 four-year period until you retired?

21    A    Yes.

22    Q    What about Mr. Dugan?  Did he have a

23 secretary?

24    A    Yes.

39

1     Q    Did he have the same secretary from '02 to

2  '06?

3     A    Yes.

4     Q    And what was her name or his name?

5     A    Dorine Barah (phonetic).

6     Q    And what about Jim Miller?  Did he have a

7  secretary?

8     A    Yes.

9     Q    And from '02 to '06, who was assigned to

10  Jim Miller?

11     A    I was.

12     Q    And Mr. Ward, I think we already covered

13  that, you were Mr. Ward's secretary from '02 to '06?

14     A    Um-hmm.

15     Q    That was one of those "um-hmm"?

16     A    Yes.  I'm sorry.

17     Q    Okay.  All right.  Thank you.

18            Do you know a lady named Camile that

19  worked for Local 150?

20     A    Yes.

21     Q    Do you know her last name?

22     A    Makevis (phonetic).

23     Q    What was her position?  Who did she work

24  for, if you can focus in on from '02 to when you

40

1   retired in '06?

2       A    All right.  I respectfully refuse to

3   testify based on my privilege against

4   self-incrimination under the Fifth Amendment to the

5   U.S. Constitution.

6       Q    Maybe I can get you to answer it a

7   different way, maybe not, but I'll try.

8                What is the Municipality Department at

9   Local 150?

10      A    I respectfully refuse to testify based on

11  my privilege against self-incrimination under the

12  Fifth Amendment to the U.S. Constitution.

13      Q    You weren't in it, right?  You weren't in

14  the Municipality Department?

15      A    Right.

16      Q    The other people that I've asked you about

17  and that you've answered questions about, they

18  weren't in the Municipality Department?

19      A    I respectfully refuse to testify based on

20  my privilege against self-incrimination under the

21  Fifth Amendment to the U.S. Constitution.

22      Q    Do you know Jim McNally?

23      A    Yes.

24      Q    Was he inside or outside the Municipality

41

1    Department from '02 to '06?

2        A    I respectfully refuse to testify based on

3    my privilege against self-incrimination under the

4    Fifth Amendment to the U.S. Constitution.

5        Q    Did he have a secretary?

6        A    What time frame?

7        Q    '02 to '06?

8        A    I don't think so.

9        Q    Okay.

10       A    I'm not sure.

11       Q    Not sure?

12       A    Not sure.

13       Q    Did Mr. Dugan ever assign you to work for

14   anybody other than Mr. Ward and Mr. Miller from

15   '02 to '06, leaving aside accounting?

16       A    I respectfully refuse to testify based on

17   my privilege against self-incrimination under the

18   Fifth Amendment to the U.S. Constitution.

19       Q    Did you do work for nonlawyer business

20   agents during the period of time that you were

21   employed at Local 150?

22       A    I respectfully refuse to testify based on

23   my privilege against self-incrimination under the

24   Fifth Amendment to the U.S. Constitution.

42

1    Q    Before the year 2001, was there a time when

2  the location that you worked at was just one floor?

3    A    Yes.

4    Q    What was the address of the place that you

5  actually went to work every day at Local 150?

6    A    6200 Joliet Road.

7    Q    And at some point in 2000, was there

8  remodeling adding a second floor to the building?

9    A    I believe at that time, yes.

10    Q    And before that, were you and the other

11  employees that worked for Local 150 all located on

12  the first floor?

13    A    Yes.

14    Q    And after there was a second floor added,

15  did you move your office?

16    A    Yes.

17    Q    And did you move to the second floor or

18  stay on the first floor?

19    A    Second.

20    Q    And did Mr. Dugan and Mr. Ward and

21  Mr. Miller get offices on the second floor at the

22  same time?

23    A    Yes.

24              MR. POLALES:  You didn't find the

43

1   letter?

2                  MR. HANLON:  No, I did not.  It's not

3   in my bag.  It's got to be in your file.

4                  MR. POLALES:  Yes, probably.

5   BY MR. POLALES:

6      Q     Did you fill out a form for Mr. Miller to

7   order motor vehicle records from the Illinois

8   Secretary of State?

9      A     I respectfully refuse to testify based on

10  my privilege against self-incrimination under the

11  Fifth Amendment to the U.S. Constitution.

12     Q     Is it true that every check that was

13  written by Local 150 in your experience had to be

14  okayed by Mr. Dugan?

15     A     Yes.

16                 MR. HANLON:  I didn't hear that.

17                 THE WITNESS:  Yes.

18  BY MR. POLALES:

19     Q     If I showed you Mr. Miller's autograph,

20  would you recognize his handwriting?

21                 MR. DIEMER:  Before we go any further,

22  and Mr. Hanlon can confirm this, I've got the

23  deposition transcript, it's Magistrate Mahoney's

24  standing order that documents may not be introduced

44

1    at a deposition if they haven't been disclosed to all

2    of the parties 24 hours in advance.

3                    MR. POLALES:  Is it?  That's too bad.

4                    MR. HANLON:  Are you looking for an

5    answer to me as to what Judge Mahoney says?

6                    MR. POLALES:  Yeah.  Did we produce

7    any of these things?

8                    MR. HANLON:  We did not produce this,

9    no.

10                   MR. POLALES:  Okay.

11                   MR. HANLON:  But we did disclose it.

12                   MR. POLALES:  Oh, we did disclose it?

13                   MR. HANLON:  Yes.  It was disclosed in

14   the 26(a) disclosure.

15                   MR. POLALES:  Did we give them copies?

16                   MR. HANLON:  We did not give them

17   copies.

18                   MR. POLALES:  Oh.  They didn't ask for

19   copies, eh?

20                   MR. HANLON:  No.

21                   MR. POLALES:  Okay.

22   BY MR. POLALES:

23       Q    Would you recognize Jim Miller's signature

24   if I showed it to you?

45

1     A    I respectfully refuse to testify based on

2  my privilege against self-incrimination under the

3  Fifth Amendment to the U.S. Constitution.

4     Q    Would you recognize computer disks of the

5  type that Local 150 used to check motor vehicle

6  records while you were employed there if I showed

7  them to you?

8     A    I respectfully refuse to testify based on

9  my privilege against self-incrimination under the

10  Fifth to the U.S. Constitution.

11     Q    Would you identify an affidavit that you

12  signed if I showed it to you?

13     A    I respectfully refuse to testify based on

14  my privilege against self-incrimination under the

15  Fifth Amendment to the U.S. Constitution.

16     Q    I'll ask it slightly different.  With

17  respect to the disks and the documents, the disk, the

18  documents, and your affidavit, the document including

19  Mr. Miller's signature, if I showed them to you and

20  asked you to identify them, would you do so if you

21  could, or would you assert your Fifth Amendment right

22  to remain silent?

23     A    I would assert my Fifth Amendment right.

24     Q    If I showed you a printout of the contents

46

1   of the computer disk containing motor vehicle

2   records, would you identify it for me if you were

3   capable of doing so, or would you assert your Fifth

4   Amendment right?

5       A    I would assert my Fifth Amendment right.

6       Q    If I asked you any other question about

7   motor vehicle records, would you give me the same

8   answer?  That is, would you answer it, or would you

9   assert your Fifth Amendment right?

10      A    I would assert my Fifth Amendment rights.

11      Q    When you were at Local 150, were you under

12   instruction that nobody got their hands on the motor

13   vehicle records?

14      A    I respectfully refuse to testify based on

15   my privilege against self-incrimination under the

16   Fifth Amendment to the U.S. Constitution.

17      Q    Were you told that you had to maintain

18   those records and that it was part of your job to

19   satisfy requests for information from those motor

20   vehicle records made to you by BAs and other union

21   officials and employees?

22      A    I respectfully refuse to testify based on

23   my privilege against self-incrimination under the

24   Fifth Amendment to the U.S. Constitution.

47

1    Q    Do you know if the CDs containing motor

2 vehicles records from the Illinois Secretary of State

3 were ever copied?

4    A    I respectfully refuse to testify based on

5 my privilege against self-incrimination under the

6 Fifth Amendment to the U.S. Constitution.

7    Q    Do you know whether there were any limits

8 put on the use of the motor vehicle record

9 information contained in the records obtained by

10 Local 150 from the Illinois Secretary of State?

11    A    I respectfully refuse to testify based on

12 my privilege against self-incrimination under the

13 Fifth Amendment to the U.S. Constitution.

14    Q    Are the attorneys that are employed by

15 Local 150 in the place where you worked, are they

16 business agents of Local 150?

17                    MR. MILLER:   Time frame.

18                    MR. POLALES:   '02 to '06, when you

19 retired.

20                    MR. MILLER:   If you know.

21                    THE WITNESS:   I don't know.

22 BY MR. POLALES:

23    Q    You don't know?

24    A    I don't know --

48

1    Q    Okay.

2    A    -- what they're considered.  I don't know.

3    Q    Is there a Christmas fund at Local 150 from

4 '02 to '06?

5    A    I respectfully refuse to testify based on

6 my privilege against self-incrimination under the

7 Fifth Amendment to the U.S. Constitution.

8    Q    Is there an assistance fund from '02 to

9 '06?

10    A    Pardon?  The what?

11    Q    An assistance fund maintained at Local 150

12 from '02 to '06 while you were employed there.

13    A    I respectfully refuse to testify based on

14 my privilege against self-incrimination under the

15 Fifth Amendment to the U.S. Constitution.

16    Q    Do you know if assistance fund moneys were

17 used to pay for the purchase of the motor vehicle

18 records from the State of Illinois?

19    A    I respectfully refuse to testify based on

20 my privilege against self-incrimination under the

21 Fifth Amendment to the U.S. Constitution.

22    Q    Did Mr. Sisco ever ask you to use the motor

23 vehicle records information from the State of

24 Illinois to run plates for him?

49

1     A     I respectfully refuse to testify based on

2 my privilege against self-incrimination under the

3 Fifth Amendment to the U.S. Constitution.

4     Q     Did Mr. Sweeney ever ask you to do that?

5     A     I respectfully refuse to testify based on

6 my privilege against self-incrimination under the

7 Fifth Amendment to the U.S. Constitution.

8     Q     Did anyone else ever ask you to do that?

9     A     Excuse me?  What was that?

10     Q     Did anyone ever else ask you to run license

11 plates?

12     A     I respectfully refuse to testify based on

13 my privilege against self-incrimination under the

14 Fifth Amendment to the U.S. Constitution.

15     Q     Did Mr. Bill Dugan ever ask you to do that?

16     A     I respectfully refuse to testify based on

17 my privilege against self-incrimination under the

18 Fifth Amendment to the U.S. Constitution.

19     Q     Is there a task force at Local 150?

20     A     I respectfully refuse to testify based on

21 my privilege against self-incrimination under the

22 Fifth Amendment to the United States Constitution.

23     Q     What is it?  What is the task force?  Same

24 answer?

50

1     A    I respectfully refuse to testify based on

2  my privilege against self-incrimination under the

3  Fifth Amendment to the United States Constitution.

4     Q    Do you know whether checks cut at Local 150

5  are -- do you know how they are printed and signed?

6     A    I respectfully refuse to testify based on

7  my privilege against self-incrimination under the

8  Fifth Amendment to the U.S. Constitution.

9     Q    Did you ever have communications with an

10  entity called IIIFFC?

11     A    I respectfully refuse to testify based on

12  my privilege against self-incrimination under the

13  Fifth Amendment to the U.S. States Constitution.

14     Q    Can you tell me what the initials stand

15  for?

16     A    I respectfully refuse to testify based on

17  my privilege against self-incrimination under the

18  Fifth Amendment to the U.S. Constitution.

19     Q    Do you know what the RFC office is?

20     A    The what?

21     Q    RFC.

22     A    RFC?

23     Q    Yeah.

24     A    I don't know what that is.

51

1     Q    Okay.  Did you use e-mail in your

2  employment at Local 150?

3     A    I respectfully refuse to testify based on

4  my privilege against self-incrimination under the

5  Fifth Amendment to the U.S. Constitution.

6     Q    Did you use computers at Local 150 from

7  2002 to 2006?

8     A    I respectfully refuse to testify based on

9  my privilege against self-incrimination under the

10  Fifth Amendment to the United States Constitution.

11     Q    Is your husband a member of Local 150?

12     A    Yes.

13     Q    Are you a member of Local 150?

14     A    No.

15     Q    Your husband is retired and he is enjoying

16  a pension now?

17     A    Yes.

18     Q    And is he working part time?

19     A    No.

20     Q    Is he working full time?

21     A    At home.

22     Q    For you?

23     A    I wish.

24     Q    While you were employed at Local 150 in the

1  time frame 2002 to 2006, did you have business agents

2  contact you for license plate information?

3      A    I respectfully refuse to testify based on

4  my privilege against self-incrimination under the

5  Fifth Amendment to the U.S. Constitution.

6              MR. POLALES:  I don't think I have

7  anything else, but let me confer with my co-counsel

8  and see whether or not...

9              MR. HANLON:  Do you want to step

10  outside?

11             MR. POLALES:  Okay.

12             (Brief recess.)

13  BY MR. POLALES:

14     Q    Ms. Soria, did you ever disclose

15  information contained in motor vehicle records to

16  anyone else?

17     A    I respectfully refuse to testify based on

18  my privilege against self-incrimination under the

19  Fifth Amendment to the U.S. Constitution.

20     Q    Do you have information as to whether Local

21  150 obtained -- disclosed motor vehicle information

22  to anyone else?

23     A    I respectfully refuse to testify based on

24  my privilege against self-incrimination under the

53

1    Fifth Amendment to the U.S. Constitution.

2         Q    Okay.  Would you identify these disks if

3    I -- I'm showing Vehicle Services, Secretary of

4    State, issued October '04, two CDs.  Would you

5    identify them?

6         A    No.

7         Q    Okay.  And that's because you would --

8         A    Invoke the fifth.

9         Q    -- refuse to identify them because of your

10   Fifth Amendment privilege?

11        A    Right.

12        Q    If I asked you any other question relating

13   to the disclosure of motor vehicle information, motor

14   vehicle records, and personal information obtained by

15   Local 150 from the Illinois Secretary of State, would

16   you refuse to answer on the grounds that you have a

17   Fifth Amendment right to refuse?

18        A    I would take my Fifth Amendment right to

19   refuse.

20             MR. POLALES:  Okay.  Then I don't

21   think I have anything else.

22             Mr. Diemer?

23             (No response.)

24             MR. POLALES:  Okay.

54

1           Mr. Miller?

2           MR. MILLER:  I have nothing.

3           MR. POLALES:  Thank you very much, Ms.

4  Soria, for coming down and answering all of those

5  questions as best you could and as best you were

6  willing to.  Thank you.

7           (Further deponent saith not.)

55

REPORTER'S CERTIFICATE

The foregoing deposition of Linda Soria, was taken before GARY SCHNEIDER, CSR, RPR, at 3500 Three First National Plaza, 70 West Madison, Chicago, IL 60602 , in the City of Chicago, Cook County, Illinois, commencing at 1:00 p.m., on May 28, 2008.

Said witness was first duly sworn by me and then examined upon oral interrogatories. The questions and answers were taken via machine shorthand by the undersigned and reduced to computerized transcription. The foregoing is an accurate and complete record of said deposition.

**The certificate annexed hereto applies only to the original transcript or copies signed and certified by me. I assume no responsibility for copies reproduced beyond my direction or control.**

The signature of the witness was reserved, and the transcript was submitted to the deponent as per copy of the attached letter.

Pursuant to Rule 30(e) of the Rules of Civil Procedure for the United States District Courts, if the Witness does not read and sign the

56

1    transcript within 30 days, or make other arrangements

2    for reading and signing, the transcript may be used

3    as fully as though signed; and this certificate will

4    then evidence such failure to appear as the reason

5    for signature being waived.

6              The undersigned is not interested in

7    the case, nor is of kin or counsel to any of the

8    parties herein.

9              IN WITNESS WHEREOF, I hereunto affix

10   my hand as Certified Shorthand Reporter in and for

11   the State of Illinois, on June 4, 2008.

12

13   Gary Schneider, CSR, RPR

14   CSR No. 084-004029

15

16

17

18

19

20

21

22

23

24